Allen M. Stewart (SBN 262594)
astewart@allenstewart.com
Stephanie Brooks Sherman (Pro Hac Vice)
ssherman@allenstewart.com
ALLEN STEWART, P.C.
325 N. St. Paul Street, Suite 4000
Dallas, Texas  75201
Telephone: (214) 965-8700
Facsimile: (214)965-8701

Michael McShane (SBN 127944)
mmcshane@audetlaw.com
Jonas P. Mann (SBN 263314)
jmann@audetlaw.com
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

Gary K. Shipman (Pro Hac Vice)
gshipman@shipmanlaw.com
William G. Wright (Pro Hac Vice)
wwright@shipmanlaw.com
Angelique Adams (Pro Hac Vice)
aadams@shipmanlaw.com
SHIPMAN & WRIGHT, LLP
575 Military Cutoff Rd., Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752

John Simon (Pro Hac Vice)
jsimon@simonlawpc.com
Anthony Simon
asimon@simonlawpc.com
SIMON LAW FIRM, P.C.
800 Market Street
St. Louis, MO 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029

***Attorney for Alvin Todd and Melody Todd, et al., and the Proposed Class***
(Additional Plaintiffs Set Forth Below on Signature Page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **ALVIN TODD** and **MELODY TODD,** *et al.,* individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>**TEMPUR SEALY INTERNATIONAL, INC.,** formerly known as **TEMPUR-PEDIC INTERNATIONAL, INC.** and **TEMPUR-PEDIC NORTH AMERICA, LLC**<br><br>Defendants. | Case No. 3:13-cv-04984-JST<br><br>**THIRD AMENDED COMPLAINT CLASS ACTION:**<br><br>**(1) Violation of Business & Professions Code § 17200 et seq (UCL);**<br>**(2) Violation of Business & Professions Code § 17500 et seq (FAL);**<br>**(3) Violations of California Civil Code § 1750 et seq (CLRA); and**<br>**(4) Violations of Various Other State Consumer Protection Laws and Common Law Unjust Enrichment Claims**<br><br>**DEMAND FOR JURY TRIAL** |

    **NOW COME**, the Plaintiffs Alvin and Melody Todd ("The Todds"), Robbie Simmons ("Ms. Simmons"), Tina White ("Ms. White"), Keith Hawkins ("Mr. Hawkins"), Thomas Comiskey ("Mr. Comiskey"), Alan and Patricia Kaufman ("The Kaufmans"), Johnny Martinez ("Mr. Martinez"), Julie Davidoff ("Ms. Davidoff"), Tracey Palmer ("Ms. Palmer"), Toni Kibbee ("Ms. Kibbee"), Brian and Sara Stone ("The Stones"), Kurt and Ericka Andersen ("The Andersens"), and Jerry and Diane Kucharski ("The Kucharskis") (jointly referred to as "Consumer Representatives"), on behalf of themselves and all others similarly situated (the "Class") (the Class and Consumer Representatives jointly referred to as "Plaintiffs"), by and through their attorneys, and amend this their Complaint pursuant to Rule 15(a) of Rules of Civil Procedure, complaining of the Defendants, allege the following facts and claims upon personal knowledge and upon information and belief as to all other matters as follows:

# INTRODUCTION

1.      The Consumer Representatives bring this class action on behalf of themselves, and others similarly situated, against Tempur Sealy International, Inc. ("Tempur Sealy") and Tempur-Pedic North America, LLC ("Tempur North America") (collectively referred to herein as  "Tempur-Pedic" or "Defendants") seeking class certification of ten (10) statewide classes, asserting claims under the various states' consumer protection and unjust enrichment laws, and a nationwide unjust enrichment class, applying the substantive law of the State of Kentucky, Tempur-Pedic's home state, claims for which the Plaintiffs seek damages and restitution for the proposed Class as defined herein.

2.      This action is brought to remedy violations of state consumer protection and unjust enrichment laws in connection with Defendants' retail sales and marketing of Tempur-Pedic mattress and pillow products containing Tempur material.

3.      Tempur Sealy is the "world's largest bedding provider".  Through its industry leading expenditure of advertising dollars and the resulting lengthy, pervasive and widespread advertising campaigns to which the Plaintiff Consumer Representatives were exposed, covering at least seven (7) years, Tempur-Pedic marketed and branded its products utilizing a wide variety of print, television and digital media platforms.  Through its "massive" marketing campaign, designed by Tempur-Pedic to drive consumer awareness, Tempur-Pedic drove, during the Class Period, over 4.3 billion consumer impressions per month, through television, radio, newspapers, targeted direct mail pieces, its website, sales training programs, "point of sale" marketing materials, product guides, sales pitches and scripted customer service responses (herein collectively the "Marketing Campaign").  Through its Marketing Campaign., Tempur-Pedic tightly created, implemented and supervised the delivery of messages and impressions to consumers, including the Plaintiffs and Class Members, that, among other things:

(a) Tempur-Pedic manufactured, distributed and sold "high quality" products that could provide substantial health benefits by "actually delivering the benefit of a great sleep";

(b) Tempur-Pedic manufactured the "only mattress recognized by NASA and certified by the Space Foundation";

(c) The original formulation for Tempur-Pedic's proprietary Tempur materials "lived for a short time in medical surfaces and seating applications";

(d) That Tempur-Pedic was recognized by NASA and the Space Foundation for the "advances made in the formula and the unique product innovations for consumer *and medical applications*";

(e) That "all Tempur-Pedic claims are backed by our investment in research, and proven medical heritage" and that its products were made using "Superior Science";

(f) That, with respect to "Tempur-Pedic Benefits", that Tempur-Pedic was "unlike any other mattress and pillow manufacturer in the industry.  With our *strong medical heritage* and unique and proprietary TEMPUR material we offer superior comfort along with relief from pain and pressure;

(g) That with respect to allergies, "Tempur-Pedic can help reduce the effects of allergies that may be preventing you from experiencing the full benefits of good sleep";

(h) That its products are "free of harmful VOC's" are "CFC (chlorofluorocarbon) and formaldehyde free" and "allergen and dustmite resistant";

(i) That its products were "Medically Proven" with "many medical applications", having been "utilized for years in healthcare environments as the solution to comfort, pressure and pain management."

(j) That its mattresses had "earned the Good Housekeeping Seal";

(k) That its products had been "extensively tested and is compliant with all federal and local regulations….";

(l) That its products "help prevent snoring *and other sinus-related problems*";

(m) That "your mattress may have a slight odor remaining from our unique manufacturing process. All polyurethane-based materials have this characteristic. *This is normal and completely harmless and will dissipate in a few days.*"

(n) That its products were "safe and healthy" and "hypoallergenic";

4.      Having consciously chosen to make these affirmative representations about its products, Tempur-Pedic assumed a corresponding duty to disclose to Plaintiffs and Class Members the truth, namely, that Tempur-Pedic knew that the  manufacture of its Tempur materials was chemical intensive and produced a large amount of potentially harmful volatile organic compounds ("VOCs") that were contained in Tempur-pedic's final products and materials. In fact, Tempur-pedic knew that its mattresses and pillows routinely possessed a significant disagreeable chemical odor because of the VOCs contained in its products. Tempur-pedic also knew that these VOCs were routinely off-gassing out of their mattresses and pillows while Tempur-pedic customers used them after purchase. Furthermore, Tempur-pedic knew that its customers were complaining to Tempur-pedic of experiencing adverse health effects from the use of Tempur-pedic products. From at least 2005 and continuing into 2014 Tempur-pedic customers routinely informed Tempur-pedic that they were experiencing strong chemical odors, horrible chemical smells, asthma, headaches, severe allergic reactions, eye and throat irritation, nausea, vomiting, nosebleeds, dizziness, flu-like symptoms, sinus issues, skin rashes and hives, and respiratory problems. Although Tempur-pedic systematically informed its customers that its products were safe and did not contain any harmful VOCs, Tempur-Pedic did not disclose that it possessed no objective tests, analyses, research or studies that had been conducted by or for

Tempur-Pedic in a manner generally accepted in the industry to yield accurate and reliable results to support or validate the affirmative representations contained in the Marketing Campaign that, by reason of the existence of VOCs in its material, that its products were "formaldehyde free", "free of harmful VOC's", "hypoallergenic", "allergen resistant" or, because of the presence of  VOC's, were "safe and healthy."   Despite Tempur-Pedic's representations to the contrary, Tempur-Pedic's own internal testing revealed that Tempur-Pedic's products off-gassed many VOCs listed as harmful to humans. For example, Tempur-Pedic products and materials testing data show conclusively that formaldehyde, a known human carcinogen to which there is no known safe level of exposure, and other harmful VOCs offgas from Tempur-Pedic materials and products. Despite this fact, Tempur-Pedic has deliberately concealed its knowledge of harmful VOCs being contained in and off-gassed from its products.

5.     During the Class Period, Tempur Pedic trained its sales and customer service representatives to further deceive Class Members by downplaying the significance of numerous complaints of allergic-type reactions and odor reported by its customers and even some of its own employees after exposure to Tempur-Pedic's products.  Tempur-Pedic's deceptive conduct during the Class Period included routinely concealing from  Class Members that numerous past Tempur-Pedic customers have complained about odor and allergic type symptoms and reactions after purchasing Tempur-Pedic's products  In response to complaints, Tempur-Pedic instructed its customer service representatives to tell consumers and Class Members that the odor and components of its products were completely harmless although it possessed nothing scientifically substantive to support such reassurances.   Each of the affirmative representations and concealments contained herein were material to a reasonable consumer, such as the Plaintiffs and Class Members.

6.     Instead of providing its potential and actual customers with all the material facts available to Tempur-Pedic and providing its retail distribution network, its own retail sales, marketing and customer service representatives with all the material facts available to Tempur-Pedic concerning its knowledge of VOCs contained within and being off-gassed from its products and past customer complaints of allergic and other adverse reactions to Tempur-Pedic's products, Tempur-Pedic has instead consciously chosen to conceal this material information.

7.     Tempur-Pedic maintains strict control over the manufacturing, distribution, pricing, marketing, sales and service of its products, there being no variation in prices and or marketing from retailer to retailer, or from region to region. Tempur-Pedic regularly "shops" and monitors the sales and marketing activities of its retail distributors to insure that its retailers maintain consistency in the marketing and branding campaigns created by Tempur Pedic, including the express representations that Tempur-Pedic makes about its products, so as to maintain Tempur-Pedic's lengthy, pervasive, and wide-spread marketing campaign.

8.     In the exercise of control over its retail distributors, Tempur-Pedic has provided uniform training, marketing materials and Product Training Guides, since at least 2007, and trained its retail distribution network and its own retail sales and marketing representatives to emphasize to potential and actual Tempur-Pedic customers that Tempur-Pedic products are "hypoallergenic" and/or "allergen resistant." Tempur-Pedic's training of its retail distributors, direct sales and customer service representatives provides that answers to consumers' questions about Tempur-Pedic's products would be contained within the materials, including the Product Training Guides.

9.     Tempur-Pedic omits from the retail distribution network and retail sales and marketing training and from the retail sales brochures:  (a) that its products contain and off-gas certain VOCs and that these VOCs can be and often are allergenic, (b) that formaldehyde, in

particular, is a VOC that Tempur-Pedic considers a harsh chemical that can trigger allergies and asthma;  and (c) that the VOCs emitted from Tempur-Pedic's newly purchased products can and do contain formaldehyde as well as other potentially harmful VOCs that can potentially trigger allergies and asthma.

10.    In addition to widely disseminating to the Plaintiffs and Class Members materially false, deceptive, unfair, misleading and fraudulent statements over at least a seven year period of time, Tempur-Pedic also failed to inform its retail distribution network, its retail sales and marketing representatives, its customer service representatives and its potential and actual consumers the truth about what Tempur-Pedic knew and when it knew it regarding the presence of formaldehyde and other potentially harmful VOCs in Tempur-Pedic's products. Tempur-Pedic's omissions were contrary to the representations made to consumers in its Marketing Campaign, and omissions of facts that Tempur-Pedic was obliged to disclose. Tempur-Pedic had exclusive knowledge of material facts not known or reasonably accessible to Plaintiffs and Class Members, including the lack of objective tests, analyses, research or studies that had been conducted by or for Tempur-Pedic in a manner generally accepted in the industry to yield accurate and reliable results to support the affirmative representations contained in the Marketing Campaign that its products were "formaldehyde free", "hypoallergenic", "safe" or "free of harmful VOCs.", "allergen resistant", "safe and healthy" and other such affirmative representations.  In fact, Tempur-Pedic possessed objective tests and analyses that showed that representations contained in its Marketing Campaign were false, and knew that reliable testing of its products showed that formaldehyde, a known human carcinogen for which there is no known "safe" level of exposure, and other potentially harmful VOCs, that can trigger allergic symptoms and responses are present in and off-gassed from Tempur-Pedic products.

11.     Plaintiffs Alvin and Melody Todd, (the "California Consumer Representatives") assert claims on behalf of themselves and a California Class for violations of Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), Cal. Bus. & Prof. Code § 17500 *et seq.* ("FAL"), and Cal. Civ. Code § 1750 *et seq.* ("CLRA") ("California Class").

12.     In addition, Plaintiff Robbie Simmons asserts claims on behalf of herself and an Illinois Subclass (defined below) for violations of the Illinois Consumer Fraud and Deceptive Practices Act 815 ILCS 505/1, *et seq.* and for Unjust Enrichment.

13.     In addition, Plaintiff Tina White asserts claims on behalf of herself and a Massachusetts Subclass (defined below) for violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A. § 1, *et seq.* and for Unjust Enrichment.

14.     In addition, Plaintiff Keith Hawkins asserts claims on behalf of himself and a Maryland Subclass (defined below) for violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, and for Unjust Enrichment.

15.     In addition, Plaintiff Thomas Comiskey asserts claims on behalf of himself and a Missouri Subclass (defined below) for violations of the Missouri Merchandising Practices Act, § 407.010, *et seq.* and for Unjust Enrichment.

16.     In addition, Plaintiffs Alan and Patricia Kaufman assert claims on behalf of themselves and a New Jersey Subclass (defined below) for violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* and for Unjust Enrichment.

17.     In addition, Plaintiff Johnny Martinez asserts claims on behalf of himself and a New Mexico Subclass (defined below) for violations of the New Mexico Unfair Practices Act, N.M. Stat. § 57-12-1, *et seq.* and for Unjust Enrichment.

18.     In addition, Plaintiffs Julie Davidoff and Tracey Palmer assert claims on behalf of themselves and a New York Subclass (defined below) for violations of § 349 of New York

General Business Law: Deceptive Acts and Practices, for Violations of § 350 of New York General Business Law: False Advertising Unlawful and for Unjust Enrichment.

19. In addition, Plaintiff Toni Kibbee asserts claims on behalf of herself and a Washington Subclass (defined below) for violations of the Washington Consumer Protection Act, Wash. Stat. § 19.86.010, *et seq.* and for Unjust Enrichment.

20. In addition, Plaintiffs Brian and Sara Stone, Kurt and Ericka Andersen, and Jerry and Diane Kucharski assert claims on behalf of themselves and a Wisconsin Subclass (defined below) for violations of the Wisconsin Deceptive Trade Practices Act, Wisc. Stat. § 100.18, *et seq.* and for Unjust Enrichment.

21. In addition, Plaintiffs collectively assert claims on behalf of themselves and the Nationwide Unjust Enrichment class for Unjust Enrichment under the laws of the State of Kentucky.

22. The California Class, Illinois Subclass, Massachusetts Subclass, Maryland Subclass, Missouri Subclass, New Jersey Subclass, New Mexico Subclass, New York Subclass, Washington Subclass, Wisconsin Subclass, and the Nationwide Unjust Enrichment Class are cumulatively hereinafter referred to as the "Class."

## THE PARTIES

23. Plaintiffs Alvin and Melody Todd are natural persons and residents of Richmond, Contra Costa County, California. Together, they purchased a Tempur-Pedic Cloud Supreme Queen mattress on or about June 3, 2013 from Sleep Train Mattress Center in Richmond, Contra Costa County, California, an approved Tempur Pedic retailer. According to the mattress tag, this Tempur-Pedic mattress was manufactured by Tempur Production USA, LLC for Tempur-Pedic Management, Inc. Upon information and belief, these two companies are part of the Tempur North America business segment of Tempur Sealy International, Inc. Prior to the Todds'

purchase, they were exposed to Tempur-Pedic's pervasive long term Marketing Campaign over a period of several years.   Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for the Todds to specifically state each representation that they saw and relied upon.  The Todds were exposed to and saw or heard Tempur- Pedic's Marketing Campaign, based upon their recollection, on television, in print media (including papers and magazines) and on the internet, including visiting the Tempur-pedic website, direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that the Todds were exposed to and either saw or heard prior to their purchase of Tempur-Pedic's products, and to the best of their recollection, that exposure included Tempur-Pedic's representations that its products were allergen resistant; that Tempur-Pedic's products were "naturally treated to be hypoallergenic" and its mattresses were "hypoallergenic".  These representations were material to the Todds and other reasonable consumers in making the decision about their purchase.  The Todds did not know those things, set forth above, that Tempur-Pedic concealed from the Todds and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOC's, including formaldehyde, a known human carcinogen, and other VOC's that are known to cause allergic type reactions and symptoms, each such omission being material to the Todds and other reasonable consumers.  The Todds have now learned that  Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and  potentially harmful and are not hypoallergenic. Had the Todds been told that Tempur-Pedic mattresses and pillows contain formaldehyde and other potentially harmful VOCs, they would not have purchased Tempur-pedic's products for the retail price paid

or would not have purchased Tempur-Pedic products at all. At the time the Todds purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including the Todds, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had the Todds been told that numerous Tempur-pedic customers had complained to Tempur-Pedic about having allergic reactions and symptoms from Tempur-Pedic products, they would not have purchased Tempur-Pedic products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of their payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, The Todds have suffered a cognizable injury.  On August 23, 2013, by registered mail, return receipt requested, The Todds' attorneys provided Tempur-Pedic with a 30-day pre-suit notice letter as set forth in California Civil Code § 1782. The notice advised Tempur-Pedic that Mr. Todd sought to represent the interests of a class of persons similarly situated. Attached as Exhibit A. The return receipt is attached as Exhibit B. Thereafter, on September 13, 2013, attorneys for The Todds responded to Tempur-Pedic's counsel's request for additional information regarding Mr. Todd's claims. Attached as Exhibit C. The return receipt is attached as Exhibit D. As the Defendants failed to provide a remedy for Mr. Todd and the class when first contacted by Mr. Todd and Mrs. Todd's transaction concerns the same purchase as noticed to Defendants, Mrs. Todd either has and/or does not need to comply with the notice provision under California Civil Code § 1782 because such additional notice would be futile. Pursuant to California Civil Code § 1780(d), Mr. and Mrs. Todd file herein affidavits showing that this action has been commenced in a proper place. The affidavits are attached as Exhibit E.

24.     Plaintiff Robbie Simmons, a natural person and former resident of Sandwich, DeKalb County, Illinois, purchased a Tempur-Pedic mattress in or about August 2013 from Back to Bed in DeKalb, Illinois. According to the mattress tag, this Tempur-Pedic mattress was manufactured by Tempur Production USA, LLC for Tempur-Pedic Management, Inc. Upon information and belief, these two companies are part of the Tempur North America business segment of Tempur Sealy International, Inc.  Prior to her purchase, Ms. Simmons was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years., Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would unrealistic for Ms. Simmons to specifically state each representation that she saw and relied upon.  Ms. Simmons was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon her recollection, on television and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Ms. Simmons was exposed to and either saw or heard prior to her purchase of Tempur-Pedic's product.  These representations were material to Ms. Simmons and other reasonable consumers in making the decision about her purchase.  Ms. Simmons did not know those things, set forth above, that Tempur-Pedic concealed from Ms. Simmons and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Ms. Simmons and other reasonable consumers. Ms. Simmons has come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens, potentially harmful and are not hypoallergenic, each of which is material to

Ms. Simmons and other reasonable consumers in making the decision about her purchase. Had Ms. Simmons been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time that Ms. Simmons purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Ms. Simmons, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Ms. Simmons been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of her payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Ms. Simmons has suffered a cognizable injury.

25.     Plaintiff Tina White, a natural person and resident of Ware, Hampshire County, Massachusetts, purchased a Tempur-Pedic mattress in or about September 2012 and several Tempur-Pedic pillows, from Sleepy's in Ware, Massachusetts.  Prior to her purchase, Ms. White was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years.  Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Ms. White to specifically state each representation that she saw and relied upon.  Ms. White was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon her recollection, on television, in print media (including papers and magazines), on the internet, including visiting the

Tempur-pedic website, direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Ms. White was exposed to and either saw or heard prior to her purchase of Tempur-Pedic's product, and to the best of her recollection, that exposure included Tempur-Pedic's representations that its products were "allergen resistant" and "hypoallergenic", "safe", and could be trusted.   These representations were material to Ms. White and other reasonable consumers in making the decision about their purchase.  Ms. White did not know those things, set forth above, that Tempur-Pedic concealed from Ms. White and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Ms. White and other reasonable consumers. Ms. White considered and relied on such representations and concealments in making her purchases but has come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens, potentially harmful and are not hypoallergenic. Had Ms. White been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Ms. White purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Ms. White, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing

efforts. Had Ms. White been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of her payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Ms. White has suffered a cognizable injury. On August 27, 2013, by registered mail, return receipt requested, Ms. White's attorneys provided Tempur-Pedic with a 30-day pre-suit notice letter as set forth in Mass. Gen. Laws Ann. Ch. 93A § 9. The notice advised Tempur-Pedic that Ms. White sought to represent the interests of a class of persons similarly situated. Attached as Exhibit F. The return receipt is attached as Exhibit G. Thereafter, on September 13, 2013, attorneys for Ms. White responded to Tempur-Pedic's counsel's request for additional information regarding Ms. White's claims. Attached as Exhibit C. The return receipt is attached as Exhibit D.

26.     Plaintiff Keith Hawkins, a natural person and resident of Fort Washington, Prince George's County, Maryland, purchased a Tempur-Pedic mattress in or about April 2013 from Mattress Warehouse in Waldorf, Maryland. Prior to his purchase, Mr. Hawkins was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Mr. Hawkins to specifically state each representation that he saw and relied upon.  Mr. Hawkins was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon his recollection, on television, the radio, in print media (including papers and magazines), on the internet, direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer. Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that

Mr. Hawkins was exposed to and either saw or heard prior to his purchase of Tempur-Pedic's product, and to the best of his recollection, that exposure included Tempur-Pedic's representations that its products were allergen resistant, "hypoallergenic", "anti-allergenic", "therapy for your senses", and "the quality of the Swedish Tempur material." These representations were material to Mr. Hawkins and other reasonable consumers in making the decision about their purchase. Mr. Hawkins did not know those things, set forth above, that Tempur-Pedic concealed from Mr. Hawkins and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Mr. Hawkins and other reasonable consumers. Moreover, the Tempur-Pedic in-store retail sales brochures used by Mattress Warehouse represented that Tempur-Pedic's products were "naturally treated to be hypoallergenic" and its mattresses were "hypoallergenic." Mr. Hawkins considered and relied on such representations in making his purchase but has come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and considered potentially harmful and are not hypoallergenic. Had Mr. Hawkins been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Mr. Hawkins purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Mr. Hawkins, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and

other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Mr. Hawkins been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of his payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Mr. Hawkins has suffered a cognizable injury.

27.     Plaintiff Thomas Comiskey, a natural person and resident of Higginsville, Lafayette County, Missouri, purchased a Tempur-Pedic mattress in or about August 2011 from Arwood's Furniture in Warrensburg, Missouri. Prior to his purchase, Mr. Comiskey was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Mr. Comiskey to specifically state each representation that he saw and relied upon.  Mr. Comiskey was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon his recollection, on television, in print media (including papers and magazines), direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.   Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Mr. Comiskey was exposed to and either saw or heard prior to his purchase of Tempur-Pedic's product, and to the best of his recollection, that exposure included Tempur-Pedic's representations that its products were "hypoallergenic".  These representations were material to Mr. Comiskey and other reasonable consumers in making the decision about their  purchase.  Mr. Comiskey did not know those things, set forth above, that Tempur-Pedic concealed from Mr. Comiskey and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs,

including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Mr. Comiskey and other reasonable consumers. Mr. Comiskey has come to learn that Tempur-Pedic's claims and omissions are false, unfair, deceptive and misleading and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and potentially harmful and are not hypoallergenic. Had Mr. Comiskey been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Mr. Comiskey purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Mr.Comiskey, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Mr. Comiskey been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of his payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Mr. Comiskey has suffered a cognizable injury.

28.    Plaintiffs Alan and Patricia Kaufman are natural persons and residents of Toms River, Ocean County, New Jersey. Together, they purchased a Tempur-Pedic mattress in or about May 2007 from Rockaway Bedding in Bayonne, New Jersey.  Prior to their purchase, the Kaufmans were exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a

period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for the Kaufmans to specifically state each representation that they saw and relied upon.  The Kaufmans were exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon their recollection, on television, in print media (including papers and magazines), direct mail and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that the Kaufmans were exposed to and either saw or heard prior to their purchase of Tempur-Pedic's product, and to the best of their recollection, that exposure included Tempur-Pedic's representations that its products were "allergen resistant", "hypoallergenic", allergen free and completely safe. These representations were material to The Kaufmans and other reasonable consumers in making the decision about their purchase.  The Kaufmans did not know those things, set forth above, that Tempur-Pedic concealed from the Kaufmans and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to The Kaufmans and other reasonable consumers. The Kaufmans have come to learn that Tempur-Pedic's  claims and omissions are false, unfair, deceptive and misleading and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and considered to be potentially harmful and are not hypoallergenic. Had The Kaufmans been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time The Kaufmans purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and

actual customers, including The Kaufmans, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had The Kaufmans been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of their payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, The Kaufmans have suffered a cognizable injury.

29.     Plaintiff Johnny Martinez, a natural person and resident of Chamita, Rio Arriba County, New Mexico, purchased a Tempur-Pedic mattress in or about October 2010 from CB Fox in Los Alamos, New Mexico. Prior to his purchase, Mr. Martinez was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Mr. Martinez to specifically state each representation that he saw and relied upon. Mr. Martinez was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon his recollection, on television and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer. Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Mr. Martinez was exposed to and either saw or heard prior to his purchase of Tempur-Pedic's product, and to the best of his recollection, that exposure included Tempur-Pedic's representations that its products were "allergen resistant" and "hypoallergenic." These representations were material to Mr. Martinez and other reasonable consumers in making the

decision about his purchase.  Mr. Martinez did not know those things, set forth above, that Tempur-Pedic concealed from Mr. Martinez and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Mr. Martinez and other reasonable consumers. Mr. Martinez has come to learn that Tempur-Pedic's  claims and omissions are false, unfair, deceptive and misleading and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and potentially harmful and are not hypoallergenic. Had Mr. Martinez been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Mr. Martinez purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Mr. Martinez, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts.  Had Mr. Martinez been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, he would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of his payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Mr. Martinez has suffered a cognizable injury.

30.     Plaintiff Julie Davidoff, a natural person and resident of Brooklyn, Kings County,

New York, purchased a Tempur-Pedic mattress in or about March 2013 from Raymour & Flanagan Furniture in Liverpool, New York. Prior to her purchase, Ms. Davidoff was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Ms. Davidoff to specifically state each representation that she saw and relied upon. Ms. Davidoff was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon her recollection, on television, in print media (including papers and magazines), direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.   Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Ms. Davidoff was exposed to and either saw or heard prior to her purchase of Tempur-Pedic's product. These representations were material to Ms. Davidoff in making the decision about her purchase.  Ms. Davidoff did not know those things, set forth above, that Tempur-Pedic concealed from Ms. Davidoff and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Ms. Davidoff and other reasonable consumers.  Ms. Davidoff has come to learn that Tempur-Pedic's claims and omissions are false, unfair, deceptive and misleading and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and potentially harmful and are not hypoallergenic. Had Ms. Davidoff been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Ms. Davidoff purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and

actual customers, including Ms. Davidoff, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Ms. Davidoff been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of her payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Ms. Davidoff has suffered a cognizable injury.

31.    Plaintiff Tracey Palmer, a natural person and resident of Buffalo, Erie County, New York, purchased a Tempur-Pedic mattress on or about June 8, 2013 from Raymour & Flanagan Furniture in Liverpool, New York. Prior to her purchase, Ms. Palmer was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration and widespread in dissemination that it would be unrealistic for Ms. Palmer to specifically state each representation that she saw and relied upon.  Ms. Palmer was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon her recollection, by viewing point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Ms. Palmer was exposed to and either saw or heard prior to her purchase of Tempur-Pedic's product.  These representations were material to Ms. Palmer and other reasonable consumers in making the decision about their purchase.  Ms. Palmer did not know those things, set forth above, that Tempur-Pedic concealed from Ms. Palmer and other Class Members, including Tempur-Pedic's

knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Ms. Palmer and other reasonable consumers.  Ms. Palmer has come to learn that Tempur-Pedic's claims and omissions are false, unfair, deceptive and misleading and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and potentially harmful and are not hypoallergenic. Had Ms. Palmer been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time Ms. Palmer purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Ms. Palmer, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Ms. Palmer been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of her payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Ms. Palmer has suffered a cognizable injury.

32.     Plaintiff Toni Kibbee, a natural person and resident of Granite Falls, Snohomish County, Washington, purchased a Tempur-Pedic mattress in or about December 2011 from www.tempurpedic.com. According to the mattress tag, this Tempur-Pedic mattress was manufactured by Tempur-Pedic Management, Inc. Upon information and belief, this company is

part of the Tempur North America business segment of Tempur Sealy International, Inc.  Prior to her purchase, Ms. Kibbee was exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for Ms. Kibbee to specifically state each representation that she saw and relied upon.  Ms. Kibbee was exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon her recollection, on television, on the internet, including visiting the Tempur-pedic website, and point of sale marketing materials in a retail store she visited.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that Ms. Kibbee was exposed to and either saw or heard prior to her purchase of Tempur-Pedic's product, and to the best of her recollection, that exposure included Tempur-Pedic's representations that its products were "allergen resistant" and "no VOCs".  These representations were material to Ms. Kibbee and other reasonable consumers in making the decision about their purchase.  Ms. Kibbee did not know those things, set forth above, that Tempur-Pedic concealed from Ms. Kibbee and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to Ms. Kibbee and other reasonable consumers. Ms. Kibbee considered and relied on such representations and omissions in making her purchase but has come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and potentially harmful. Had Ms. Kibbee been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, she would not have purchased Tempur-Pedic's products for the retail price paid or would not have

purchased Tempur-Pedic products at all. At the time Ms. Kibbee purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including Ms. Kibbee, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had Ms. Kibbee been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, she would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of her payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, Ms. Kibbee has suffered a cognizable injury.

33.     Plaintiffs Brian and Sara Stone are natural persons and residents of Appleton, Outagamie County, Wisconsin. Together, they purchased a Tempur-Pedic mattress on or about December 2011 from Mattress Firm in Appleton, Wisconsin.  Prior to their purchase, the Stones were exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years. Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for the Stones to specifically state each representation that they saw and relied upon.  The Stones were exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon their recollection, on television, in print media (including papers and magazines), direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that the Stones were exposed to and either saw or heard prior to their purchase of Tempur-Pedic's product.

These representations were material to The Stones and other reasonable consumers in making the decision about their purchase.  The Stones did not know those things, set forth above, that Tempur-Pedic concealed from the Stones and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to The Stones and other reasonable consumers. The Stones considered and relied on such representations and concealments in making their purchase but have come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and considered potentially harmful. Had The Stones been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time The Stones purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including The Stones, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had The Stones been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of their payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, the Stones have suffered a cognizable injury.

34.     Plaintiffs Kurt and Ericka Andersen are natural persons and residents of Twin Lakes, Kenosha County, Wisconsin. They purchased a Tempur-Pedic mattress on or about March 21, 2011 from Mattress Firm in Delavan, Wisconsin.  Prior to their purchase, the Andersens were exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years.  Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for the Andersens to specifically state each representation that they saw and relied upon.  The Andersens were exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon their recollection, on television, in print media (including papers and magazines), on the internet, including visiting the Tempur-pedic website, direct mail, and also viewed point of sale marketing materials at Tempur-Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that the Andersens were exposed to and either saw or heard prior to their purchase of Tempur-Pedic's product, and to the best of their recollection, that exposure included Tempur-Pedic's representations that its products were allergen resistant and free of VOCs.These representations were material to The Andersens and other reasonable consumers in making the decision about their purchase.  The Andersens did not know those things, set forth above, that Tempur-Pedic concealed from the Andersens and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to The Andersens and other reasonable consumers. The Andersens considered and relied on such representations and omissions in making their purchase but have come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that

are known allergens and potentially harmful. Had The Andersens been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all.  At the time The Andersens purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including The Andersens, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had The Andersens been told that numerous customers had complained to Tempur-pedic about having allergic reactions and symptoms from Tempur-pedic products, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of their payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, the Andersens have suffered a cognizable injury.

35.     Plaintiffs Jerry and Diane Kucharski are natural persons and residents of Milwaukee, Milwaukee County, Wisconsin. They purchased a Tempur-Pedic mattress on or about August 2011 from Mattress Firm in Cudahy, Wisconsin.  Prior to their purchase, the Kucharskis were exposed to Tempur-Pedic's pervasive, long term Marketing Campaign over a period of several years.  Tempur-Pedic's Marketing Campaign was sufficiently lengthy and pervasive in duration, and widespread in dissemination that it would be unrealistic for the Kucharskis to specifically state each representation that they saw and relied upon.  The Kucharkis were exposed to and saw or heard Tempur-Pedic's Marketing Campaign, based upon their recollection, on television and also viewed point of sale marketing materials at Tempur-

Pedic's approved retailer.  Attached to this Third Amended Complaint are representative samples of Tempur-Pedic's Marketing Campaign that the Kucharskis were exposed to and either saw or heard prior to their purchase of Tempur-Pedic's product, and to the best of their recollection, that exposure included Tempur-Pedic's representations that its products were allergen resistant. These representations were material to The Kucharskis and other reasonable consumers in making the decision about their purchase.  The Kucharkis did not know those things, set forth above, that Tempur-Pedic concealed from the Kucharskis and other Class Members, including Tempur-Pedic's knowledge that its products contain and off-gas VOCs, including formaldehyde, a known human carcinogen, and other VOCs that are known to cause allergic type reactions and symptoms, each such omission being material to The Kucharskis and other reasonable consumers. The Kucharskis considered and relied on such representations and omissions in making their purchase but have come to learn that Tempur-Pedic's statements and omissions are false, unfair, misleading and deceptive, and that, in fact, Tempur-Pedic's mattresses and pillows at initial purchase can and do contain formaldehyde and other VOCs that are known allergens and considered potentially harmful. Had The Kucharskis been told that Tempur-pedic mattresses and pillows can contain formaldehyde and other potentially harmful VOCs, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic products at all. At the time The Kucharskis purchased Tempur-Pedic products, Tempur-Pedic omitted telling its potential and actual customers, including The Kucharskis, that Tempur-Pedic had received numerous complaints from Tempur-Pedic customers claiming Tempur-Pedic's products were causing them allergic reactions and symptoms inconsistent with Tempur-Pedic's allergen resistant, hypoallergenic, free of formaldehyde and other harmful VOCs and completely safe and healthy sales and marketing efforts. Had The Kucharskis been told that numerous customers had complained to Tempur-pedic about having allergic reactions

and symptoms from Tempur-pedic products, they would not have purchased Tempur-pedic's products for the retail price paid or would not have purchased Tempur-pedic's products at all. As a result of their payment and provision of consideration for a falsely, unfairly, deceptively and misleadingly advertised, marketed and sold product, the Kucharskis have suffered a cognizable injury.

36.    Defendant Tempur Sealy is the world's largest bedding provider and is a Delaware corporation with its principal place of business at 1000 Tempur Way, Lexington, Kentucky 40511. Tempur Sealy was formerly known as Tempur-Pedic International, Inc. and has been developing, manufacturing, and marketing Tempur-Pedic mattresses, foundations, pillows and other products since the 1990s. The company's historic and present brand portfolio includes Tempur and Tempur-Pedic. Whenever reference in this Complaint is made to any act of this Defendant or other corporate Defendants named herein or that may be named in the future, the allegation shall be deemed to mean that the officers, directors, managing agents, representatives, subsidiaries, affiliates and employees of the Defendant did or authorized or ratified the act while actively engaged in the management, direction, or control of the affairs of the Defendant, and while acting within the course and scope of their employment. Tempur Sealy may be served with civil process by serving its registered agent National Corporate Research, Ltd, 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.  Kentucky has a significant contact or significant aggregation of contacts to the Unjust Enrichment claims asserted herein on behalf of the Nationwide Unjust Enrichment Class under the law of the State of Kentucky.  All or substantially all of Tempur-Pedic's Marketing Campaign, including its affirmative representations and omissions herein stated, originated within the State of Kentucky.  There exists no substantial conflict between the laws of the various states reglating to unjust enrichment and the law of the State of Kentucky, as the law of unjust enrichment is substantially the same in

every state of the United States, including Kentucky. No other jurisdiction has a great interest in the application of the law of unjust enrichment to the claims herein asserted by the Nationwide Unjust Enrichment Class than the State of Kentucky. Application of the law of unjust enrichment to the Nationwide Unjust Enrichment Class will further the interests of the State of Kentucky.

37. Defendant Tempur-Pedic North America, LLC ("Tempur North America") is a Delaware limited liability corporation and a subsidiary of Tempur Sealy, with its principal office co-located with Tempur Sealy in Lexington, Kentucky, and is responsible for the design, manufacture, distribution, sales and marketing of Tempur and Tempur-Pedic products in North America. Tempur North America can be served with civil process by serving its registered agent National Corporate Research, Ltd, 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

38. In the quarter ending June 30, 2013, Tempur North America had retail sales of $201.7 million. Based upon these present sales volumes as well as past sales volumes in North America since 2007, the Consumer Representatives, upon information and belief, assert that thousands of California consumers and tens of thousands of consumers or more in the rest of the United States have purchased Tempur-Pedic mattresses and pillows since 2007.

39. Upon information and belief, Defendants Tempur Sealy and Tempur North America operate their business enterprise by using various subsidiaries that they directly control. These entities include, but are not limited to, Tempur Production USA, LLC and Tempur-Pedic Management, Inc. Defendants Tempur Sealy and Tempur North America share members, officers, directors and key personnel with each other and with their various subsidiaries. Defendant Tempur Sealy is the alter ego of its subsidiaries. Defendant Tempur North America is the alter ego of its subsidiaries.

**JURISDICTION AND VENUE**

40.     This Court has subject matter jurisdiction over this case as a class action in which a member of the class of plaintiffs is a citizen of a state different from any defendant and the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs.  28 U.S.C. § 1332(d) (2).  This Court may also exercise supplemental jurisdiction under 28 U.S.C. § 1367.

41.     Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the Consumer Representatives' claims occurred in this judicial district pursuant to 28 U.S.C. § 1391. This specifically includes the purchase and use of Tempur-Pedic products in this district by Plaintiffs Alvin and Melody Todd.  Moreover, Defendants have marketed their products at issue in this case in this District, and a substantial number of sales of Defendants' products to putative class members have occurred in this District.

**INTRADISTRICT ASSIGNMENT**

42.     Intra-district assignment to the San Francisco Division is proper because a substantial part of the events and omissions giving rise to the claims occurred, in part, in San Francisco County and Contra Costa County. Plaintiffs Alvin and Melody Todd live in Contra Costa County and purchased Tempur-Pedic products, the subject of this lawsuit, in Contra Costa County.

**FACTUAL BACKGROUND**

43.     Defendants are responsible for designing, manufacturing, distributing, marketing and selling Tempur-Pedic mattresses and pillows in the United States, historically beginning in the 1990s and into the present. Defendants manufacture all the Tempur-Pedic products sold in the United States since 2007 at two manufacturing plants, one located in Albuquerque, New Mexico and the other in Duffield, Virginia.

44.     Tempur-Pedic mattresses and pillows contain and off-gas VOCs in sufficient amounts that a noticeable odor is present when Tempur-Pedic mattresses and pillows are unwrapped for initial use by Tempur-Pedic customers.

45.     VOCs are chemical compounds that can be toxic and even deadly, in sufficient concentrations. VOCs, in general, can cause and trigger allergic reactions and symptoms as well as asthmatic reactions and symptoms.

46.     Formaldehyde is a VOC that is a colorless, pungent smelling gas that can be harmful to humans. According to the EPA, formaldehyde can cause watery eyes, burning sensations in the eyes and throat, nausea, and difficulty breathing in some humans, and may even trigger asthma attacks. There is evidence that some people can develop sensitivity to formaldehyde. Formaldehyde health effects can include eye, nose, and throat irritation, wheezing and coughing, fatigue, skin rash and severe allergic reactions. Defendants have, in the past, admitted on their own website that VOCs such as formaldehyde are "harsh chemicals that can trigger allergies and asthma."

47.     Formaldehyde is listed as a known human carcinogen by The National Toxicology Program of the U.S. Health and Human Services Public Health Service, as well as a known carcinogen by California's OEHHA. The International Agency for Research on Cancer ("IARC") also lists formaldehyde as a known human carcinogen.

48.     Other VOCs contained within and off-gassed from Tempur-Pedic mattress and pillow products and materials include, but are not limited to: 1,2,3-Trichloropropane; 1,2-Dichloropropane; 1,4-Dichlorobenzene; 1,4-Dioxane; 2-Propanol, 1,3-dichloro; Acetaldehyde; Chlorobenzene; Chloroform; Chloromethane; Cumene; Cyclotettrasiloxane; Ethylbenzene; Methylene Chloride; Morpholine, 4-methyl; N,N-Dimethyl Formamide; Propanal; Styrene; Tetrachloroethylene; Toluene; Trichloroethylene; Trimethylbenzene; and Xylenes. Many of

these VOCs are associated with adverse human reactions and conditions, including but not limited to allergic reactions, asthma-like symptoms, flu-like symptoms, headaches, nosebleeds, respiratory problems, rashes and hives and cancer.  Tempur-Pedic received numerous complaints from its customers from at least 2005 through the present that attributed the above symptoms to coming in contact with or being in the same room as Tempur-Pedic products and materials. Defendants have developed and maintained a retail distribution network consisting of thousands of mattress and pillow retailers across the United States, including but not limited to California, Illinois, Massachusetts, Maryland, Missouri, New Jersey, New Mexico, New York, Washington, and Wisconsin. Defendants send and receive communications with this retail distribution network about Tempur-Pedic products. Defendants provide sales, marketing and training materials to this retail distribution network, which includes but is not limited to Sleep Train, Back to Bed, Sleepy's, Mattress Warehouse, Arwood's Furniture, Mills & Thomas Furniture, Rockaway Bedding, CB Fox, 1-800-Mattress, Raymour & Flanagan Furniture, Mattress Firm, and Sussex County Mattress. Likewise, Defendants' retail distribution network provides information to Defendants concerning customer-reported complaints about Tempur-Pedic products, including but not limited to odor complaints and allergic reaction/symptoms complaints, and requests by customers to return Tempur-Pedic products due to customer dissatisfaction.

49.    Defendants also maintain and/or train their own retail sales and marketing representatives and customer service representatives that work directly for Defendants. Defendants communicate with their own retail sales and marketing representatives and customer service representatives about Tempur-Pedic products. Defendants provide their own retail sales and customer service representatives with sales, marketing and training materials regarding Tempur-Pedic products. Defendants' sales and marketing representatives and customer service

representatives provide information to Defendants concerning customer reported complaints about Tempur-Pedic products, including but not limited to odor complaints and allergic reaction/symptoms complaints and requests by customers to return Tempur-Pedic products due to customer dissatisfaction.

50.     Tempur-Pedic pillows and mattresses can and do emit a chemical odor caused by the off-gassing of chemicals from Tempur-Pedic's products. Defendants admit this fact in some of their sales and marketing materials but downplay its significance. Historically and recently, as of August, 2013, Defendants state: "Your new mattress may have a slight odor remaining from our manufacturing process. This is normal. It's completely harmless and will dissipate in a few days." Upon information and belief, Tempur-Pedic possesses no objective tests, analyses, research or studies that have been conducted by or for Tempur-Pedic in a manner generally accepted in the industry to yield accurate and reliable results to support or validate the affirmative representations that the mixtures of VOCs  contained within or off gassed from Tempur-Pedic's products are "completely harmless."  To the contrary, Tempur-Pedic knows that its products contain and off-gas VOCs to which there is no known safe level of exposure, such as formaldehyde.

51.     Defendants train their retail distribution network and their own retail sales and marketing representatives and customer service representatives to tell each potential and actual Tempur-Pedic customer that the odors emitted from Tempur-Pedic's products contain nothing harmful and are completely safe. Defendants' sales and marketing training omits the material fact that the off-gassing chemicals from Tempur-Pedic's products can and do contain formaldehyde; that formaldehyde has been listed as a probable human carcinogen by the U.S. National Toxicology Program since 1981; and that the US National Toxicology Program in 2013 upgraded formaldehyde to a known human carcinogen. Defendants' sales and marketing training

also omits telling potential and actual customers that the International Agency for Research on Cancer ("IARC") considers formaldehyde to be a known human carcinogen and omits that California's OEHHA lists formaldehyde as a known carcinogen. Defendants train their retail distribution network and their own retail sales and marketing representatives to avoid telling customers the actual chemicals contained in the offgassing VOCs and to hide behind the banner of "trade secrets", suggesting to customers and retailers that Tempur-pedic is not legally permitted to tell customers or retailers what actual chemicals offgas from Tempur-pedic products.

52.     Since 2007, Defendants have trained their retail distribution network, their retail sales and marketing representatives and their customer service representatives to emphasize to each potential and actual Tempur-Pedic customer that Tempur-Pedic products are allergen resistant. Historically and recently, as of August 2013, Tempur-Pedic's retail in-store brochures state that "TEMPUR MATERIAL and the outer cover are naturally treated to be hypoallergenic." The same brochure then provides a "Tempur-Pedic Sleep Systems" chart that lists each Tempur-Pedic mattress as being "hypoallergenic." Defendants uniformly train Tempur-Pedic's retail distribution network, their own retail and marketing representatives and their customer service representatives to provide each potential and actual Tempur-Pedic customer with access to a copy of this brochure and to emphasize the allergy resistance and hypoallergenic attributes of Tempur-Pedic's products. Defendants omit from the retail and marketing training and from the sales brochures that VOCs can be and often are allergenic, that formaldehyde, in particular, is a VOC that Tempur-Pedic considers a harsh chemical that can trigger allergies and asthma, and that the VOCs being emitted from Tempur-Pedic's newly purchased products can and do contain formaldehyde as well as other potentially harmful VOCs that can potentially trigger allergies and asthma.

53.     As of 2007 and continuing into 2010, Defendants marketed, advertised, and sold their Tempur-Pedic products as being "naturally treated to be resistant to mites and other household allergens. Our products are also CFC (chlorofluorocarbon) and formaldehyde free." These representations were and are materially important characteristics to consumers including Plaintiffs. Defendants' retail distribution network and their retail sales and marketing representatives used these statements to advertise, market and sell Tempur-Pedic products to potential and actual Tempur-Pedic customers.

54.     By November 24, 2010 and continuing through at least August 7, 2013, Defendants were still marketing, advertising and selling Tempur-Pedic products, but now under the heading of "Superior Science" Tempur-Pedic's website touted that "TEMPUR material is at the core of virtually all of our products. It was designed with unique properties that make it the perfect material for our mattresses, pillows and other sleep products." Under the subheading of "Allergen and dust-mite resistance", Defendants stated further, "TEMPUR material is resistant to allergens such as dust mites, mold, and mildew, and free of harmful VOCs (volatile organic compounds) such as formaldehyde and CFC (chlorofluorocarbon)—harsh chemicals that can trigger allergies and asthma." These representations were and are materially important characteristics to consumers including Plaintiffs. Defendants' retail sales and distribution network and their retail sales and marketing representatives used these statements to advertise, market and sell Tempur-Pedic products to potential and actual Tempur-Pedic customers.

55.     Even though Defendants have had knowledge of many customer complaints regarding allergic reactions and symptoms to the VOCs being emitted from Tempur-Pedic products, Defendants, for many years, have omitted sharing this material information with potential and actual Tempur-Pedic customers. Once Defendants decided to use statements concerning formaldehyde content, VOC content, allergen resistance and hypoallergenic

characteristics in their advertising, marketing and retail sales strategies to consumers, Defendants assumed the duty to truthfully disclose material facts concerning these statements and topics that Defendants had in their possession from any source, including but not limited to their customers, their own sales and marketing representatives, their warranty representatives and their customer service representatives, their retail sales and distribution network, and scientific research and testing conducted by Defendants or others on their behalf.

56.     Defendants, from at least 2005 until the present have become aware of repeated customer complaints.  Defendants received such complaints from their customers directly, from their own retail sales and marketing representatives and customer service representatives, and from their retail sales and distribution network. Customers have complained about the amount of chemical odor off-gassing from Tempur-Pedic's products, the amount of time the off-gassing occurs, and the allergic reactions and symptoms and other health complaints customers attribute to Tempur-Pedic's products. The following paragraphs illustrate the scope and degree of complaints that have been brought to the Defendants' attention and/or have been published on the internet. The spelling errors contained in the original internet posts remain intact.

57.     For example, on the website Consumer Affairs, Cherie of Attleboro, Massachusetts wrote on March 25, 2007: "We ordered a Tempur-pedic Deluxe mattress from Sleepy's and received the delivery at 1:30pm Friday, 03/23/07. After they removed the plastic, we were immediately confronted with a strong chemical odor. After spending 10 minutes in the room, I became extremely nauseas [sic], dizzy, and started with a headache. My husband also felt sick and started with a headache. We opened all windows and allowed the mattress to "out-gas". Due to the fumes spreading throughout the house, we had to close the door of the bedroom and put towels under the door to contain the fumes. We kept the windows open throughout the night (although cold) and slept in the guest room. The following morning the smell was stronger,

and I became more nauseas [sic] and continued with a headache. I have a constant bad taste in my mouth, burning feeling in my throat, and feel as though the smell is in my clothes, hair, skin, etc….I checked the internet for possible harmful affects this could be having on my family (especially my baby), and read 100+ complaints of health problems related to a Tempur-pedic mattress. All clothes and materials in the bedroom the mattress is in, now have a strong chemical odor. I fear for the long term health problems this may have on my family. Sleepys agreed to return the mattress, but we had to purchase another mattress and receive store credit for the rest. They didn't seem surprised by the problem. Tempurpedic should not be selling materials that are harmful to ones health."

58.    Likewise, on October 2, 2008, Linda of University Place, Washington posted on Consumer Affairs' website: "The noxious and toxic fumes from the mattress caused respiratory distress for me, nasal distress for my husband. We are unable to use the bed at all or even be in the room where it is located. How can such an unsafe product remain on the market without clear warnings to consumers? The web is full of complaints about this product."

59.    On February 16, 2009, Sandra of La Center, Washington reported on the Consumer Affairs website the following: "Last May we purchased a Classic 9" Queen Tempur-pedic mattress along with a mattress cover and a couple of Tempur-pedic pillows from Sleep Country in Portland, Oregon….NO ONE mentioned that these beds have a horrific chemical odor, but the salesman said that we would need a special mattress cover (which we purchased) and that we should not use the hypoallergenic queen size mattress cover that we have, that completely covers the mattress but should buy, separately a special Premium Queen Mattress Protoqueen cover that is specifically for Tempur-pedic mattresses. We were told that it would take 30 to 60 days to break in? [sic] the bed and this could be done by laying and sitting all over the bed. Unfortunately, the odor was overpowering even though I washed the mattress cover and

sheets two or three times a week. And, the bed seemed to become less and less supportive. The horrible chemical smell plus the diminishing firmness of the bed has led to many restless nights with nausea, back, leg and side pains. And I know it is the bed because during a two-week road trip this past fall we slept on many beds in many upscale motels like Comfort and Hampton Inns etc., and NEVER had any problems with our beds. I wrote to Tempur-pedic in August of 2008 about our problems with the mattress and they responded that we should put a thick mattress pad on the bed. We purchased a thick mattress pad from Costco but the strong chemical odor continued and now I was laundering the sheets, mattress cover AND the mattress pad two or three times a week….I tend to have hot-flashes at night and perhaps this in some way impacts the bed, but it took more than four months for the odor to become tolerable and it is still overpowering if I don't launder all the mattress covers frequently, or maybe I've just become used to the smell. This is a truly horrible part of owning a Tempur-pedic bed and a problem that should be noted by all salesmen when someone is interested in the bed….Tempur-pedic has responded that they will replace the bed but have not addressed the problems with odor and dimishing [sic] firmness except to state that this is inherent in the bed, thus replacing it would not solve the problem."

60.     On April 24, 2010, Peter of Amarillo, Texas posted on the Consumer Affairs website: "As a doctor, I have real concerns about the strong odor emanating from our Tempur-Pedic mattresses—odors my wife has characterized as "chemically", "paint-like" and as being similar to stale cat urine. Also, these odors take an unacceptably long time to dissipate. I have expressed our concerns to Tempur-Pedic Customer Service representatives on several occasions and have also taken the time and effort to bring them to the attention of the Chief Executive Officer and CEO of Tempur-Pedic as well as to the attention of Tempur-Pedic's Research and Development department. I have specifically inquired as to the nature of any chemicals used in

the manufacturing process and whether or not these chemicals are known or suspected to have any adverse effects on human health, especially with regard to pregnancy, reproduction, and development (e.g. embryologic and cytogenetic effects, etc,). The Customer Service representatives with whom I have communicated have all assured me Tempur-Pedic products are safe and have repeatedly cited proprietary reasons for not being able to disclose the chemicals used in their manufacturing process. Furthermore, even though it has been requested, no one with Tempur-Pedic has been able or willing to provide documentation substantiating their claims with regard to safety. Providing chemicals are used in their manufacturing process, where are the studies showing these chemicals are safe? Inquiries directed to specific individuals within the Research and Development department were referred to a lower tier of support which, once again, echoed what was conveyed previously. And we have not yet received any response from Mr. Mark S., Chief Executive Officer and President of Tempur-Pedic, with respect to our concerns. This stinks both figuratively and literally. As one might imagine, the impact and potential liability from the use of chemicals suspected or known to have adverse effects on human health could be enormous."

61.     On May 20, 2010, Denise of Goose Creek, South Carolina wrote on Consumer Affairs' website: "I am a 58 year old lady and live on a fixed income. So when I bought a Tempurpedic mattress in August 2008 at $3941.09, it was a very big deal. Since that time, I have been suffering with increasing headaches and complaining of knee and lower back pain and being tired all the time. Now I find out that the mattress gives off gases for the life of the mattress which cause the symptoms I'm having. I now read numerous complaints on your site about other people having the same trouble, and just like them, when you call Tempurpedic and ask what chemicals or gases are in the mattress, they say, "Our process is a secret" and to contact

the product safety commission. I was given no warning notice when I purchased this bed; there should be a warning label."

62.     On November 8, 2010, Harold of Jerseyville, Illinois, wrote on the Consumer Affairs website: "We purchased our fist [sic] Tempur-pedic bed 2 years ago. After 2 months, Tempur-Pedic replaced it as the smell was horrendous. It was summer and we had our windows open with a breeze blowing all 2 months."

63.     On September 24, 2011, Joyce of Pottsville, Pennsylvania contacted Consumer Affairs' website and described the following: "We purchased a Rhapsody Tempur-Pedic mattress in June 2011. As it was being unpacked after delivery, I detected an odor which I could only describe as a "new" product smell. However, within an hour, the odor had become very pronounced and permeated the whole house. It was very irritating to the eyes and lungs. I called the department store within the hour and requested that they come and remove the mattress. They declined and said I had to keep it at least a month. In order to continue to stay in our house, we actually had to seal the bedroom (windows open with an exhaust fan running) for 2 weeks until the mattress was finally removed. It took many phone calls and lots of negotiating with Tempur-Pedic and the department store to get it picked up."

64.     On the same day, September 24, 2011, Jackie of Surprise, Arizona posted the following to Consumer Affairs' website: "I purchased the Tempur-Pedic Cloud "Luxe", a $4,500 mattress. When it arrived, my house began to "reek" with chemicals, which I am quite certain is fermaldehyde (sic). My throat and larynx felt raw and burned. Each day, it got worse and although I struggled to have the company exchange the mattress, at 10 days, they finally picked it up. I never slept on the bed, because I couldn't get near it."

65.     On February 20, 2009, an anonymous writer posted the following to a consumer website called Pissed Consumer: "Paid 3000.00 dollars for a new bed that we can not sleep on.

The odor is so bad it makes us sick. Have had the bed over two weeks and it still stinks to [sic] bad to sleep on it. This bed is a joke and tepur-pedic [sic] has the worst customer service ever. Tempur-pedic or the local store will not refund my money to get a new bed, so me and my pregnant wife have been without a bed for over two weeks. We gave away our old bed the day the new one was delivered. Stay away of [sic]this product."

66.     In or about September 2009, bnbonnet wrote the following on the Pissed Consumer website: "I had a severe allergic reaction to my new tempurpedic mattress and ended up in the hospital. I ordered it from brookestone and it arrived straight from the factory. When I took it from the bag, the smell of it was really intense. It's hard to describe, but sort of a strong industrial compound smell—similar to what a five gallon drum of crazy glue might smell like! I slept on my mattress and by morning had developed a sore throat. It was nov. [sic] and I didn't think much about it, just thought I might have come down with a cold. The second night was even worse and I could hardly talk the next day. But by the evening it had gotten really bad. I was having trouble swallowing. The little doo hicky in the back of my throat was the size of a giant slug. It filled my throat. Even then I hadn't made a eureka connection to it being the bed. However, I woke in the middle of the third night unable to breathe. My throat had swollen shut. I ended up in the emergency room. The doctor asked me if I had been exposed to anything that corresponded with the allergic reaction, like new furniture or carpet. By then I had done the math and realized the intense smell that came off the mattress when it came out of the bag was in fact being realized even more as I slept on the mattress as my body weight compressed it. I weighed a measely [sic] 125 pounds but as I compressed the foam, it released toxic petroleum based fumes. I had to get shots at the hospital and I had to stop using the bed. The doctor said my throat looked as if it had been chemically burned from the inside. I called brookstone and didn't get anywhere and the tempurpedic company themselves was a joke. They wanted to send me a complimentary

travel pillow for the trouble of my throat closing shut. The rep actually confided in me that the mattresses that come fresh off the line and are then sent out, so mine prob [sic] only a few days old. The material is petroleum based and many people have allergic reactions to things like new carpet and other new furniture. She told me that when a person lays on the mattress, it does release fumes. She said it should be put in a separate room or storage area and allowed to air out for several weeks. I was like !!! You want me to move this mattress to another part of the house and let it air out so that it will be safe enough to sleep on?? Why not put a warning on it or just let them air out in your own dam house before sending them out to your customers. Then, if they just about keel over from the toxic shock because there wasn't a warning, why don't you offer something beside a travel pillow. The mattress was 1400.00."

67.     On November 12, 2009, Sickly responded to the above post on Pissed Consumer, writing: "My husband and I purchased a Tempur Pedic mattress. It was delivered on Aug. 23, 2009. It had a terrible odor. We were told that it would go away eventually. Almost three weeks later I had to go into the hospital because I could not breath. [sic] It was becaused [sic] by this mattress. I am no longer sleeping on the mattress and we are in the process of trying to get the company that we purchased it from to let us exchange it for something else. In the mean time we are sleeping on another mattress that we had in a spare room. I am still having breathing problems and hardly have a voice at times. To the allergic person above did you get well again after you got rid of this horrible mattress? I am worried I will never feel well again. This should be taken off the market!"

68.     On February 12, 2010, Yanggor1983 responded on the Pissed Consumer website to the consumers listed in the above two paragraphs, stating: "I have the same allergy problem and I called Tempurpedic and you know what their reply is: "Haha! I don't think there is anything I could do" said by a representative call "ray". Then he sent me to go talking to the

retailer instead as if it is not their problem. If I ended up dying using their product and evidence noted that I did made [sic] a complaint and they refused to take action about it. It is essentially murder. I wish the general public are aware how irresponsible this Company is. Wish they will go bankrupt!!"

69.     Responding to the above three posts on the Pissed Consumer website, Dismayed Sooner wrote on March 3, 2010: "My wife and I bought a tempurpedic "Classic" king size mattress set for $2600 from a local dealer for Christmas. Mattress had to be ordered, not in stock. It arrived 2 weeks later direct from the factory to the dealer. Dealer said she'd air it out in her warehouse before delivering it to us after Christmas. OK by us. Mattress delivered mid-January. Wow, what a smell! Toxic chemical odor spread throughout our house. Friend came to visit, said "Yuck, What's that smell?" My wife refused to sleep on it. She has epilepsy & oders [sic] are a potential trigger for a seizure. I slept on it alone the first night, woke up feeling heavy in my limbs, aching joints, headache. Just like the flu. Called the manufacturer, Tempurpedic, told them what I experienced. Lady said the smell was harmless & would dissipate in a few days. The more I sleep on it the faster the oder [sic] would dissipate, she said. Silly me, I tried to "work" the mattress to get the oder [sic] out. Didn't sleep in the room, in fact, shut it off from the rest of the house, towel wedged into the bottom of the bedroom door, etc. but I tried every day to "knead" the foam to force the gas from the cells of the foam, like the Tempurpedic rep & dealer said to do. After a week, still smelly. Called again, wanted to return it (Tempurpedic has an infomercial advertising guarantee and 90 day trial offer—Nope! I was told I have to work through the dealer I bought the thing from-kinda [sic] snotty phone attitude to boot.) I approached the dealer, asked her to take it back, she agreed to pick it up & air it out some more, and loaned us a conventional mattress in the meantime. My wife still wouldn't enter our bedroom, said our clothes in the closet had absorbed the oder [sic] & it made her nauseous. Two

weeks later, the dealer asked us down to the store to "sniff test" the matress. [sic] In the store around other Tempurpedic floor models, I could smell only a faint oder, [sic] so said OK, send it to our house. When delivered & set up in our bedroom, the smell was noticeable. My wife fled. I slept on it 3 nights. Called the dealer, said take it back, we want to exchange it for a conventional mattress set. She said OK, go to another dealer & pick out what you want (she didn't have anything comparable in price.) We did, found comparable but $500 cheaper elsewhere, new dealer was sympathetic, said would work with the Tempurpedic dealer to work something out to our satisfaction. Tempurpedic dealer said OK & authorized the purchase. Yesterday received a letter from the Tempurpedic dealer listing $1050 in additional charges for returning stinking merchandise twice. Insult & injury-Tempurpedic requires $250 for delivering the mattress to the dealer & another $250 for picking up the mattress as a "return" & we have to pay $198 for the 2 "FREE" pillows given when we bought originally. Where do I turn for help? Class action suit anybody? Sick in body & heart in Norman OK."

70.    On the Pissed Consumer website, on February 13, 2011, Bob in Illinois responded: "WOW!! I was beginning to think I was the crazy one. We purchased a King size Tempurpedic mattress 5 weeks ago at Bedding Experts in the Chicago area. My husband's doctor recommended it for his back problems. The set cost $3500. We were told not to put any sheets on the mattress for a few hours after it was delivered, so it could "air" out. Two days later it was still smelling horrible, so I called the store and was told it would take a couple of WEEKS for the smell to go away. We were also told to walk on it and that would help get the fumes out. Anyway…5 weeks later it still SMELLS and my eyes burn and my throat is sore and I know it is from the fumes from this mattress. So we go to the store today and were told…yes you have a 90 day trial and you can return it, BUT we won't give you your money back and if you want another mattress that costs $2600…we will not give you the difference back! What the hell kind of

business is that? I have contacted the IL attorney general to file a complaint and also will file a complaint with the better business bureau. Class action suit??? COUNT US IN!!"

71.     Another anonymous post to the Pissed Consumer website occurred on December 19, 2009 regarding the overriding odor from Tempur-Pedic products. It stated: "My new Tempur-pedic Classic is…***. I don't know how well it sleeps because I've had the mattress in my house unwrapped, "airing out" for 28 days and I've never slept on it. I and my pregnant wife have been sleeping on our pull-out couch for a month now because we bought a noxious gas mat for $1,783.95. We have compressed the mattress to try and get the smell out. We have vacuumed it to try and get the smell out. I have had the window open daily for weeks, in the state of Maine, at the end of November and throught [sic] the first half of December, with freezing temperatures outside to no avail. My wife still won't go into our bedroom without quickly covering her nose upon entering the room. I can't believe any company would state as part of their sales pitch and marketing material that the smell of their mattress "will dissipate within a few days" when the reality of the product is completely different. Please notice that the word "few" is undefinable and could mean 3 days or 50 depending on your perspective of time. Also take note of the word "dissipate." I will testify that the smell will "dissipate" and lessen. This much is true. The statement, however, is meant to influence the consumer into inferring that the smell will dissipate until it is either not noticeable or gone completely. I can make no other conclusion other than that the statement made on the FAQ page of Tempur-pedic's website "Your mattress may have a slight odor remaining from our unique manufacturing process. This is normal and completely harmless and will dissipate within a few days" is misleading. It is a grand example of Stephen Cobet's [sic] term: "truthiness." Nowhere in the marketing literature does it say that the smell will "go away" or "fully air out." In fact, as it stands now, the evidence shows that the smell never goes away. It will always have a smell that I liken to the smell of mold or mildew. So far,

28 days into owning the Tempur-pedic Classic, the most expensive piece of furniture I've ever bought, and not to mention that I bought it so that I might bring comfort to my pregnant wife (this will be the fist [sic] child for both of us), I am completely unsatisfied and would never recommend this product to anyone. Do not buy this product. You will regret it."

72.    On July 5, 2013 on the Pissed Consumer website, angry_consumer responded to the posting directly mentioned above as follows: "Completely agree! And what ***me off the most is that the sales person mentioned nothing about the odor when we bought the mattress. Had I known there is a strong chemical odor and there is a period of off-gassing, I wouldn't have bought it. I'm also angry with the website of Tempurpedic dismissing the odor as "slight" and "will dissipate within a few days". These are just out-right lies. The odor is NOT slight, and it does NOT dissipate within a few days. We consumers should unite together and file a class action law suit against Tempurpedic for the mental and physical harm, and time loss dealing with the hassle, done by the false advertisement of Tempurpedic."

73.    On July 14, 2011, Sav posted the following on the Pissed Consumer website: "My husband and I purchased a tempurpedic deluxe Queen bed with the impression that it is the best bed money can buy. The mattress and pillows besides leaving us feeling hot, sunken in, heavy, immobile, numb, and red gave my husband flu like symptoms the whole two weeks we endured it. The off gassing is so bad it is seeped into everything in the bedroom. I developed an extreme allergic response from the irritants causing body aches, headaches, nausea, coughing, shortness of breath and palpitations. (I am a healthy active 36yr old mother of two.) Eventually, the symptoms became so severe I had an asthma-like attack. At the doctor my x-ray revealed pneumonia in my lungs. I wish I could sue then for nearly killing me."

74.    On January 18, 2012, in response to Sav's posting, Lindasmithusa stated: "We had the same problem, headaches, nausea etc. They did not care. We never were able to sleep on

it but they wouldn't take it back. I hope people learn about this before it makes more people sick." In response to another dis-satisfied Tempur-Pedic customer, Lindsmithusa further posted on the same day: "Ours had a horrible smell that made us sick. We moved it to a guest room thinking they would take it back but they would not even though we begged them to. The smell never left and was all over our house. After months of this and being sick all the time we finally wrapped it up and moved it to our storage building where it is now. I want people to know about this so they don't go through what we did. It was a terrible experience. I wouldn't wish it on anyone. I don't know how Tempur-pedic has managed to hide this so well. A cheap mattress shouldn't make you sick and a $7000 one absolutely shouldn't. Consumers beware!"

75.     Thereafter, on June 8, 2012, Jan responded to the same Pissed Consumer postings and replied: "The mattress will make you sick if you are sensitive to chemicals. It did me. I ended up at the pulmonologist after I bought the bed, because I became very short of breath, kept coughing, had a constant irritating feeling in my trachea, and a pain in my lungs. The CT of my lungs and Pulmonary function test came back abnormal and now I am on inhalers. I sent the bed back but am still left with some of the bothersome side effects. I would never recommend anyone buy this bed or any bed that has chemicals for that matter. I am going to buy a chemical free mattress."

76.     On March 29, 2012, Jennifer of Madison, New Jersey described her experience on Consumer Affairs' website: "I spent $3150 on a twin cloud mattress. The toxic smell gave me asthma attacks and flu-like symptoms….My experience with tempur-Pedic makes me sick, literally—first, their toxic mattress; now their incompentent [sic] customer service and accounting departments."

77.     On February 21, 2012, Caryn of Roswell, Georgia shared the following on Consumer Affairs' website: "I purchased a Tempur-Pedic Cloud Luxe Queen Mattress and base

from mattress Firm. I spent over $5,100. The sales person said it might have a slight odor for a couple of days. When it was delivered, it had the worst reek I could imagine. It made my whole house smell like a chemical dump. I called Mattress Firm and was told to open the windows and put out baking soda! That did nothing….What can of chemicals are the manufacturers putting in these things? If I wanted cancer, I could just start smoking again! Now I'm stuck with chemicals wafting through my house and no place to sleep and a splitting headache from the fumes."

78.    On October 25, 2012, Sick wrote to the Pissed Consumer website and described their experience with Tempur-Pedic products this way: "We just spent $4800 on the Tempurpedic Cloud Supreme, and cannot even enter our bedroom since it arrived. The first questing [sic] we asked before purchase was "is it hypoallergenic." Well, this asmatic [sic] can tell you it is not. Burning eyes, sore throat, dizziness, shortness of breath, you name it. The fumes are so strong, even with the windows open and fans on, it permeates the entire house. God forbid you actually lie on it for any length of time, and you are rushing for the door to get out. I called the store, and they insist they must send a manager to make sure there really is a problem. Before they take it back. Really? Does the manager have asthma and heart and lung disease, with chemical sensitivities? Yes, this has been a nightmare….Needless to say, we do not think very highly of Tempurpedic."

79.    On April 17, 2012, bubberbubber contacted the Pissed Consumer website and stated: "Bought a Tempur-pedic cloud mattress 4 weeks ago. Today it left on the truck that brought the mattress which is not programmed to end my life. When it 1st arrived it smelled of plastic and pesticide. I suppose that's what polyurethane is in some form. I was told by the company that the smell was common to new mattresses and that it would dissipate in a few days. Week one: feeling sick haven't slept. Week 2: feeling sick haven't slept. In the meantime per company suggestions I have washed the cover (daily) and pounded the mattress with every broad

beamed object I have around. Week 3 sick as a dog, no sicker than a dog. Week 4 looking to spend 8 years at Gitmo, I trade the *** thing in. It's gone, praise the lord. What product that costs 2500 bucks requires you to have a black belt to whip it into shape. Why may I ask don't they do that at the factory so that when it arrives it's ready to use out of the box rather than having it become a life consuming experience."

80.    On April 25, 2012, in response to bubberbubber's post, Lisa replied: "I completely agree. Stay away from this toxic nightmare. When the delivery man dropped off and took off the plastic wow…did it smell toxically strong…told me a couple of hours it would be better. Well it has been 5 weeks now and still smells very strong, and the smell has permeated throughout our entire house. As a person with asthma, the smell gave me the worst asthma attack I ever had!! Don't listen to the salesmen that say cut an apple and in a couple of days the smell will be gone…they are very, very wrong!! Buyer beware!!"

81.    On November 28, 2012, an anonymous post on the Pissed Consumer website noted: "Toxic smell: Tempurpedic mattresses not only smell bad, the fumes they expel cause headaches, allergies and nausea. The smell does not go away in days or weeks, it stays for months! The customer service agents will only tell you that you have to use the mattress for the odor to go away, but please, don't even try it! We woke up in the middle of the night with headaches, nausea, bleeding noses and a sore throat. Calling customer service is a waste of time because they will only tell you that they will replace them for other stinky mattress! What is the explanation they will give you? That they sell so many mattresses that there is not enough time for the fumes to leave the mattress…."

82.    On December 11, 2012, another anonymous post regarding Tempur-Pedic on the Pissed Consumer website stated, in part: "I was very excited about the new bed and happy to have called, but when the bed arrived, the real nightmare began. Within fifteen minutes of being

brought into the bedroom, the whole house smelled of chemicals (sort of like a super intense new car smell combined with new carpeting and oil-based paint). I had expected some odor, so I immediately opened the window, put fans in the room, and closed the door. I expected to wait a few days to sleep on the mattress, and by the way, it was also hard as table, so even if I had wanted to sleep with the smell, I couldn't have. The odor got worse for at least a week as the mattress softened up, or as the representatives that I spoke with every day told me—"the cells opened." I was advised to walk on it, put fans on it, and finally to *** the sleeve and wash it three times. After four days, I did try to sleep on it for three nights, but I made the mistake of closing the window (it was cold out in November), and each night I woke up and had to wash all the blankets and sheets and mattress cover. My pajamas also smelled of chemicals and all the clothing in my closet. On the third morning, I woke up with asthma, and moved out again to an air mattress. I put an air filter in the room along with the fans, and was told that the off-gassing could take up to a month. Well, this was starting to seem completely unreasonable for a new piece of furniture, and it was probably ten or twenty times worse than the odor I had noticed with the first bed. Supposedly this was because the bed was already five months old and had been warehoused at the retailer's and had had time to off gas, whereas the replacement beds are made to order and shipped out directly from the factory. It was true that my replacement bed had a production date of two weeks before it had arrived. I was so disillusioned with this, exhausted from sleeping on the floor and not even being able to enter my bedroom without feeling sick that I called to ask for a refund. Each time I called, I spoke to a different representative who all told me that the odor was "normal" and "not normal" depending on the day. They finally offered to send a refund but only if I accepted another replacement and that if that one had any odor after a week, I could get my money back. This was an offer I might have taken had I not already spent over three weeks on the floor, but no one could tell me why the new bed would not have an odor

unless they were going to do something different either in the production or shipment which they denied. So, I said that I couldn't handle another three more weeks without a bed or bedroom, and I gave the bed away (even after it was moved out, my room still stunk for a few days), and bought a cheaper traditional bed."

83.     On March 11, 2013, Jane responded to the above post with this entry, on Pissed Consumer, in part: "…I just have to say it is almost EXACTLY our experience. Our good friends bought a Tempurpedic 2 years ago and like it, so we tried one too. Our Tempurpedic Weightless, a new model, arrived late in the afternoon, and we slept on it that night despite the chemical smell. Big mistake. My husband, an ER physician, awoke with a sore throat and hoarseness, and I experienced shooting pains in my head unlike any I had ever experienced. In the interest of full disclosure, I do get migraines, but these pains were different-—sharp and jab like, each one very brief but painful. We also realized everything stunk—the sheets, our pajamas, the large room. We called our salesman at Sleep Train to ask about the smell, and he told us to walk all over the mattress to open the cells. We did this over and over, opened windows, and turned the mattress on edge in front of a powerful shop fan. For the next 9 days, we slept downstairs in another room. Unfortunately, every time we went into our master bedroom to retrieve clothes, etc., my shooting pains came back and my husband's hoarseness became asthma-like. He also developed headaches, and I had one migraine after another, in addition to the random shooting pains. On the 9th day, our friends with a Tempurpedic came over to look at our mattress at our request. They couldn't believe the smell! They said it was nothing like their experience. Yes, their mattress smelled initially but only for a few days and never as strong. I have no idea what accounts for the difference. Many say that newly made mattresses smell worse because they haven't had the chance to off gas. But unless a mattress is used and being resold as new, the plastic covering them wouldn't allow for much off-gassing in the warehouse….Truthfully I don't

know what the cause of our problems were with this mattress. But I do know this: the room stank and continued to cause us the same reactions for a week after the mattress was hauled away."

84.    On June 3, 2013, Edward Henderson of Billings, Montana stated on Consumer Affairs' website: "Severe increasing breathing, mental and physical problems encountered by myself and my wife while sleeping on a Tempur-Pedic mattress. We purchased a Tempur-pedic King size Weightless Supreme mattress and two queen sized Cloud Pillows for $3,299.00, via telephone from Tempur-Pedic on November 24, 2012. We received the pillows within a few days of the order placement and the mattress arrived the first week in December 2012. We immediately set up the bed, complied with Tempur-Pedic's recommended procedures for assisting in reducing gas/chemicals smells from the mattress and pillows by airing and walking on them several times and immediately began sleeping each night on the mattress and utilized the Cloud Pillows. Increasingly, when sleeping on the mattress, I became aware of increasing difficulties breathing, gasping for breath, extensive sinus mucus drainage and feelings of a partially blocked or swollen throat. I was having increasing difficulty sleeping, and when I did sleep I would sometimes wake up almost panicky with a sensation of drowning. Mentally, I had an increasing inability to relax and extensive random rapid, frustrating, uncontrollable mental thoughts leaping through my mind making sleep very difficult or impossible. Being a senior citizen, I assumed I had "a bug" that would resolve itself and/or I was just getting older and had to expect these difficulties to occur. The symptoms would lessen during the daytime and I would feel better by evening. As the symptoms continued to become more severe, I determined that I must take some sort of action to attempt to find the cause for and some relief from these problems. I tried to determine if I had changed any meds or other aspects of my life that could possibly contribute. We evaluated our foods for any changes of diet or any lifestyle changes that may have contributed. After extensive considerations, I thought to evaluate the potential that the

Tempur-Pedic mattress and/or pillows could be a factor. At this point, I chose to try and continue to sleep on the Tempur-Pedic mattress but utilize a regular conventional pillow from our old bed. My symptoms during the night and day reduced somewhat but did not stop. Sometimes, I would change back to the Tempur-Pedic pillow and my symptoms would once again increase. Finally, I chose to sleep in our guest bedroom on a conventional inner spring mattress with a regular pillow to see if there was a difference in my symptoms. The first night I slept fitfully but the symptoms were greatly reduced. Since then, each night I have slept more soundly and the symptoms now have reduced to the point that I consider to be much improved. I do not know if my symptoms will ever completely clear up and/or if there is possibly some permanent damage been caused, but I have chosen to not sleep again on the Tempur-Pedic mattress and/or pillows. We are in the process of obtaining a new pure 100% natural latex mattress to replace the Tempur-pedic mattress and pillows at a cost of $2,807.00. As I discussed my symptoms and concerns with my wife, she began to list symptoms that she was experiencing that she was trying to justify as possible aging and/or stress/intensity in her employment requirements. Some of the symptoms she listed were; eyes feeling very tired with stinging and burning sensation, inability to think as well and difficulty in concentrating on specific subjects, severe itching on the back of her neck and head, not sleeping soundly and not feeling rested, very tired and un-energetic all the time. After the decrease in my symptoms after one night, she chose to also sleep in the guest bedroom on the conventional inner spring mattress and pillow. Her symptoms have also significantly improved. We have never slept on the Tempur-pedic mattress and pillows again. After all of our efforts, it is apparent and it is my opinion that the off-gassing from chemical byproducts from the Tempur-Pedic mattress and pillows is the cause of our discomfort and symptoms. On April 16, 2013, we filed a complaint with the Better Business Bureau concerning our problems with the Tempur-Pedic products. After extensive communication from BBB to Tempur-Pedic, as of June

3, 2013, there has been absolutely no communications from the Tempur-pedic company in any manner."

85.     Thereafter, Edward Henderson of Billings, Montana posted to the Consumer Affairs website on June 4, 2013: "Follow-up to my review submitted on June 3, 2013. I received a call from Tempur-Pedic company today. They stated that they will arrange to have the mattress and pillows returned to them and will submit a letter to me to sign that will specify a refund amount. I am awaiting their further action."

86.     On March 18, 2013, Denise of Young Harris, Georgia wrote on the Consumer Affairs' website: "We purchased the Tempur-Pedic Contour Signature Queen Mattress for $3,000.00. After having it for sixteen days, we still were not able to sleep on it because the smell was so toxic. The store owner would not return our calls. His employees would tell us that the owner said they could not do anything for us, and we had to go through Tempur-pedic. They called their rep for Tempur-Pedic, and they said she told the owner we had to keep it for 30 days and then they would take it back for a $300.00 restock fee. The Tempur-Pedic rep would not return our calls, and Tempur-Pedic would not respond to our emails. When we did finally get a hold of someone at Tempur-Pedic, they said they only take care of warranties and only exchange the mattress with another."

87.     On February 12, 2013, Gina of Copiague, New York, told the Consumer Affairs website: "After many years of doctor visits: from dermatologists, to rheumatologist, to gynecologist, and finally to an allergist, I found out that I am allergic to chemicals used in making rubber products. The diagnosis was overexposure to these chemicals causing my immune system to react. After several years of misdiagnosis, I have finally found the source of my medical problems, which are hives on hands, swollen face, itchy burning eyes, fatigue, body aches, nausea, flu like symptoms, and endless other symptoms. My symptoms have been treated

with oral steroids, antibiotics, and now topical creams. After abandoning my Tempur-Pedic bed, I have determined the source of the chemicals making me sick. I called tempur-pedic directly and have yet to get a reply. I wanted a breakdown of chemicals used in the manufacturing to determine if any mixed Diakyl Thioureas are used. I cannot get an answer. I am now stuck with a $3,000.00 bed I cannot sleep in."

88.     Repeated scientific testing of Tempur-Pedic products consistently reveals that Tempur-Pedic mattresses and pillows can and do contain potentially harmful VOCs including, but not limited to, formaldehyde. For example, in August 2012, scientific testing conducted on newly purchased Tempur-Pedic products found formaldehyde and other VOCs. In April of 2013, scientific testing of newly purchased Tempur-Pedic product found formaldehyde and other potentially harmful VOCs. Further scientific testing on newly purchased Tempur-Pedic product in August 2013 and October 2013 confirmed the presence of formaldehyde and other VOCs in Tempur-Pedic's products.

89.     The Consumer Representatives relied on Defendants' misrepresentations and omissions to their detriment.  The mattresses and pillows made from TEMPUR materials owned by the Consumer Representatives contain VOCs, including but not limited to formaldehyde. The Tempur-Pedic products are neither allergen resistant nor hypoallergenic. The Tempur-Pedic products can and do contain formaldehyde and other VOCs that are considered potential allergens.   Although the various models of the Tempur-Pedic mattresses and pillows sold by Defendants contain different features, all of these products contain TEMPUR material that can and do off-gas formaldehyde and other VOCs.

90.     Defendants' use of false, misleading, unfair and deceptive statements and omissions in its lengthy, pervasive and widespread Marketing Campaign for all its Tempur-Pedic mattresses and pillows containing Tempur material for many years created a false belief among

its retailers and customers that Tempur-Pedic products were free of harmful VOCs, including but not limited to formaldehyde, and were allergen resistant, hypoallergenic and safe and healthy. Defendants charge, through its "one price", non-negotiable policy, a premium for Tempur-Pedic products as compared to other mattresses and pillows.

91.     Defendants' misrepresentations and/or omissions caused Plaintiffs to purchase Defendants' products, which they would not have otherwise purchased, or would have paid significantly less for, had Defendants truthfully stated that Defendants' Tempur-Pedic mattresses and pillows containing TEMPUR material can and do contain potentially harmful VOCs including, but not limited to, formaldehyde and that numerous Tempur-Pedic customers have had ongoing complaints concerning allergic reactions and symptoms and other health related conditions concerning  Tempur-Pedic's products.

92.     Moreover, upon information and belief, Defendants intended Plaintiffs to rely on its deceptive conduct, including its affirmative misrepresentations and omissions.

93.     The conduct of Defendants was fraudulent, malicious, and/or oppressive to a degree sufficient to support an award of punitive damages against Defendants. Defendants intentionally misrepresented, deceived and/or concealed material facts known to Defendants with the intention on the part of the Defendants of thereby depriving the Plaintiffs of property and/or legal rights and/or otherwise causing injury. Defendants' malicious conduct was intended to cause injury to Plaintiffs and/or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights and safety of others. Defendants' oppressive conduct is despicable conduct in that it subjects Tempur-Pedic customers to cruel and unjust hardship in conscious disregard of the customers' rights.

## **CLASS ALLEGATIONS**

94.     The Consumer Representatives bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

95.     The Class and Subclasses that the Consumer Representatives seek to represent are defined as follows:

a. Plaintiffs seek certification of a ten (10) state class, defined as:

All persons who purchased, not for resale, a Tempur-Pedic mattress or pillow in the States of California, Illinois, Maryland, Massachusetts, Missouri, New Jersey, New Mexico, New York, Wisconsin and Washington from January 1, 2006, through December 31, 2013.

Excluded from the Class are:  (i) Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendants' employees, officers, directors, agents and representatives and their direct family members; (iv) the Judge and staff to whom this case is assigned and any member of the Judge's immediate family;  (v) all those who validly and timely opt-out of the certified class; and (vi) claims for physical injuries.

b.      Plaintiffs seeks certification of a nationwide Unjust Enrichment class, applying the substantive law of the State of Kentucky, as follows:

All persons who purchased, not for resale, a Tempur-Pedic mattress or pillow in the United States from January 1, 2006, through December 31, 2013.

Excluded from the Class are:  (i) Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendants' employees, officers, directors, agents and representatives and their direct family members; (iv) the Judge and staff to whom this case is assigned and any member of the Judge's immediate family; (v) all those who validly and timely opt-out of the certified class; and (vi) claims for physical injuries.

96.     This action has been brought and may be properly maintained as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a

well-defined community of interest in the litigation and the proposed class is easily ascertainable:

a) <u>Ascertainability</u>:   The proposed class definition is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a Class Member. Identifying class members is a manageable process that does not require much, if any, individual factual inquiry, as members can be ascertained by reference to objective criteria, like sales records in the possession of Class Members, the Defendants and/or the Defendants' approved retailers.

b) <u>Numerosity.</u> Tempur-Pedic products were sold and distributed throughout California, Illinois, Massachusetts, Maryland, Missouri, New Jersey, New Mexico, New York, Washington, and Wisconsin and across the United States. The Consumer Representatives are informed and believe that the proposed putative Class and Subclasses are made up of thousands of Tempur-Pedic customers throughout California, Illinois, Massachusetts, Maryland, Missouri, New Jersey, New Mexico, New York, Washington, Wisconsin and the remainder of the United States making the joinder of all members impracticable.   Although the precise number of such persons is unknown, the information on which that number is calculated is presently within the sole control of Defendants, and upon information and belief, is in excess of one million consumers.

c) <u>Common Issues Exist and Predominate.</u> Common questions of law and fact exist as to all members of the Class that are capable of classwide resolution, meaning that the determination of the truth or falsity of such common questions of law and fact will resolve issues central to the validity of each one of the claims advanced herein.   Those common questions and issues of law and fact predominate over any questions which affect only individual members of the Class. All Tempur-Pedic mattress and pillow products contain Tempur material and off-gas

chemicals. Tempur-Pedic products are all the same in this regard and do not differ in any manner relevant to the Consumer Representatives' allegations, and the damage and harm caused thereby. The Consumer Representatives allege herein in greater detail that Tempur-Pedic mattress and pillow products all have the same inherent problems regarding the misrepresentations and omissions by Tempur-Pedic concerning the mattress and pillow products. There is a well-defined community of interest in the questions of law and fact involved and that affect Plaintiffs who purchased Tempur-Pedic mattress and pillow products. These questions of law and fact predominate over the questions that affect only individual class members.

The common questions of law and fact include, without limitation:

(1)    Whether Defendants' Tempur-Pedic mattress and pillow products contain formaldehyde;

(2)    Whether Defendants' Tempur-Pedic mattress and pillow products contain any potentially harmful VOCs besides formaldehyde;

(3)    Whether the chemicals in Defendants' Tempur-Pedic mattress and pillow products and/or off-gassing from Tempur-Pedic mattress and pillow products are harmless;

(4)    Whether the chemicals in Defendants' Tempur-Pedic mattress and pillow products and/or off-gassing from  Tempur-Pedic mattress and pillow products are completely safe;

(5)    Whether Defendants' Tempur-Pedic mattress and pillow products are allergen resistant;

(6)    Whether Defendants' Tempur-Pedic mattress and pillow products are hypoallergenic;

(7)    Whether Defendants knew and/or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products contain formaldehyde;

(8) Whether Defendants knew and/or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products contain potentially harmful VOCs;

(9) Whether Defendants knew or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products were not harmless;

(10) Whether Defendants knew and/or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products were not completely safe;

(11) Whether Defendants knew and/or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products were not allergen resistant;

(12) Whether Defendants knew and/or recklessly disregarded the fact that Defendants' Tempur-Pedic mattress and pillow products were not hypoallergenic;

(13) Whether Defendants ever tested Defendants' Tempur-Pedic mattress and pillow products for the presence of formaldehyde;

(14) Whether Defendants ever tested Defendants' Tempur-Pedic mattress and pillow products for the presence of any other potentially harmful VOCs;

(15) Whether Defendants ever tested Defendants' Tempur-Pedic mattress and pillow products to determine their allergen resistance;

(16) Whether Defendants ever tested Defendants' Tempur-Pedic mattress and pillow products to determine their hypoallergenic characteristics;

(17) Whether Defendants concealed and failed to disclose to the Class, material facts from Defendants' communications and disclosures to Defendants' retail sales and distribution network, their own retail sales and marketing representatives, their own customer service representatives and to Defendants' potential and actual customers;

(18) Whether Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the sale of Tempur-Pedic products;

(19) Whether Defendants violated California, Illinois, Massachusetts, Maryland, Missouri, North Carolina, New Jersey, New Mexico, New York, Washington, and Wisconsin consumer protection statutes;

(20) Whether Defendants have been unjustly enriched;

(21) Whether, as a result of Defendants' conduct the putative Plaintiff Class and Subclass members have suffered damages; and if so the appropriate amount thereof; and

(22) Whether, as a result of Defendants' misconduct, Plaintiffs are entitled to equitable relief and/or other relief, and if so, the nature of such relief.

These questions of law and fact predominate over questions that affect only individual Class members and there is a well-defined community of interest in the questions of law and fact involved and that affect the Class. Claims under each of the various state consumer protection statutes are not premised upon the individual reliance of any Class Member, and causation, for purposes of showing damage, is determined by an objective standard, from the perspective of a reasonable consumer, rather than any understandings specific to the individual consumer. Claims for unjust enrichment, including under the law of the State of Kentucky, are not materially different under the laws of any State, all involving a showing of a benefit conferred upon the Defendants that it would be inequitable for them to retain. Furthermore, there exists a classwide method of awarding relief to Class Members consistent with the Plaintiffs' theories of liability, and classwide damages, or the "price premium" that the Defendants extracted from Class Members can feasibly and efficiently be calculated once the common liability questions are adjudicated.

d)      <u>Typicality.</u>  The Consumer Representatives' claims are typical of the claims of the Class members and the interests of the named Plaintiffs align with the interests of the Class, in that the Consumer Representatives and Class Members have substantially the same Tempur-Pedic mattress and pillow products, which share the same design, parts, materials, workmanship and manufacture. Tempur-Pedic repeatedly made the same, if not nearly identical, uniform representations and omissions about these products. Therefore, the claims of the Consumer Representatives are and will be typical of Class Members.  Class Members have suffered the same or similar injury as the named Consumer Representatives; the present action is based on conduct which is not unique to the named Consumer Representatives, and absent Class Members have been injured by the same course of conduct.

e)      <u>Adequacy.</u>  The Consumer Representatives will fairly and adequately represent the interests of all Class members. Consumer Representatives have each purchased Tempur-Pedic mattresses and pillows and are adequate representatives of the Class, as they have no interests which are adverse to the interests of absent Class Members. The named Consumer Representatives' claims and the Class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence.   The Consumer Representatives have retained counsel with substantial experience and success in the prosecution of complex litigation, particularly involving chemicals such as VOCs, and consumer protection class action litigation.

f)      <u>Superiority.</u>  A class action is superior to other available means for a fair and efficient adjudication of this controversy. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The disposition of their claims in this case and as part of a

single class action lawsuit, rather than thousands of individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds of separate lawsuits. Furthermore, given the extraordinary expenses and burden in conducting discovery and presentation of evidence regarding the chemicals involved in this case, the burden of individual litigation would make it extremely difficult, if not impossible, for individual members of the Class to redress the wrongs asserted herein. Addressing this matter as a class action will serve important public interests. Moreover, separate prosecutions by thousands of individual members of the Class would likely establish inconsistent standards of conduct for the Defendants and result in the impairment of and potential harm to, Class members' rights and the disposition of their rights through actions to which they were not parties. The Consumer Representatives are informed and believe that a great amount of time and expense will be saved by conducting discovery and presenting evidence about the characteristics of Tempur-Pedic's mattress and pillow products and the misrepresentations and omissions alleged in this complaint in a single class action lawsuit. By contrast, repeated discovery and presentation of evidence in hundreds of separate lawsuits addressing those same common questions would be highly duplicative, and highly wasteful of the resources of the parties and the court. The Consumer Representatives know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.   The actual interests of the parties to this litigation, including absent Class Members, can be served best by settling these issues in a single action.

**FIRST CAUSE OF ACTION**
**Asserted On Behalf Of the California Class**
**(Violations of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

97.   The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

98.     Defendants have engaged in unfair, unlawful, and fraudulent business acts or practices as set forth above.

99.     The California Consumer Representatives, Alvin and Melody Todd,  bring this cause of action on behalf of themselves and the California Class, pursuant to California Business and Professions Code § 17200, *et seq.*

100.    Defendants' conduct constitutes **<u>unfair</u>** business acts and/or practices because Defendants' practices have caused and are likely to continue to cause substantial injury to Plaintiffs. Plaintiffs could not have reasonably avoided such injury, in light of Defendants' exclusive knowledge about the nature and degree of chemicals off-gassing from Tempur-Pedic mattresses and pillows, as well as Defendants' actual and/or constructive knowledge of the volume and content of customer complaints concerning allergic reactions and symptoms attributed to Tempur-Pedic's products. The substantial injury suffered by the California Consumer Representatives and the members of the putative California Plaintiff Class are not outweighed by any benefits to the Plaintiffs. Defendants' conduct is ongoing and continues to this date.

101.    Defendants' acts and practices of selling Tempur-Pedic mattresses and pillows while omitting material facts about Tempur-Pedic's mattresses and pillows offend an established public policy, and/or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Defendants omitted material facts about Tempur-Pedic mattresses and pillows including, but not limited to the following: (i)  that Defendants' Tempur-Pedic mattresses and pillows  can contain formaldehyde and other potentially harmful VOCs; (ii) that Defendants consider formaldehyde and other VOCs capable of triggering allergic reactions and asthma attacks; (iii) that, when newly-purchased, Defendants' Tempur-Pedic mattresses and pillows  can and often do emit a significant chemical odor; (iv) that the chemical odor from Defendants'

Tempur-Pedic mattresses and pillows can and does persist for a significant period of time—up to many months; (v) that Defendants have received numerous complaints, over a number of years, from Tempur-Pedic customers about the strength of the odor coming from their Tempur-Pedic products; (vi) that over a number of years Defendants' Tempur-Pedic customers have complained to Defendants and their retail sales and distribution network about allergic reactions and symptoms from Tempur-Pedic's mattresses and pillows; (vii) that Defendants knew or should have known numerous previous customer complaints called into question Defendants' repeated claims concerning the purported allergen resistance, hypoallergenic, and completely safe character of Defendants' Tempur-Pedic mattresses and pillows.

102.    Defendants' omissions and misrepresentations are anticompetitive because consumers are lured into buying Defendants' Tempur-Pedic mattresses and pillows when, had they been made aware of the true facts, they would have bought less expensive mattresses and/or pillows or other alternative mattresses and pillows.

103.    Defendants' acts and practices are **<u>unlawful</u>** because they violate California Civil Code §§ 1709, 1710 and 1711. Defendants' acts and practices are also unlawful because they violate the CLRA, Civil Code 1750 *et seq.,* Cal. Bus. & Prof. Code § 17500 and California common law.

    i.    Defendants violate California Civil Code §§ 1709, 1710 and 1711 by not disclosing to the public:    (a)    that Defendants' Tempur-Pedic mattresses and pillows  can contain formaldehyde and other potentially harmful VOCs; (b) that Defendants consider formaldehyde and other VOCs capable of triggering allergic reactions and asthma attacks; (c) that Defendants' Tempur-Pedic mattresses and pillows can and often do emit a significant chemical odor when newly purchased; (d) that the chemical odor from Defendants' Tempur-Pedic mattresses and pillows

can and does persist for a significant period of time—up to many months; (e) that Defendants have received numerous complaints from Tempur-Pedic customers about the strength of the odor emitting from their Tempur-Pedic products over a number of years; (f) that over a number of years Defendants' Tempur-Pedic customers have complained to Defendants and their retail sales and distribution network about allergic reactions and symptoms from Tempur-Pedic's mattresses and pillows; (g) that Defendants knew or should have known that numerous previous customer complaints called into question Defendants' repeated claims concerning the purported allergen resistance, hypoallergenic, and completely safe character of Defendants' Tempur-Pedic mattresses and pillows. Defendants have engaged in deceit by suggesting as facts things that are not true and that Defendants do not believe are true. This includes, but is not limited to, Tempur-Pedic products being formaldehyde free, Tempur-Pedic products being free of harmful VOCs, Tempur-Pedic products being safe, Tempur-Pedic products being completely harmless, Tempur-Pedic products being allergen resistant, Tempur-Pedic products being hypoallergenic, and Tempur-Pedic products having only a slight odor that will dissipate in a few days. Defendants have engaged in deceit by asserting as facts things that are not true and that Defendants have no reasonable grounds for believing to be true. This includes, but is not limited to, Tempur-Pedic products being formaldehyde free, Tempur-Pedic products being free of harmful VOCs, Tempur-Pedic products being completely safe, Tempur-Pedic products being harmless, Tempur-Pedic products being allergen resistant, Tempur-Pedic products being hypoallergenic, and Tempur-Pedic products having only a slight odor that will dissipate in a few days. Defendants have engaged in the suppression

of facts Defendants are bound to disclose and have provided other information which was likely to mislead consumers because of Defendants' material omissions. These material omissions include, but are not limited to, providing information regarding: the presence of formaldehyde in Tempur-Pedic products, the presence of other potentially harmful VOCs in Tempur-Pedic products, the number, scope and degree of consumer complaints concerning allergic and asthmatic symptoms and reactions consumers attributed to Tempur-Pedic products, and the number, scope and degree of consumer complaints concerning the strength and length of time chemical odors are emitted from Tempur-Pedic products. Defendants practiced these deceits with intent to defraud the public, including but not limited to, potential and actual Tempur-Pedic customers.

ii.    Defendants violate Cal. Bus. & Prof. Code § 17500 as alleged throughout this Complaint and in the Second Cause of Action, incorporated hereto by reference.

iii.   Defendants violated the CLRA as alleged throughout this Complaint and in the Third Cause of Action, incorporated hereto by reference.

iv.    Defendants violated California common law as alleged throughout this Complaint.

104.   Defendants' acts and practices are **fraudulent** in that they have deceived and/or are likely to deceive Plaintiffs and members of the consuming public, including the Class. Defendants knowingly sold Tempur-Pedic mattresses and pillows by making material misrepresentations and omissions since at least March 2007.

105.   California Consumer Representatives and the putative Plaintiff Class relied upon Defendants' unfair, unlawful, and fraudulent business acts and practices—the material misrepresentations, omissions and non-disclosures—to their detriment in that they would not

have purchased the Tempur-Pedic products for the retail price they paid had they known of the true material facts.

106.    Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Class.

107.    California Consumer Representatives and the putative Plaintiff Class have suffered injury in fact and have lost money as a result of Defendants' unfair competition in that they have overpaid for the Tempur-Pedic mattresses and pillows and/or would not have purchased the Tempur-Pedic mattresses and pillows had Defendants not misrepresented and omitted disclosing the information set forth in this Complaint.

108.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

109.    The Consumer Representatives seek an order of this Court awarding restitution, injunctive relief and all other relief allowed under § 17200 *et seq.*, plus interest, attorneys' fees and costs.

## SECOND CAUSE OF ACTION
**Asserted On Behalf of the California Class**
**(Violations of Cal. Bus. & Prof. Code § 17500 *et seq.*)**

110.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

111.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17506.

112.    Defendants falsely advertised the performance, uses, benefits, characteristics, quality, grade and standard of Defendants' Tempur-Pedic mattresses and pillows by, *inter alia*, representing: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii)

that Tempur-Pedic mattresses and pillows are "formaldehyde free"; (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will "dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "completely safe"; and (viii) that Tempur-Pedic mattresses and pillows are "harmless".

113.    Defendants also falsely advertised by failing to disclose the material facts set forth in this Complaint.

114.    These and other representations and omissions, as more fully described above, did deceive, and are likely to deceive the California Consumer Representatives and the putative Plaintiff Class.

115.    California Consumer Representatives and the putative Plaintiff Class relied upon these material representations and omissions to their detriment in that they would not have purchased the Tempur-Pedic mattresses and pillows for the retail price paid had they known of the true facts.

116.    Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Class.

117.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

118.    The above-described sales and misleading advertising conducted by Defendants continues to this day and presents a threat to the general public in that Defendants have not acknowledged their wrongdoing to consumers or publicly issued an appropriate, conspicuous notice to existing or prospective purchasers of its Tempur-Pedic mattresses and pillows, and have not disclosed the presence of formaldehyde and other potentially harmful VOCs in their Tempur-

Pedic mattresses and pillows, or disclosed the fact that they have received numerous complaints from consumers of the strength of the chemical odors lasting more than a few days and have also received complaints about allergic reactions and symptoms attributed to Tempur-Pedic mattresses and pillows from Tempur-Pedic customers.

119.   As a result of the above-described conduct, Defendants have been, and will continue to be unjustly enriched at the expense of Plaintiffs.

120.   Pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17535, the California Consumer Representatives seek an order 1) requiring Defendants to immediately cease the unlawful, unfair, and/or fraudulent business acts and/or practices and false and misleading advertising complained of herein; 2) enjoining Defendants from continuing to misrepresent Tempur-Pedic mattresses and pillows uses, benefits, characteristics, standard, quality and grade by omitting from its advertising and communications regarding Tempur-Pedic mattresses and pillows that; (i) they can and do contain formaldehyde; (ii) they can and do contain other potentially harmful VOCs; (iii) they are  not allergen resistant; (iv) they are not hypoallergenic; (v) they are not completely safe; (vi) they are not harmless; (vii) the odor from the mattresses and pillows can often be very strong; (vii) the odor from the mattresses and pillows can last for many months; and (viii) past Tempur-Pedic customers have complained of allergic reactions and symptoms they attributed to Tempur-Pedic's mattresses and pillows; and 3) requiring Defendants to provide full restitution to the California Consumer Representatives and California Class members of all monies wrongfully acquired by means of such acts of unfair competition and false advertising, plus interest, costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Asserted on Behalf of a California Class**
**(Violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*)**

121.    Consumer Representatives re-allege and incorporate the above allegations by reference as if fully set forth herein.

122.    California Consumer Representatives seek to recover for themselves and the California Class based on Defendants' breach of the Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*

123.    At all times relevant hereto, California Consumer Representatives and the California Class were "consumer[s]" as that term is defined in Civ. Code § 1761(d).

124.    At all times relevant hereto, Tempur-Pedic mattresses and pillows constituted "goods" as that term is defined in Civ. Code § 1761(a).

125.    At all times relevant hereto, Defendants constituted "person[s]" as that term is defined in Civ. Code § 1761(c).

126.    At all times relevant hereto, the California Consumer Representatives' and the California Class' purchases of Tempur-Pedic mattresses and pillows constituted a "transaction" as that term is defined in Civ. Code § 1761(e).

127.    The CLRA provides, in relevant part, that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: subsection (a)(5) [r]epresenting that goods…have…characteristics, uses, benefits…which they do not have: …subsection (a)(7) [r]epresenting that goods…are of a particular standard, quality or grade…if they are of another; …and subsection (a)(9) [a]dvertising goods…with intent not to sell them as advertised. California Civil Code §§ 1770(a)(5),(7), and (9).

128.    Defendants make uniform written representations that Tempur-Pedic mattresses and pillows are allergen resistant, hypoallergenic, formaldehyde free and free of harmful VOCs,

that will perform as represented and, as set forth above, makes specific representations regarding the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows that are false, deceptive and/or misleading in violation of the CLRA.

129.    Defendants intentionally conceal and/or fail to disclose the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde; (ii) that Tempur-Pedic mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers have complained for years about the strong odor coming from Tempur-Pedic mattresses and pillows that does not dissipate within a few days; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe. Defendants concealed these facts to induce Plaintiffs to purchase Defendants' Tempur-Pedic mattresses and pillows.

130.    The information Defendants have concealed and/or failed to disclose to California Consumer Representatives and the California Class constitute material facts because a reasonable consumer would have considered them important in deciding whether to purchase, or whether to pay the stated priced for, the Tempur-Pedic mattresses and pillows. Moreover, those concealed and/or undisclosed facts are also material because, if the California Consumer Representatives and the California Class had been aware of those facts, the California Consumer Representatives and the California Class would not have bought Tempur-Pedic mattresses and pillows, and/or would have paid less for Tempur-Pedic mattresses and pillows.

131.   The material facts alleged above that were concealed and/or not disclosed by Defendants are flatly in conflict with Defendants' actual, affirmative representations, including but not limited to the following: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and/or have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii) that Tempur-Pedic mattresses and pillows are "formaldehyde free"; (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will "dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "completely safe"; and (viii) that Tempur-Pedic mattresses and pillows are "harmless." Defendants, having chosen to make affirmative representations regarding the above matters, had a duty and were obliged to disclose the information in their knowledge or possession or control because 1) Defendants had exclusive knowledge of the material facts not known to the California Consumer Representatives and the California Class, since only the Defendants had exclusive access to the aggregate data from its retail sales and distribution network, its own tests, and complaints from its customers; 2) Defendants actively concealed and suppressed material facts from the California Consumer Representatives and the California Class by not warning of these material facts at the time of purchase, and recommending remedies to complaining consumers that it knew would not solve the inherent problems with Tempur-Pedic mattresses and pillows set forth in this Complaint; and/or 3) Defendants made partial representations, such as recommending futile remedies such as walking on the mattresses, spending additional time on the mattresses. Meanwhile, Defendants failed to disclose such material facts as their knowledge that any attempt to push the VOCs out of the mattresses and pillows, as recommended by Tempur-Pedic, would increase Tempur-Pedic customers' exposures to potentially harmful VOCs.  Defendants further concealed and/or failed to disclose that this

increase in exposure would create a risk of allergic reactions and symptoms from the VOCs escaping from the Tempur-Pedic mattresses and pillows.

132.    The California Consumer Representatives and the California Class justifiably acted or relied to their detriment upon Defendants failure to disclose such facts, as evidenced by their purchase of Tempur-Pedic mattresses and pillows. Had the California Consumer Representatives and the California Class known of the concealed problems with Tempur-Pedic's mattresses and pillows, they would not have purchased Tempur-Pedic mattresses and pillows, or would have paid less for them.

133.    Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Class

134.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

135.    California Civil Code § 1780(a)(2) permits any court of competent jurisdiction to enjoin practices that violate California Civil Code § 1770. The California Consumer Representatives and the California Class are entitled to recover damages as provided by statute, as well as costs, attorneys' fees, rescission, and other relief as is deemed appropriate.

136.    Pursuant to Civil Code § 1782, the California Consumer Representatives have notified Defendants and their counsel in writing of particular violations of Civil Code § 1770 and made a demand for corrective action. The California Consumer Representatives sent these notices by certified mail, return receipt requested, to Defendants' principal places of business and, thereafter in follow up correspondence, to Defendants' counsel at their request. See Exhibits A-D.

## **FOURTH  CAUSE OF ACTION**

**Asserted on Behalf of the Illinois Subclass**
**(Violations of Illinois Consumer Fraud and Deceptive Practices Act,**
**815 ILCS 505/1, *et seq.*)**

137. Consumer Representatives repeat and re-allege all prior paragraphs and incorporates them as if fully set forth herein.

138. Plaintiff and Illinois Consumer Representative Robbie Simmons seeks to recover for herself and the Illinois Subclass based on Defendants' violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*

139. The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") prohibits "unfair and deceptive practices."

140. Consumer Representative Robbie Simmons and members of the Illinois Subclass are consumers.

141. Consumer Representative Simmons and Illinois Subclass members reasonably expected that their Tempur-Pedic mattresses and pillows would be completely safe and harmless, as set forth in detail herein, including allergen free, hypoallergenic, formaldehyde free and free or other potentially harmful VOCs, as well as not give off a strong odor consisting of off-gassing VOCs or causing or contributing to cause any allergic reaction and symptoms from using or being proximal to Tempur-Pedic mattresses and pillows as complained of by other Tempur-Pedic customers for years.

142. Defendants developed, manufactured, marketed and sold the Tempur-Pedic mattresses and pillows.

143. Defendants' misconduct, including the misrepresentations and material omissions concerning the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows as alleged herein took place in the course of trade or commerce in Illinois, and arose out of transactions that occurred at retail stores and/or outlets in Illinois.

144.   Defendants' misconduct includes the following:

(a)   marketing Tempur-Pedic's products as "formaldehyde free" despite knowing the Tempur-Pedic products contained formaldehyde and other harmful VOCs;

(b)   failing to disclose that the odor of new Tempur-Pedic products contains formaldehyde and other VOCs that can potentially trigger allergies and asthma;

(c)   falsely marketing Tempur-Pedic's products as "allergen resistant" and "hypoallergenic";

(d)   training its retail distribution network and its own retail sales and marketing representatives to falsely inform potential and actual customers that the odors emitted from Tempur-Pedic's products contain nothing harmful and are completely safe;

(e)   actively concealing that Tempur-Pedic's products are not "formaldehyde free" or "free of harmful VOCs";

(f)   falsely informing customers that the chemical odor emitted from Tempur-Pedic's products is completely harmless and will dissipate in a few days; and

(g)   failing to disclose that past customers reported allergic symptoms and other health reactions that they attribute to the chemicals off-gassing from Tempur-Pedic's products.

145.   Defendants had exclusive knowledge about the content of the Tempur-Pedic products, the nature and degree of chemicals off-gassing from Tempur-Pedic mattresses and pillows and the volume and content of complaints received by Defendants, directly or indirectly, concerning allergic reactions and other health symptoms attributed to Tempur-Pedic products, which conduct is ongoing and continues to this date.

146.   Despite Defendants' knowledge of the true nature of the Tempur-Pedic products and the complaints received by Tempur-Pedic customers, Defendants have failed to disclose the

existence of this material information to Consumer Representative Simmons and the Illinois Subclass at the time each of them purchased the Tempur-Pedic products, and/or at the time they made a warrant claim related to the odor.

147.   Defendants intended, and continue to intend, that Consumer Representative Simmons and the Illinois Subclass rely on the misrepresentations and omissions as set forth herein in concerning the Tempur-Pedic mattresses and pillows.

148.   Based upon Defendants' misrepresentations, material omissions and business practices, Consumer Representative Simmons and the Illinois Subclass were led to believe that Defendants were selling and providing Tempur-Pedic products that were free of harmful VOCs, such as formaldehyde and other – "harsh chemicals that can trigger allergies and asthma." Furthermore, Defendants' practices, as alleged herein, are such that reasonable consumers were led to believe that any chemicals emitting from Tempur-Pedic products were harmless and completely safe.

149.   In failing to inform consumers of the actual characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows as alleged herein Defendants have engaged in an unfair or deceptive act prohibited by the ICFA.

150.   Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Illinois Subclass.

151.   If not for Defendants' deceptive and unfair acts of concealing from Consumer Representative Simmons and the Illinois Subclass the material facts as alleged herein, Consumer Representative Simmons and the Illinois Subclass would not have purchased the Tempur-Pedic mattresses and pillows, or would have paid less for them.

152.    Defendants, at all relevant times knew or should have known that Consumer Representative Simmons and the Illinois Subclass did not know or could not have reasonably discovered these issues prior to their purchases.

153.    As a direct and proximate result of Defendants' violations of the ICFA, Consumer Representative Simmons and the Illinois Subclass suffered damages, in the form of, among other things, the diminution in value of the Tempur-Pedic products.

154.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

155.    Defendants' violation of the ICFA entitles Consumer Representative Simmons and the Illinois Subclass to statutory and actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### FIFTH  CAUSE OF ACTION
**Asserted on Behalf of the Illinois Subclass**
**(Unjust Enrichment)**

156.    Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

157.    Consumer Representative Simmons brings this claim on behalf of herself and the Illinois Subclass pursuant to the common law doctrine of unjust enrichment.

158.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

159.    Defendants have been unjustly enriched by Consumer Representative Simmons' and the Illinois Subclass' purchases of Tempur-Pedic mattresses and pillows.

160.     Consumer Representative Simmons' and the Illinois Subclass conferred a benefit, directly and indirectly, on Defendants to Consumer Representative Simmons' and the Illinois Subclass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

161.     Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representative Simmons and the Illinois Subclass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

162.     The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

163.     The circumstances are such that it would be inequitable, unconscionable and unjust to permit Defendants to retain the benefit of these funds that it has unfairly obtained from Consumer Representative Simmons and the Illinois Subclass.   Defendants would be unjustly enriched if they were allowed to retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Simmons and the Illinois Subclass.

### SIXTH  CAUSE OF ACTION
**Asserted on Behalf of the Maryland Subclass**
**(Violations of Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101)**

164.     The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

165.     Plaintiff and Consumer Representative Keith Hawkins seeks to recover for himself and the Maryland Subclass based on Defendants' violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101.

166.   Consumer Representative Hawkins and members of the Maryland Subclass are "consumers" and "persons" within the meaning of Md. Code Ann., Com. Law§ 13-10(c) and (h); Defendants are a "merchant" within the meaning of Md. Code Ann., Com Law § 13-101(f).

167.   The Tempur-Pedic mattresses and pillows are "consumer goods" and "merchandise" within the meaning of Md. Code Ann., Com. Law § 13-101(d) and (f).

168.   The Maryland Consumer Protection Act proscribes any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" in connection with the sale of consumer goods.  Md. Code Ann., Com. Law § 13-301 (1).

169.   The Maryland Consumer Protection Act also proscribes "any representation that . . . [c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have"; and "[c]onsumer goods, consumer realty, or consumer services are of a particular standard, grade, style, or model which they are not."  Md. Code Ann., Com. Law § 13-301(2)(i) and (2)(iv).

170.   The Maryland Consumer Protection Act also proscribes as unfair and deceptive trade practices: "[f]ailure to state a material fact if the failure deceives or tends to deceive; [a]dvertisement or offer of consumer goods . . . [w]ithout intent to sell . . . them as advertised or offered; [d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service . . . or [t]he subsequent performance of a merchant with respect to an agreement of sale.  Md. Code Ann., Com. Law § 13-301(3), (5)(l), (9)(i) and (9)(iii).

171.     Defendants falsely represented material facts regarding the Tempur-Pedic mattress and pillow products which misled Consumer Representative Hawkins and members of the Maryland Subclass as more fully alleged herein.

172.     Defendants misrepresented the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows as alleged herein.

173.     Defendants intentionally concealed and/or failed to disclose to Consumer Representative Hawkins, members of the Maryland Subclass, and the Public, the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde, (ii) that Tempur-Pedic mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers have complained for years about the strong odor emitting from Tempur-Pedic mattresses and pillows; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and other health symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe. This concealment is done for the purpose of inducing Plaintiff to purchase Defendants' Tempur-Pedic mattresses and pillows.

174.     Defendants advertised the Tempur-Pedic mattresses and pillows without the intent to sell them as advertised as alleged herein.

175.     Defendants intentionally deceived Consumer Representative Hawkins and the Maryland Subclass members by misrepresenting and/or omitting material facts in connection

with the sale of the Tempur-Pedic pillows and mattresses as alleged herein in violation of Md. Code Ann., Com. Law § 13-301(9)(i).

176. Defendants knew of the falsity of its representations of fact and/or omissions and intended to induce reliance by Consumer Representative Hawkins and members of the Maryland Subclass members as alleged herein.

177. Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Maryland Subclass.

178. As a result of Defendants' conduct, Consumer Representative Hawkins and members of the Maryland Subclass did not receive the benefit of the bargain because they overpaid for the Tempur-Pedic mattresses and pillows.

179. As a result of Defendant's conduct, Consumer Representative Hawkins and members of the Maryland Subclass lost money through the diminution in value of their Tempur-Pedic mattresses and pillows.

180. The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

181. Consumer Representative Hawkins and members of the Maryland Subclass seek restitutionary and injunctive relief, as well as damages, costs and attorneys' fees.

### SEVENTH  CAUSE OF ACTION
**Asserted on Behalf of the Maryland Subclass**
**(Unjust Enrichment)**

182. The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

183. Consumer Representative Hawkins brings this claim on behalf of himself and the Maryland Subclass pursuant to the common law doctrine of unjust enrichment.

184.   At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

185.   Defendants have been unjustly enriched by Consumer Representative Hawkins' and the Maryland SubClass' purchases of Tempur-Pedic mattresses and pillows.

186.   Consumer Representative Hawkins and the Maryland SubClass conferred a benefit, directly and indirectly, on Defendants to Consumer Representative Hawkins' and the Maryland SubClass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

187.   Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representative Hawkins and the Maryland SubClass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

188.   Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Maryland Subclass.

189.   The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

190.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit Defendants to retain the benefit of these funds that it has unfairly obtained from Consumer Representative Hawkins and the Maryland SubClass.  Defendants would be unjustly enriched if they were allowed to retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Hawkins and the Maryland SubClass.

## EIGHTH CAUSE OF ACTION

**Asserted on Behalf of the Massachusetts Subclass**
**(Violations of Massachusetts Consumer Protection Act – M.G.L. c. 93A § 1, *et seq*.)**

191.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

192.    Plaintiff and Consumer Representative Tina White seeks to recover for herself and the Massachusetts Subclass based on Defendants' violation of the Massachusetts Consumer Protect Act (the "MCPA"), M.G.L. c. 93A § 1, *et seq*.

193.    The MCPA provides in pertinent part that [u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A § 2(a) (2012).

194.    Defendants engaged in unfair and deceptive practices including the following:

    a)    using false, misleading and deceptive statements in its advertising of all its Tempur-Pedic mattresses and pillows;

    b)    marketing Tempur-Pedic products as "formaldehyde free"  and free of harmful VOCs despite knowing the Tempur-Pedic products contain these chemicals;

    c)    failing to disclose that the odor of new Tempur-Pedic products contains formaldehyde and other potentially harmful VOCs that can potentially trigger allergies and asthma;

    d)    falsely marketing Tempur-Pedic's products as "allergen resistant" and "hypoallergenic";

    e)    training its retail distribution network and its own retail sales and marketing representatives to falsely inform potential and actual customers

that the odors emitted from Tempur-Pedic's products contain nothing harmful and are completely safe;

f)    actively concealing that Tempur-Pedic's products are not "formaldehyde free" or "free of harmful VOCs";

g)    informing customers that the chemical odor emitted from Tempur-Pedic's products is completely harmless and will dissipate in a few days;

h)    failing to disclose that past customers reported allergic symptoms and other health reactions that they attribute to the chemicals off-gassing from Tempur-Pedic's products; and

i)    other misconduct as may be evidenced at the trial of this matter.

195.    In light of Defendants' exclusive knowledge about the nature and degree of chemicals off-gassing from Tempur-Pedic mattresses and pillows and the volume and content of complaints received by Defendants, directly and indirectly, concerning allergic reactions and other health symptoms attributed by Tempur-Pedic customers to Tempur-Pedic's products, which conduct is ongoing and continues to this date, Defendants' conduct constitutes unfair and/or deceptive acts and/or practices.

196.    In purchasing the Tempur-Pedic products, Consumer Representative Ms. White and the Massachusetts Subclass relied upon the promises and representations set forth herein.

197.    Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Massachusetts Subclass.

198.    The disclosure by Defendants of the presence of formaldehyde and other potentially harmful VOCs and other material facts as set forth herein would have influenced Consumer Representative Ms. White and the Massachusetts Subclass not to purchase the Tempur-Pedic products.

199.    Had Consumer Representative Ms. White and the Massachusetts Subclass been made aware of the true facts concerning the Tempur-Pedic mattresses and pillows, they would not have purchased them or would have purchased less expensive mattresses and/or pillows or other alternative mattresses or pillows.

200.    The violations of the MCPA as set forth herein were willful and/or knowing by the Defendants.

201.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

202.     On August 13, 2013, Consumer Representative Ms. White, through counsel, sent Defendants by certified mail demands for relief identifying the claimants and reasonably describing the unlawful and unfair and deceptive acts and practices relied upon, and the damages sustained as a result as required by M.G.L.A. c. 93A § 9.  A copy of the notice is attached hereto marked as Exhibit F. Thereafter, in response to a request by Tempur-Pedic's counsel for further information, Consumer Representative Ms. White, through her counsel, sent further correspondence to Tempur-Pedic on September 13, 2013. Attached as Exhibit C.

203.    Defendants' have failed to grant any relief and this failure to grant relief upon demand was in bad faith with reason to know that the acts complained of were in violation of M.G.L.A. c. 93A § 2.

204.    By making these false and misleading misrepresentations and omissions, and by concealing the true facts from the Consumer Representative Ms. White and Massachusetts Subclass, the Defendants intended to induce and did induce the Consumer Representative Ms. White and Massachusetts Subclass to purchase Tempur-Pedic products.

205.    Consumer Representative Ms. White and Massachusetts Subclass relied on the false marketing scheme by the Defendants as set forth herein in purchasing Tempur-Pedic products.

206.    Based upon Defendants' misrepresentations, material omissions and business practices, Consumer Representative Ms. White and the Massachusetts Subclass were led to believe that Defendants were selling and providing Tempur-Pedic products that were free of harmful VOCs, such as formaldehyde and other – "harsh chemicals that can trigger allergies and asthma."   Furthermore, Defendants' practices, as alleged herein, are such that reasonable consumers were led to believe that any chemicals emitting from Tempur-Pedic products were harmless and completely safe.

207.    Defendant's misrepresentations, material omissions, and business practices, as alleged in this Complaint, constitute unfair and/or deceptive acts or practices in violation of the provisions of the MCPA.

208.    The publication and distribution of deceptive and misleading material, the misrepresentations of material facts, and the sale of the Defendants' products within the State of Massachusetts all constitute unfair and deceptive actions undertaken in commerce.

209.    For the foregoing reasons, this Court may grant an injunction against the Defendants.

210.    As a result of unfair and deceptive practices of the Defendants as set forth herein, Consumer Representative Ms. White and Massachusetts Subclass have suffered damages.

211.    As a result of Defendants' unfair and/or deceptive acts and practices, in or affecting trade or commerce, Consumer Representative Ms. White and Massachusetts Subclass are entitled to recover double or treble damages and attorneys' fees pursuant to M.G.L.A. c. 93A § 11.

**NINTH  CAUSE OF ACTION**
**Asserted on Behalf of the Massachusetts Subclass**
**(Unjust Enrichment)**

212.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

213.    Plaintiff and Consumer Representative Ms. White brings this claim on behalf of herself and the Massachusetts Subclass pursuant to the common law doctrine of unjust enrichment.

214.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

215.    Defendants have been unjustly enriched by Consumer Representative Ms. White and the Massachusetts Subclass purchases of Tempur-Pedic mattresses and pillows.

216.    Consumer Representative Ms. White and the Massachusetts Subclass conferred a benefit, which benefit was not conferred gratuitously, on Defendants to Consumer Representative Ms. White's and the Massachusetts Subclass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

217.    Defendants appreciated the benefit of Consumer Representative Ms. White's and the Massachusetts Subclass' purchases of Tempur-Pedic mattresses and pillows, and Defendants consciously accepted and retained the benefit under inequitable or unjust circumstances as set forth in this Complaint.

218.    Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representative Ms. White and the Massachusetts Subclass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

219.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

220.    The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept and retain the benefit of these funds that it has unjustly obtained from Consumer Representative Ms. White's and the Massachusetts Subclass' expense.  Defendants would be unjustly enriched if they were allowed to accept and retain such funds and, therefore, Consumer Representative Ms. White and the Massachusetts Subclass are entitled to recover from the Defendants, by way of restitution and/or a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Ms. White and the Massachusetts Subclass.

**TENTH CAUSE OF ACTION**
**Asserted on Behalf of a Missouri Subclass**
**(Violations of Missouri's Merchandising Practices Act § 407.010 *et seq*)**

221.    Consumer Representatives re-allege and incorporate the above allegations by reference as if fully set forth herein.

222.    Plaintiff and Consumer Representative Thomas Comiskey seeks to recover for himself and the Missouri Subclass based on Defendants' violation of Missouri's Merchandising Practices Act ("MPA") § 407.010 *et seq.*

223.    At all times relevant hereto, Consumer Representative Mr. Comiskey, the Missouri Subclass and Defendants are "persons" as that term is defined in the MPA, § 407.010(5).

224.    At all times relevant hereto, Defendant's Tempur-Pedic mattresses and pillows are "merchandise" as that terms is defined in the MPA, § 407.010(4).

225.   At all times relevant hereto, Defendant's sale of Tempur-Pedic mattresses and pillows to Consumer Representative Mr. Comiskey and the Missouri Subclass constituted both a "sale" and a "trade" or "commerce" as those terms are defined in the MPA, §§ 407.010(6) and 407.010(7).

226.   Consumer Representative Mr. Comiskey and the Missouri Subclass purchased the Tempur-Pedic mattress primarily for personal, family, or household purposes, as the products are used in their houses for sleeping.

227.   Section 407.020 of the MPA provides that the: "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in or from the state of Missouri, is declared to be an unlawful practice. ….Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation."

228.   In connection with the sale or advertisement of merchandise in trade or commerce, Defendants engaged in an unfair or deceptive act or practice by making uniform written representations that Tempur-Pedic mattresses and pillows are allergen resistant, hypoallergenic, formaldehyde free, and products free of harmful VOCs,  that will perform as represented and, as set forth above, makes specific representations regarding the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows that are false, deceptive, unfair, and/or misleading in violation of the MPA.

229.   At all times relevant hereto, the foregoing representations by Defendants constituted, among other things, an "advertisement" as that term is defined in the MPA, § 407.010(1).

230.   Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Missouri Subclass.

231.   In connection with the sale or advertisement of merchandise in trade or commerce, Defendants intentionally conceal and/or fail to disclose from Consumer Representative Mr. Comiskey, the Missouri Subclass, and the Public, the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde; (ii) that Tempur-Pedic mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers have complained for years about the strong odor emitting from Tempur-Pedic mattresses and pillows; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and other health symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe.  This concealment is done for the purpose of inducing Consumer Representative Mr. Comiskey and the Missouri Subclass to purchase Defendants' Tempur-Pedic mattresses and pillows.

232.   The information Defendants conceal and/or do not disclose to Consumer Representative Mr. Comiskey and the Missouri Subclass are material facts in that a reasonable consumer would have considered them important in deciding whether to purchase, or whether to pay the stated priced for, the Tempur-Pedic mattresses and pillows and because Consumer Representative Mr. Comiskey and the Missouri Subclass would have been aware of it and behaved differently by not buying Tempur-Pedic mattresses and pillows, and/or paying less for Tempur-Pedic mattresses and pillows.

233.     The omission of the material facts alleged above, and throughout this Complaint, is contrary to Defendants' actual representations, including but not limited to the following: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and/or have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii) that Tempur-Pedic mattresses and pillows are "formaldehyde free"; (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will "dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "completely safe"; and (viii) that Tempur-Pedic mattresses and pillows are "harmless".

234.     Defendants, having chosen to make affirmative representations regarding the above matters, were obliged to disclose the information in their knowledge or possession or control because: 1) Defendants had exclusive knowledge of the material facts not known to the Consumer Representative Mr. Comiskey and the Missouri Subclass, since only the Defendants had exclusive access to the aggregate data from its retail sales and distribution network, its own tests, and complaints from its customers; 2) Defendants actively concealed and suppressed material facts from Consumer Representative Mr. Comiskey and the Missouri Subclass by not warning of these material facts at the time of purchase and recommending remedies to complaining consumers that it knew would not solve the inherent problems with Tempur-Pedic mattresses and pillows set forth in this Complaint; and/or 3) Defendants made partial representations, such as recommending futile remedies such as walking on the mattresses, spending additional time on the mattresses, but suppressed material facts such as attempting to push the VOCs out of the mattresses and pillows by Tempur-Pedic's recommended methods increased Tempur-Pedic customers' exposures in the short term to higher levels of potentially

harmful VOCs thereby risking the onset of allergic reactions and other health symptoms caused by the VOCs escaping from the Tempur-Pedic mattresses and pillows.

235.    As a result of Defendants' unfair or deceptive acts and practices as set forth above, Consumer Representative Mr. Comiskey and the Missouri Subclass suffered an ascertainable loss of money or personal property including, but not limited to, Consumer Representative Mr. Comiskey's and the Missouri Subclass' payment to Defendants for merchandise they would not have purchased, or would have paid less for, had Consumer Representative Mr. Comiskey and the Missouri Subclass known the truth about the merchandise. As such, Consumer Representative Mr. Comiskey and the Missouri Subclass are entitled to, inter alia, the difference in value between the purchased merchandise as represented by Defendants and the fair market value of the merchandise.

236.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

237.    For the foregoing reasons, Section 407.025 of the MPA permits this Court to grant an injunction against Defendants.

238.    For the foregoing reasons, Consumer Representative Mr. Comiskey and the Missouri Subclass are entitled to recover damages as provided by statute pursuant to Section 407.025 of the MPA, as well as costs, attorneys' fees, restitution, and other relief as is deemed appropriate.

239.    As discussed above, Defendants' conduct is outrageous and was done intentionally or with reckless indifference to the rights of Consumer Representative Mr. Comiskey, the Missouri Subclass and others.  As such, Consumer Representative Mr. Comiskey and the Missouri Subclass are entitled to punitive damages.

**ELEVENTH CAUSE OF ACTION**
**Asserted on Behalf of a Missouri Subclass**
**(Unjust Enrichment)**

240.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

241.    Plaintiff and Consumer Representative Thomas Comiskey brings this claim on behalf of himself and the Missouri Subclass pursuant to the common law doctrine of unjust enrichment.

242.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

243.    Defendants have been unjustly enriched by Consumer Representative Mr. Comiskey's and the Missouri Subclass' purchase of a Tempur-Pedic mattress.

244.    Consumer Representative Mr. Comiskey and the Missouri Subclass conferred a benefit on Defendants by purchasing a Tempur-Pedic mattress.

245.    Defendants appreciated the benefit of Consumer Representative Mr. Comiskey's and the Missouri Subclass' purchase of a Tempur-Pedic mattress, and Defendants accepted and retained the benefit under inequitable or unjust circumstances as set forth in this Complaint.

246.    Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Plaintiff regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

247.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

248.    The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept and retain the benefit of these funds that it has

unjustly obtained from Consumer Representative Mr. Comiskey and the Missouri Subclass. Defendants would be unjustly enriched if they were allowed to accept and retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Mr. Comiskey and the Missouri Subclass.

## TWELFTH CAUSE OF ACTION
### Asserted on Behalf of the New Jersey Subclass
### (Violations of New Jersey Consumer Fraud Act – N.J.S.A.  56:8-1, *et seq.*)

249.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

250.    Plaintiffs and Consumer Representatives Alan and Patricia Kaufman bring this cause pursuant to the New Jersey Consumer Fraud Act (the "NJCFA"), N.J.S.A. 56:8-1, *et seq.*, on behalf of themselves and as the New Jersey Subclass, in that they purchased and used Tempur-Pedic mattress and/or pillow products containing Tempur material primarily for personal use and thereby suffered ascertainable loss as a result of Defendants' actions in violation of the NJCFA.

251.    At all relevant times herein, the Defendants were merchants within the meaning of the NJCFA, providing goods governed by that Act.

252.    Defendants' common business practice and conduct in marketing and selling Tempur-Pedic mattress and pillow products containing Tempur material to New Jersey consumers as set forth herein, including that the products do not contain formaldehyde and other VOCs considered potentially harmful and are not hypoallergenic or allergen resistant, constitutes an unconscionable commercial practice, deception, fraud, false promise, false pretense, omission, and/or misrepresentation in violation of the NJCFA.

253. Defendants unconscionable commercial practice, deception, fraud, false promise, false pretense, omissions and/or misrepresentations in connection with the marketing and sale of their Tempur-Pedic mattress and pillow products include the following:

a) engaged in fraudulent and deceptive conduct in the marketing and sale of Tempur-Pedic mattress and pillow products tending to deceive or mislead consumers, including Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass;

b) making oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers, including Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass;

c) marketing Tempur-Pedic products as "formaldehyde free" and free of harmful VOCs despite the fact that Tempur-Pedic products contain these chemicals;

d) failing to state material facts, including that the odor of new Tempur-Pedic products contains formaldehyde and other VOCs that can potentially trigger allergies and asthma, and this failure deceived or tended to deceive consumers, including Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass;

e) falsely marketing Tempur-Pedic's products as "allergen resistant" and "hypoallergenic";

f) training its retail distribution network and its own retail sales and marketing representatives to falsely inform potential and actual customers that the odors emitted from Tempur-Pedic's products contain nothing harmful and are completely safe;

g)    actively concealing that Tempur-Pedic's products are not "formaldehyde free" or free of harmful VOCs;

h)    informing customers that the chemical odor emitted from Tempur-Pedic's products is completely harmless and will dissipate in a few days;

i)    failing to disclose that past customers reported allergic symptoms and other health reactions that they attribute to the chemicals off-gassing from Tempur-Pedic's products;

j)    engaging in deception, fraud, misrepresentation, knowing concealment, suppression, and the omission of material facts, with the intent that consumers, including Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass would rely on the same in connection with Defendants' promotion and sale of Tempur-Pedic pillow and mattress products; and

k)    other misconduct as may be evidenced at the trial of this matter.

254.    In light of Defendants' exclusive knowledge about the nature and degree of chemicals off-gassing from Tempur-Pedic mattresses and pillows and the volume and content of complaints received by Defendants, directly and indirectly, concerning allergic reactions and other health symptoms attributed by Tempur-Pedic customers to Tempur-Pedic's products, which conduct is ongoing and continues to this date, Defendants' conduct constitutes unfair and/or deceptive acts and/or practices.

255.    By making these false, misleading and material misrepresentations and omissions, and by concealing the true facts from Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass, the Defendants intended to induce Consumer Representatives Alan and

Patricia Kaufman and the New Jersey Subclass to rely on the same in their purchase of Tempur-Pedic products.

256. Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire New Jersey Subclass.

257. Based upon Defendants' misrepresentations, material omissions and business practices, Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass believed that Defendants were selling and providing Tempur-Pedic products that were free of harmful VOCs, such as formaldehyde and other – "harsh chemicals that can trigger allergies and asthma." Furthermore, Defendants' practices, as alleged herein, are such that reasonable consumers were led to believe that the chemical odors emitting from Tempur-Pedic products were harmless and completely safe.

258. Had the Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass been made aware of the true facts concerning the Tempur-Pedic mattresses and pillows, they would not have purchased them or would have purchased less expensive mattresses and/or pillows or other alternative mattresses or pillows.

259. Defendants' misrepresentations, material omissions, and business practices, as alleged in this Complaint, constitute an unconscionable commercial practice, deception, fraud, false promise, false pretense and/or misrepresentations in violation of the provisions of the NJCFA.

260. The Defendants' actions, including the publication and distribution of the deceptive and misleading material, the misrepresentations of material facts, and the sale of the Defendants' products within the State of New Jersey constitute actions in connection with the sale or advertisement of merchandise pursuant to the NJCFA.

261.    Defendants' actions as described herein evidence lack of good faith, honesty in fact and observance of fair dealing so as to constitute an unconscionable commercial practice in violation of the NJCFA.

262.    N.J.S.A. 56:8-19 provide Consumer Representatives Alan and Patricia Kaufman, with standing to commence this action.

263.    A copy of this complaint will be mailed to the Attorney General of the State of New Jersey within 10 days after the filing with the court pursuant to N.J.S.A. 56:8-20.

264.    As a direct and proximate result of Defendants' conduct, Consumer Representatives Alan and Patricia Kaufman, and the New Jersey Subclass purchased Tempur-Pedic products.

265.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

266.    For the foregoing reasons, this Court may grant an injunction against the Defendants.

267.    As a direct and proximate result of these violations of the NJCFA, Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass have suffered ascertainable loss for which Defendants, jointly and severally, are liable to Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass for treble their actual damages and their attorneys' fees pursuant to N.J.S.A. 56:8-19.

**THIRTEENTH CAUSE OF ACTION**
**Asserted on Behalf of the New Jersey Subclass**
**(Unjust Enrichment)**

268.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

269.    Plaintiffs and Consumer Representatives Alan and Patricia Kaufman bring this claim on behalf of themselves and the New Jersey Subclass pursuant to the common law doctrine of unjust enrichment.

270.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

271.    Defendants have been unjustly enriched by Consumer Representatives Alan and Patricia Kaufman's and the New Jersey Subclass' purchases of Tempur-Pedic mattresses and pillows.

272.    Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass conferred a benefit, which benefit was not conferred gratuitously, on Defendants to Consumer Representatives Alan and Patricia Kaufman's and the New Jersey Subclass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

273.    Defendants appreciated the benefit of Consumer Representatives Alan and Patricia Kaufman's and the New Jersey Subclass' purchases of Tempur-Pedic mattresses and pillows, and Defendants consciously accepted and retained the benefit under inequitable or unjust circumstances as set forth in this Complaint.

274.    Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Plaintiffs regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

275.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

276.    The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept and retain the benefit of these funds that it has

unjustly obtained from Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass.  Defendants would be unjustly enriched if they were allowed to accept and retain such funds and, therefore, Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass are entitled to recover from the Defendants, by way of restitution and/or a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representatives Alan and Patricia Kaufman and the New Jersey Subclass.

**FOURTEENTH CAUSE OF ACTION**
**Asserted on Behalf of a New Mexico Subclass**
**(Violations of the New Mexico Unfair Practices Act § 57-12-1 *et seq*)**

277.    Consumer Representatives re-allege and incorporate the above allegations by reference as if fully set forth herein.

278.    Plaintiff and Consumer Representative Johnny Martinez seeks to recover for himself and the New Mexico Subclass based on Defendants' violation of the New Mexico Unfair Practices Act ("UPA") § 57-12-1 *et seq.*

279.    At all times relevant hereto, Consumer Representative Martinez, the New Mexico Subclass, and Defendants were "persons" as that term is defined in the UPA, § 57-12-2(A).

280.    At all times relevant hereto, Defendants' sale of Tempur-Pedic mattresses and pillows to Consumer Representative Martinez and the New Mexico Subclass constituted a "trade" or "commerce" as those terms are defined in UPA§ 57-12-2(C).

281.    Section 57-12-2(D) of the UPA provides, in relevant part, that an "unfair or deceptive trade practice" is any "act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of

goods or services…in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes: … [subsection] (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have…"; "(7) representing that goods or services are of a particular standard, quality or grade…"; "(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive"; (17) "failing to deliver the quality or quantity of goods or services contracted for".

282.    In addition, Section 57-12-2(E) of the UPA provides that an "unconscionable trade practice" is any "act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services…that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."

283.    Defendants made uniform written representations to Consumer Representative Martinez and the New Mexico Subclass that Tempur-Pedic mattresses and pillows are allergen resistant, hypoallergenic, formaldehyde free and products free of harmful VOCs, that will perform as represented and, as set forth above, makes specific representations regarding the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows that are false, deceptive, unfair, and/or misleading in violation of the UPA.

284.    Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire New Mexico Subclass.

285.    Defendants intentionally conceal and/or fail to disclose to Consumer Representative Martinez and the New Mexico Subclass the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde; (ii) that Tempur-Pedic

mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers have complained for years about the strong odor emitting from Tempur-Pedic mattresses and pillows; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and other health symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe. This concealment is done for the purpose of inducing Plaintiffs to purchase Defendants' Tempur-Pedic mattresses and pillows.

286. The information Defendants conceal and/or do not disclose to Consumer Representative Martinez and the New Mexico Subclass are material facts in that a reasonable consumer would have considered them important in deciding whether to purchase, or whether to pay the stated priced for, the Tempur-Pedic mattresses and pillows and because Consumer Representative Martinez and the New Mexico Subclass would have been aware of it and behaved differently by not buying Tempur-Pedic mattresses and pillows, and/or paying less for Tempur-Pedic mattresses and pillows.

287. The omission of the material facts alleged above, and throughout this Complaint, is contrary to Defendants' actual representations, including but not limited to the following: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and/or have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii) that Tempur-Pedic mattresses and pillows are "formaldehyde free"; (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will

"dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "completely safe"; and (viii) that Tempur-Pedic mattresses and pillows are "harmless".

288.   Defendants, having chosen to make affirmative representations regarding the above matters, were obliged to disclose the information in their knowledge or possession or control because: 1) Defendants had exclusive knowledge of the material facts not known to the Consumer Representative Martinez and the New Mexico Subclass, since only the Defendants had exclusive access to the aggregate data from its retail sales and distribution network, its own tests, and complaints from its customers; 2) Defendants actively concealed and suppressed material facts from Consumer Representative Martinez and the New Mexico Subclass by not warning of these material facts at the time of purchase and recommending remedies to complaining consumers that it knew would not solve the inherent problems with Tempur-Pedic mattresses and pillows set forth in this Complaint; and/or 3) Defendants made partial representations, such as recommending futile remedies such as walking on the mattresses, spending additional time on the mattresses, but suppressed material facts such as attempting to push the VOCs out of the mattresses and pillows by Tempur-Pedic's recommended methods increased Tempur-Pedic customers' exposures in the short term to higher levels of potentially harmful VOCs thereby risking the onset of allergic reactions and other health symptoms caused by the VOCs escaping from the Tempur-Pedic mattresses and pillows.

289.   Defendant's representations were of the type that may, or tend to, or do deceive or mislead persons such as Consumer Representative Martinez and the New Mexico Subclass, as set forth above.

290.   Defendants also committed an "unconscionable trade practice" under the UPA because the foregoing conduct was to Consumer Representative Martinez's and the New Mexico Subclass' detriment and took advantage of the lack of knowledge, ability, or experience of

Consumer Representative Martinez and the New Mexico Subclass to a grossly unfair degree, and/or resulted in a gross disparity between the value received by Consumer Representative Martinez and the New Mexico Subclass and the price paid.

291. Consumer Representative Martinez and the New Mexico Subclass justifiably acted or relied to their detriment upon the concealment and/or non-disclosed facts as evidenced by their purchase of Tempur-Pedic mattresses and pillows. Had Consumer Representative Martinez and the New Mexico Subclass known of the concealed problems with Tempur-Pedic's mattresses and pillows, Consumer Representative Martinez and the New Mexico Subclass would not have purchased Tempur-Pedic mattresses and pillows, or would have paid significantly less.

292. The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

293. For the foregoing reasons, Section 57-12-10(A) of the UPA permits this Court to grant an injunction against Defendants under the principles of equity and on terms that the court considers reasonable.

294. For the foregoing reasons, Consumer Representative Martinez and the New Mexico Subclass are entitled to recover damages as provided by statute pursuant to Section 57-12-10(B)–(E) of the UPA, as well as costs, attorneys' fees, rescission, and other relief as is deemed appropriate.

295. Moreover, because Defendants willfully engaged in the aforementioned unfair, deceptive, or unconscionable conduct, this Court may award up to three times actual damages to Consumer Representative Martinez and the New Mexico Subclass pursuant to Section 57-12-10(B).

**FIFTEENTH CAUSE OF ACTION**

**Asserted on Behalf of a New Mexico Subclass**
**(Unjust Enrichment)**

296.     The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

297.     Plaintiff and Consumer Representative Martinez brings this claim on behalf of himself and the New Mexico Subclass pursuant to the common law doctrine of unjust enrichment.

298.     At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

299.     Defendants have been unjustly enriched by Consumer Representative Martinez's and the New Mexico Subclass' purchases of Tempur-Pedic mattresses and pillows.

300.     At Plaintiff's expense, Defendants have knowingly benefitted from Consumer Representative Martinez's and the New Mexico Subclass' purchases of Tempur-Pedic mattresses and pillows. Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representative Martinez and the New Mexico Subclass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

301.     The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

302.     The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to retain the benefit of these funds that it has unfairly obtained from Consumer Representative Martinez and the New Mexico Subclass.  Defendants would be unjustly enriched if they were allowed to retain such funds and, therefore, a

constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Martinez and the New Mexico Subclass.

### SIXTEENTH CAUSE OF ACTION
**Asserted on Behalf of the New York Subclass**
**(Violations of § 349 of New York General Business Law: Deceptive Acts and Practices)**

303.    Consumer Representatives repeat and reallege all prior paragraphs and incorporates them as if fully set forth herein.

304.    Consumer Representatives Julie Davidoff and Tracey Palmer purchased their Tempur-Pedic mattresses in New York and bring this action pursuant to NY GBL § 349 on behalf of themselves and all members of the New York Subclass.

305.    NY GBL § 349 makes unlawful any deceptive act or practice, including false advertising, in the conduct of any trade or commerce or in the furnishing of any service in New York.

306.    Consumer Representatives Julie Davidoff and Tracey Palmer and members of the New York Subclass are consumers.

307.    Defendants have engaged in deceptive practices through misrepresentations and omissions of material facts directed at Consumer Representatives Julie Davidoff and Tracey Palmer and members of the New York Subclass, as more fully described above, in connection with the sale of Tempur-Pedic mattresses and pillows that contain formaldehyde and other harmful VOCs as described herein.

308.    Defendants' misrepresentations and material omissions are likely to mislead and did materially mislead Consumer Representatives Julie Davidoffand Tracey Palmer, the New York Subclass, and other reasonable consumers by causing them to purchase Tempur-Pedic

mattresses and/or pillows that they would not have paid for or would have paid less for, but for the Defendants' misrepresentations and material omissions.

309. Defendants made numerous misrepresentations and omitted material facts upon which Consumer Representatives Julie Davidoffand Tracey Palmer and members of the New York Subclass relied to their detriment.

310. Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire New York Subclass.

311. The unfair and deceptive trade practices have directly, foreseeably, and proximately caused damages and injury to Consumer Representatives Julie Davidoff and Tracey Palmer and members of the New York Subclass as described above.

312. The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

313. Plaintiffs seeks to enjoin Defendants' deceptive conduct, as well as damages and attorneys' fees, and all other relief available under NY GBL § 349.

## SEVENTEENTH  CAUSE OF ACTION
### Asserted on Behalf of the New York Subclass
### (Violations of § 350 of New York General Business Law: False Advertising Unlawful)

314. Consumer Representatives repeat and reallege all prior paragraphs and incorporates them as if fully set forth herein.

315. NY GBL § 350 makes false advertising unlawful.

316. Defendants' advertising of the Tempur-Pedic mattresses and pillows, as alleged in more detail herein, is and was false within the meaning of NY GBL § 350-a(1).

317. Consumer Representatives Julie Davidoff and Tracey Palmer and New York Subclass members were materially misled by Defendants' advertising.

318.    As a direct and proximate result of Defendants' false advertising, Consumer Representatives Julie Davidoff and Tracey Palmer and New York Subclass members lost money in that they would not have purchased the Tempur-Pedic mattresses and/or pillows or would have paid less for them.

319.    The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

**EIGHTEENTH CAUSE OF ACTION**
**Asserted on Behalf of the New York Subclass**
**(Unjust Enrichment)**

320.    Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

321.    Consumer Representatives Julie Davidoff and Tracey Palmer bring this claim on behalf of themselves and the New York Subclass pursuant to the common law doctrine of unjust enrichment.

322.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

323.    Defendants have been unjustly enriched by Consumer Representatives Julie Davidoff's and Tracey Palmer's and the New York Subclass' purchases of Tempur-Pedic mattresses and pillows.

324.    Consumer Representatives Julie Davidoff and Tracey Palmer and the New York Subclass conferred a benefit, directly and indirectly, on Defendants to Consumer Representatives Julie Davidoff's and Tracey Palmer's and the New York Subclass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

325.    Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representatives Julie Davidoffand Tracey Palmer and the New York Subclass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

326.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

327.    The circumstances are such that it would be inequitable, unconscionable and unjust to permit Defendants to retain the benefit of these funds that it has unfairly obtained from Consumer Representatives Julie Davidoff and Tracey Palmer and the New York Subclass. Defendants would be unjustly enriched if they were allowed to retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representatives Julie Davidoff and Tracey Palmer and the New York Subclass.

### NINETEENTH CAUSE OF ACTION
**Asserted on Behalf of a Washington Subclass**
**(Violations of Washington's Consumer Protection Act § 19.86.010 *et seq*)**

328.    Consumer Representatives re-allege and incorporate the above allegations by reference as if fully set forth herein.

329.    Plaintiff and Consumer Representative Toni Kibbee seeks to recover for herself and the Washington Subclass based on Defendants' violation of Washington's Consumer Protection Act ("CPA") § 19.86.010 *et seq*.

330.    At all times relevant hereto, Consumer Representative Kibbee, the Washington Subclass, and Defendants were "persons" as that term is defined in the CPA, § 19.86.010(1).

331.   At all times relevant hereto, Defendant's sale of Tempur-Pedic mattresses and pillows to Consumer Representative Kibbee and the Washington Subclass constituted a "trade" or "commerce" as those terms are defined in the CPA, § 19.86.010(2).

332.   The CPA declares unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

333.   Defendants engaged in an unfair or deceptive act or practice by making uniform written representations that Tempur-Pedic mattresses and pillows are allergen resistant, hypoallergenic, formaldehyde free and products free of harmful VOCs, that will perform as represented and, as set forth above, makes specific representations regarding the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows that are false, deceptive, unfair, and/or misleading in violation of the CPA.

334.   Defendants intentionally conceal and/or fail to disclose from Consumer representative Kibbee, the Washington Subclass  and the general public, the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde; (ii) that Tempur-Pedic mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers have complained for years about the strong odor emitting from Tempur-Pedic mattresses and pillows; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and other health symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe.  This concealment is done for the

purpose of inducing Consumer Representative Kibbee and the Washington Subclass to purchase Defendants' Tempur-Pedic mattresses and pillows.

335.   The information Defendants conceal and/or do not disclose to Consumer Representative Kibbee and the Washington Subclass are material facts in that a reasonable consumer would have considered them important in deciding whether to purchase, or whether to pay the stated priced for, the Tempur-Pedic mattresses and pillows and because Consumer Representative Ms. Kibbee and the Washington Subclass would have been aware of it and behaved differently by not buying Tempur-Pedic mattresses and pillows, and/or paying less for Tempur-Pedic mattresses and pillows.

336.   The omission of the material facts alleged above, and throughout this Complaint, is contrary to Defendants' actual representations, including  but not limited to the following: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and/or have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii) that Tempur-Pedic mattresses and pillows are "formaldehyde free"; (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will "dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "completely safe"; and (viii) that Tempur-Pedic mattresses and pillows are "harmless".

337.   Defendants, having chosen to make affirmative representations regarding the above matters, were obliged to disclose the information in their knowledge or possession or control because: 1) Defendants had exclusive knowledge of the material facts not known to Consumer Representative Kibbee and the Washington Subclass, since only the Defendants had exclusive access to the aggregate data from its retail sales and distribution network, its own tests, and complaints from its customers; 2) Defendants actively concealed and suppressed material

facts from Consumer Representative Kibbee and the Washington Subclass by not warning of these material facts at the time of purchase and recommending remedies to complaining consumers that it knew would not solve the inherent problems with Tempur-Pedic mattresses and pillows set forth in this Complaint; and/or 3) Defendants made partial representations, such as recommending futile remedies such as walking on the mattresses, spending additional time on the mattresses, but suppressed material facts such as attempting to push the VOCs out of the mattresses and pillows by Tempur-Pedic's recommended methods increased Tempur-Pedic customers' exposures in the short term to higher levels of potentially harmful VOCs thereby risking the onset of allergic reactions and other health symptoms caused by the VOCs escaping from the Tempur-Pedic mattresses and pillows.

338.   Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Washington Subclass

339.   Defendants' unfair or deceptive acts or practices, as set forth above, occurred in trade or commerce and affect the public interest because it is part of a pattern or generalized course of conduct and many thousands of persons have been and will continue to be injured in exactly the same fashion as Consumer Representative Kibbee and the Washington Subclass.

340.   As a direct and proximate result of Defendants' unfair or deceptive acts and practices as set forth above, Consumer Representative Kibbee and the Washington Subclass suffered injury to their property in the form of financial loss.  Consumer Representative Kibbee's and the Washington Subclass' injury would not have occurred but for Defendants' misrepresentations and/or failure to disclose material information about Tempur-Pedic's mattresses and pillows. As such, Consumer Representative Kibbee's and the Washington Subclass' injury occurred because of Defendants' misrepresentations and/or omissions.

341.     The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

342.     For the foregoing reasons, Section 19.86.090 of the CPA permits this Court to grant an injunction against Defendants.

343.     For the foregoing reasons, Consumer Representative Kibbee and the Washington Subclass are entitled to recover damages as provided by statute pursuant to Section 19.86.090 of the CPA, as well as costs, attorneys' fees, rescission, and other relief as is deemed appropriate. This Court may also award up to three times actual damages to Consumer Representative Kibbee and the Washington Subclass pursuant to Section 19.86.090.

**TWENTIETH CAUSE OF ACTION**
**Asserted on Behalf of a Washington Subclass**
**(Unjust Enrichment)**

344.     The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

345.     Consumer Representative Kibbee brings this claim on behalf of herself and the Washington Subclass pursuant to the common law doctrine of unjust enrichment.

346.     At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

347.     Defendants have been unjustly enriched by Consumer Representative Kibbee's and the Washington Subclass' purchase of Tempur-Pedic mattresses and pillows.

348.     Consumer Representative Kibbee and the Washington Subclass conferred a benefit to Defendants by purchasing Tempur-Pedic mattresses and pillows.

349.     Defendants knowingly received and benefitted from Consumer Representative Kibbee's and the Washington Subclass' purchase of Tempur-Pedic mattresses and pillows.

350.     Defendants accepted or retained the benefit under circumstances that make it inequitable for Defendants to retain the benefit without paying its value.

351.     Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Plaintiff regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

352.     The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

353.     The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept or retain the benefit of these funds that it has unfairly obtained from Consumer Representative Kibbee and the Washington Subclass. Defendants would be unjustly enriched if they were allowed to accept or retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representative Kibbee and the Washington Subclass.

## TWENTY-FIRST CAUSE OF ACTION
### Asserted on Behalf of the Wisconsin Subclass
**(Violations of Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*)**

354.     The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

355.     The Plaintiffs and Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, and Jerry and Diane Kucharski bring this claim on behalf of themselves and the Wisconsin Subclass for violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.* ("WDTPA").

356.     Wis. Stat. 100.18(1)  provides:

**No person, firm, corporation or association** or agent or employee thereof, **with intent to sell**, distribute, increase the consumption of or in any wise dispose of any real estate, **merchandise,** securities, employment, service, **or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale,** hire, use or lease of any real estate, **merchandise,** securities, employment or service, **shall make, publish, disseminate, circulate, or place before the public,** or cause directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement, or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or service or employment or to the terms or conditions thereof, **which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.** Wis. Stat. § 100.18 (2012) (emphasis added).

357.   Defendants made uniform written representations to the public including Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass that Tempur-Pedic mattresses and pillows are allergen resistant, hypoallergenic, formaldehyde free and products free of harmful VOCs that will perform as represented and, as set forth above, made specific representations regarding the characteristics, uses, benefits, standards and quality of Tempur-Pedic mattresses and pillows that are false, deceptive, unfair and/or misleading in violation of the WDTPA.

358.   Defendants intentionally conceal and/or fail to disclose to Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass the following material facts: (i) that Tempur-Pedic mattresses and pillows can and do contain formaldehyde; (ii) that Tempur-Pedic mattresses and pillows can and do contain other potentially harmful VOCs; (iii) that Tempur-Pedic mattresses and pillows can and do give off a strong odor consisting of off-gassing VOCs; (iv) that Tempur-Pedic customers

have complained for years about the strong odor emitting from Tempur-Pedic mattresses and pillows; (v) that Tempur-Pedic customers have complained for years of experiencing allergic reactions and other health symptoms from using or being proximal to Tempur-Pedic mattresses and pillows; (vi) that Tempur-Pedic mattresses and pillows are not allergen resistant; (vii) that Tempur-Pedic mattresses and pillows are not hypoallergenic; (viii) that Tempur-Pedic mattresses and pillows are not harmless; and (ix) that Tempur-Pedic mattresses and pillows are not completely safe.

359.    The information Defendants conceal and/or do not disclose to Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass are material facts in that a reasonable consumer would have considered them important in deciding whether to purchase, or whether to pay the stated price for, the Tempur-Pedic mattresses and pillows and because Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass would have been aware of it and behaved differently by not buying Tempur-Pedic mattresses and pillows, and or paying less for Tempur-Pedic mattresses and pillows.

360.    The omission of the material facts alleged above, and throughout this Complaint, is contrary to Defendant's actual representations, including but not limited to the following: (i) that Tempur-Pedic mattresses and pillows are "allergen resistant" and/or have "allergen resistance"; (ii) that Tempur-Pedic mattresses and pillows are "hypoallergenic"; (iii) that Tempur-Pedic mattresses and pillows are "formaldehyde free", (iv) that Tempur-Pedic mattresses and pillows are free of harmful VOCs; (v) that Tempur-Pedic mattresses and pillows have only a "slight odor"; (vi) that the odor from Tempur-Pedic mattresses and pillows will "dissipate in a few days"; (vii) that Tempur-Pedic mattresses and pillows are "harmless"; and (viii) that Tempur-Pedic mattresses and pillows are "completely safe.".

361.   Defendants, having chosen to make affirmative representations regarding the above matters, were obliged to disclose the information in their knowledge or possession or control because: 1) Defendants had exclusive knowledge of the material facts not known to the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass, since only the Defendants had exclusive access to the aggregate data from its retail sales and distribution network, its own tests, and complaints from its customers; 2) Defendants actively concealed and suppressed material facts from Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass by not warning of these material facts at the time of purchase and recommending remedies to complaining consumers that it knew would not solve the inherent problems with Tempur-Pedic mattresses and pillows set forth in this Complaint; and/or 3) Defendants made partial representations, such as recommending futile remedies such as walking on the mattresses, spending additional time on the mattresses, but suppressed material facts such as attempting to push the VOCs out of the mattresses and pillows by Tempur-Pedic's recommended methods increased Tempur-Pedic customers' exposures in the short term to higher levels of potentially harmful VOCs thereby risking the onset of allergic reactions and other health symptoms caused by the VOCs escaping from the Tempur-Pedic mattresses and pillows.

362.   The misrepresentations and concealment as set forth herein were made to the public, which include the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass, with the intent to induce the public to purchase Defendants' Tempur-Pedic mattresses and pillows and/or to overpay for these products.

363.   Material misrepresentations and omissions were made to Class Members, and accordingly, an inference of reliance arises as to the entire Wisconsin Subclass.

364.   As set forth in this Complaint, the representations made by the Defendants were untrue, deceptive, and misleading.

365.   By making these false and misleading misrepresentations and omissions, and by concealing the true facts from the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass, the Defendants intended to induce and did materially induce the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass to purchase Tempur-Pedic products in reliance on the same.

366.   Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass relied on the false, deceptive and misleading marketing scheme by the Defendants as set forth herein in purchasing Tempur-Pedic products.

367.   Based upon Defendants' misrepresentations, material omissions and business practices, Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass were led to believe that Defendants were selling and providing Tempur-Pedic products that were free of harmful VOCs, such as formaldehyde and other – "harsh chemicals that can trigger allergies and asthma."  Furthermore, Defendants' practices, as alleged herein, are such that reasonable consumers were led to believe that the chemical odors emitting from Tempur-Pedic products were harmless and completely safe.

368.   Had the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass been made aware of the true facts concerning the Tempur-Pedic mattresses and pillows, they would not have purchased them or would have purchased less expensive mattresses and/or pillows or other alternative mattresses or pillows.

369.     Defendants' conduct in advertising and selling Tempur-Pedic mattress and pillow products containing Tempur material to Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass are in violation of the provisions of the WDTPA.

370.     The publication and distribution of the false, deceptive and misleading material, the misrepresentations of material facts, and the sale of the Defendants' products within the State of Wisconsin all constitute unfair actions undertaken in trade and/or commerce.

371.     The statute of limitations was tolled by Defendants' fraudulent concealment of the characteristics, benefits, standards and quality of the said Tempur-Pedic products, the discovery rule, and/or the continuing violations rule.

372.     For the foregoing reasons, this Court may grant an injunction against the Defendants.

373.     Defendants' misrepresentations, concealments and unfair and deceptive acts or practices as set forth herein proximately caused pecuniary loss and/or damage to the Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass in that they purchased and/or have overpaid for the Tempur-Pedic mattresses and pillows.

374.     As a direct and proximate result of Defendants' misrepresentations, concealment and conduct, Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass are entitled to recover damages in the amount of twice their pecuniary loss, together with costs, including attorney's fees pursuant to Wis. Stat. § 100.20(5), for which damages and fees they are jointly and severally liable.

**TWENTY-SECOND  CAUSE OF ACTION**
**Asserted on Behalf of the Wisconsin Subclass**
**(Unjust Enrichment)**

375.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

376.    The Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, and Jerry and Diane Kucharski bring this claim on behalf of themselves and the Wisconsin Subclass pursuant to the common law doctrine of unjust enrichment.

377.    At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-Pedic mattresses and pillows.

378.    Defendants have been unjustly enriched by Consumer Representatives Brian and Sara Stone's, Kurt and Ericka Andersen's, Jerry and Diane Kucharski's, and the Wisconsin Subclass' purchases of Tempur-Pedic mattresses and pillows.

379.    Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass conferred a benefit, which benefit was not conferred gratuitously, on Defendants to Consumer Representatives Brian and Sara Stone's, Kurt and Ericka Andersen's, Jerry and Diane Kucharski's, and the Wisconsin Subclass' detriment through the purchase of Tempur-Pedic mattresses and pillows.

380.    Defendants appreciated the benefit of Consumer Representatives Brian and Sara Stone's, Kurt and Ericka Andersen's, Jerry and Diane Kucharski's, and the Wisconsin Subclass' purchases of Tempur-Pedic mattresses and pillows, and Defendants accepted and retained the benefit under inequitable or unjust circumstances as set forth in this Complaint.

381.    Defendants knew of the problems with Tempur-Pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski,

and the Wisconsin Subclass regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

382.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

383.    The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept and retain the benefit of these funds that it has unjustly obtained from Consumer Representatives Brian and Sara Stone's, Kurt and Ericka Andersen's, Jerry and Diane Kucharski's, and the Wisconsin Subclass' expense.  Defendants would be unjustly enriched if they were allowed to accept and retain such funds and, therefore, Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass are entitled to recover from the Defendants, by way of restitution and/or a constructive trust should be imposed on all monies wrongfully obtained by Defendants and their retail distribution network and the money should be ordered returned to Consumer Representatives Brian and Sara Stone, Kurt and Ericka Andersen, Jerry and Diane Kucharski, and the Wisconsin Subclass.

## TWENTY-THIRD CAUSE OF ACTION
### Unjust Enrichment – Nationwide Class Applying Kentucky Law

384.    The Consumer Representatives repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

385.    Each of the Consumer Representatives bring this claim on behalf of themselves and the Nationwide Unjust Enrichment Class pursuant to the Kentucky common law doctrine of unjust enrichment.

386.   Kentucky has a significant contact or significant aggregation of contacts, by each member of the Nationwide Class, such contacts creating state interests such that applying Kentrucky law to the Nationwide Unjust Enrichment claims is not arbitrary or unfair.

387.   As to the Nationwide Class claims for Unjust Enrichment, there exists no substantial burden to the Defendants to the application of Kentucky law to the Nationwide Class's claims for Unjust Enrichment.

388.   Applying the law of Kentucky to the Nationwide Class' Unjust Enrichment claims will further the interests of the State of Kentucky, and is therefore an appropriate one for this Court to apply to the Unjust Enrichment claims of the Nationwide Class.

389.   Variations among the state laws of the United States pertaining to Unjust Enrichment are not material, with the issue common to all Class Members of the Nationwide Class being whether the Defendants were unjust enriched from the sale of their products during the Class Period.

390.   At all times relevant hereto, Defendants designed, manufactured, marketed and sold Tempur-pedic mattresses and pillows.

391.   Defendants have been unjustly enriched by Consumer Representatives and the Nationwide Class' purchases of Tempur-pedic mattresses and pillows.

392.   Consumer Representatives and the Nationwide Class conferred a benefit at their expense upon the Defendants.

393.   There was a resulting appreciation of the benefits conferred by the Consumer Representatives and the Nationwide Class by the Defendants.

394.   Defendants accepted and retained the benefit under inequitable or unjust circumstances as set forth in this Complaint.

395.    Defendants knew of the problems with Tempur-pedic mattresses and pillows as set forth in this Complaint, but failed to disclose this material information and misled Consumer Representatives and the Nationwide Class regarding the nature, benefits, characteristics, uses, performance, and quality of Tempur-Pedic mattresses and pillows while profiting from this deception.

396.    The statute of limitations was tolled by Defendants' fraudulent concealment, the discovery rule, and/or the continuing violations rule.

397.    The circumstances are such that it would be unjust, inequitable, and unconscionable to allow Defendants to accept and retain the benefit of these funds that it has unjustly obtained from Consumer Representatives and the Nationwide Class.  Defendants would be unjustly enriched if they were allowed to accept and retain such funds and, therefore, Consumer Representatives and the Nationwide Class are entitled to recover from the Defendants, by way of restitution and/or a constructive trust should be imposed on all monies, including any price premium, wrongfully obtained thereby and the money should be ordered returned to Consumer Representatives and the Nationwide Class.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants for the following:

1.   An order certifying a ten (10) state consumer protection statute and unjust enrichment class action for the states of California, Illinois, Massachusetts, Maryland, Missouri, New Jersey, New Mexico, New York, Washington, and Wisconsin; an order certifying a Nationwide Unjust Enrichment Class, applying the law of the Defendants' home State of Kentucky, and appointing Alvin and Melody Todd, Robbie Simmons, Tina White, Keith Hawkins, Thomas Comiskey, Alan and Patricia Kaufman, Johnny Martinez, Julie Davidoff, Tracey Palmer, Toni Kibbee,

Brian and Sara Stone, Kurt and Ericka Andersen, and Jerry and Diane Kucharski, as representative plaintiffs, and appointing their undersigned counsel to be class counsel for the Class.

2.     Imposition of a constructive trust on, and restitution of, all amounts obtained by Defendants and their retail distribution network as a result of their misconduct, together with interest thereon from the date of payment, to all victims of such violations.

3.     All recoverable compensatory and other damages sustained by Plaintiffs.

4.     All punitive and exemplary damages allowed by law, as appropriate.

5.     Actual and/or statutory damages for injuries suffered by Plaintiffs in the maximum amount permitted by applicable law.

6.     An order (1) enjoining Defendants' wrongful, unfair, unlawful, fraudulent, and deceptive conduct as set forth above; (2) ordering Defendants to engage in a corrective notice campaign; and (3) requiring Defendants to refund Plaintiffs the funds paid to Defendants or their retailers for Tempur-pedic mattresses and pillows.

7.     Statutory pre-judgment and post-judgment interest on any amounts.

8.      Payment of attorneys' fees and costs as may be allowable under applicable law.

9.     Granting such other and further relief as this Court may deem just and proper.

The Consumer Representatives, individually and on behalf of all similarly situated persons, hereby demand a trial by jury on all issues so triable.

DATED:

By:   /s/  Allen M. Stewart
Allen M. Stewart (262594)
ALLEN STEWART, P.C.
Steve Baughman Jensen (Pro Hac Vice)
Stephanie Brooks Sherman (Pro Hac Vice)
325 N. St. Paul Street, Suite 4000
Dallas, Texas  75201
214/965-8700

214/965-8701 (fax)

Michael McShane (SBN 127944)
mmcshane@auditlaw.com
Jonas P. Mann (SBN 263314)
jmann@audetlaw.com
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
415/568-2555
415/ 568-2556 (fax)

SHIPMAN & WRIGHT
Gary K. Shipman (Pro Hac Vice)
William G. Wright (Pro Hac Vice)
Angelique Adams (Pro Hac Vice)
575 Military Cutoff Road, Suite 106
Wilmington, North Carolina 28405
910/762-1990
910/762-6752 (fax)

SIMON LAW FIRM, P.C.
John Simon (Pro Hac Vice)
Anthony Simon (Pro Hac Vice)
800 Market St.
St. Louis, MO 63101
314/241-2929
314/241-2029 (fax)

*Attorneys for Plaintiffs Alvin Todd, Melody Todd, Robbie Simmons, Tina White, Keith Hawkins, Thomas Comiskey, Dian Pace, Alan Kaufman, Patricia Kaufman, Johnny Martinez, Julie Davidoff, Tracey Palmer, Toni Kibbee, Brian Stone, Sara Stone, Kurt Andersen, Ericka Andersen, Jerry Kucharski, Diane Kucharski and the Proposed Class*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on _____ , 2015, I electronically filed the foregoing

4    document described as **PLAINTIFFS' THIRD AMENDED COMPLAINT** with the Clerk of

5    the Court using the CM/ECF System which will send notification of such filing via electronic

6    mail to all counsel of record.

7

8                              By:   /s/  Allen M. Stewart_____
                                     Allen M. Stewart (262594)
9                                    ALLEN STEWART, P.C.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28