"REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED"

# Exhibit 4

"REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED"

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Alvin Todd, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:13-cv-04984-JST |
| Tempur-Sealy International, Inc *et al,* | |
| Defendants. | |

Sur-Rebuttal Expert Report of Peter E. Rossi

**1. Overview and Summary**

In my report of July 2015, I outlined how I would estimate damages incurred by potential class members as a result of Tempur-Sealy International (hereafter, "Tempur") claims regarding the safety of the material used in manufacture of mattresses. In particular, I endorse a market price premium measure of damages. That is, the economic losses suffered uniformly by all proposed class members is the difference between the price they paid for their mattresses less the market price that would prevail in a world in which the Tempur claims were not present.   In addition, I considered the possibility that Tempur might be required to make a disclosure that Tempur mattresses may emit some amount of potentially harmful gases due to VOCs. In order to implement a market price premium measure of damages in this case, market prices would have to be computed for the disclosure state of the world.   Since the states of the world in which Tempur makes no safety claims or is required to make a disclosure did not occur in the class period, I proposed to estimate demand and supply conditions and simulate market prices.   Market demand in the unobserved states of the world would be estimated by using a conjoint survey.

Tempur's expert, James Langenfeld, agrees with my proposed theory of damages – namely that damages should be based on a market price premium (if any) for the Tempur claims. Dr. Langenfeld believes that market prices of Tempur mattresses observed after this lawsuit was filed[1] should be used as a proxy for the market price in the unobserved state of the world in which Tempur claims are removed and/or disclosures are made. Dr. Langenfeld does not provide an explanation as to what is the basis for his opinion and summarily dismisses my arguments as to why more recent market prices cannot be used.

---

[1] The disputed claims were removed after the filing of the lawsuit.

Tempur's expert, David Reibstein, is a not a qualified economist and offers no opinion regarding a valid economic theory of damages. Instead, Dr. Reibstein confines his opinions as to the feasibility and validity of my proposed conjoint survey.[2]  In spite of the widespread evidence to the contrary, Dr. Reibstein argues that conjoint cannot be used to evaluate products which have attributes which must be appreciated by "experiential" means. Dr. Reibstein believes that the comfort of a mattress can only be assessed by lying on the mattress and, therefore, any study of mattresses that does not allow for this "experience" is invalid.  Dr. Reibstein also contends that a conjoint study assumes awareness of each attribute and, therefore, that conjoint cannot be applied in situations where this assumption might be questionable.

In this report, I will show that Dr. Langenfeld's arguments have no basis in either fact or economic reasoning.  I will also explain that Dr. Reibstein's arguments that conjoint is inappropriate are incorrect and fly in the face of conjoint practice in both academe and in industry.

Not only do the defendant's experts criticize my proposed methodology but also appear to have already formulated opinions regarding the merits of this case.  Both Langenfeld and Reibstein believe that surveys done by the Blackstone Group for Tempur show that few, if any, consumers were exposed to the claims at issue. In short, both argue "no harm, no foul" and appear to suggest that the case should be dismissed even if the Tempur claims are shown to be false.  Dr. Langenfeld holds himself out to be an expert in both law and economics and appears to be arguing that the class should not be certified

---

[2] Dr. Reibstein appears to agree with Dr. Langenfeld's contention that recent market prices can be used to proxy for Tempur prices but-for the alleged mis-representations. In my opinion, in order for this assessment to receive weight, Dr. Reibstein would have to demonstrate a basis for expertise in economics.

based on the theory that consumer fraud is perpetrated *only* if all, or a vast majority, of class members are exposed to the alleged mis-representations.

I will leave it to the court to decide the validity of class certification as well as to be the ultimate interpreter of consumer fraud law.  However, I will explain that any results from the Blackstone surveys are wholly unreliable and invalid.  The Blackstone Group violated virtually every scientific standard in survey sampling.  In addition, it appears that neither Dr. Langenfeld nor Dr. Reibstein actually examined the data produced by the Blackstone surveys.  Even a cursory examination of this data shows ample evidence of consumer concern for health and safety issues.

## 2. Availability of Market Price Data for Damage Assessment

As I have explained above, a market price premium measure of damages requires an estimate of what market prices would have been "but-for" or absent the alleged mis-representations. There is only one state of the world that occurred during the proposed class period – the state of the world in which Tempur claims were made. Dr. Langenfeld gives the impression that it is possible to directly observe market prices in the but-for world in which no claims were made.  This is obviously false. In 2013, after the lawsuit was filed Tempur removed the claims from its website, sales training manuals, customer response scripts and advertisements.  What Dr. Langenfeld is proposing to do is to use the more recent prices to *estimate* market prices in the "but-for" world.  As his proposal is merely an estimate and not a direct observation of the relevant market price, he must justify his estimate as valid and reliable.

Dr. Langenfeld states in his report:

"Comparing prices during the period when the alleged claims were made to the period after they removed can provide actual market data that indicate whether it is

> likely (sic) that any reliable analysis of valuation would find all members of the proposed Class to have been affected by the statements and whether one can systematically and reliably estimate any damages on a classwide basis." P. 48

In this statement, Dr. Langenfeld confuses the problem of evaluating the validity of an estimate with the results of the estimation. That is, suppose we find that market prices fall dramatically after the claims are removed. Does this mean that we can use the difference (before – after prices) to estimate damages in a valid and logically coherent matter? The answer is absolutely not. By the same token, if we find no change in market prices before and after the claims are removed, this doesn't indicate anything about our ability to use the "after" market prices in damage calculations.

What Dr. Langenfeld does not understand is that our ability to use the "after" market prices depends crucially on the absence of other factors affecting demand. If there are other factors affecting demand in any material way, we simply cannot use the "after" market prices to estimate what would have occurred without the alledged mis-representations. In order to use market prices "after" claims were removed in 2013, Dr. Langenfeld must demonstrate that the demand conditions during the class period were identical to those conditions "after" the mis-representations were removed.

The class period is proposed to be from 2007 to 2013, a period in which the US suffered the most severe recession in post World War II history. Dr. Langenfeld acknowledges this in his deposition (p. 115). He also admits that, in recessions, demand for durable goods falls as consumers postpone purchases. Anyone who lived through the collapse of the real estate bubble, the stock market crash, and almost double digit unemployment knows that sales of all sorts of durable goods fell. In fact, the US government undertook a highly controversial bail-out of the largest US car manufacturer as car sales fell to historic lows.

4

Q: In a severe recession, how do consumers alter their spending?
A: … they will buy less of a variety of things.
Q: And it's also true that they are much more apt to postpone purchases of durable goods as long as they can still use their car, their refrigerator, their mattress, correct?
A: That can happen, yes."[3]

We do not have to take Dr. Langenfeld's word for the severity of the recession. US government statistics show the unemployment rate doubling from about 4.5 to over 8 per cent.  The consumer confidence index fell by more than one half.  What is even more striking about what macro-economists now call the "Great Recession" is not just the huge impact of the recession but the slow recovery from it.  Consumer confidence has not yet returned to pre-recession levels.  Unemployment in California did not return to pre-recession levels until 2015. Labor economists also point out that these official statistics mask the more pervasive "under-employment" problem.  In order to be included in unemployment statistics, one must be actively searching for a job.  The Great Recession drove many from the labor force and many of these workers have not yet returned.  Most importantly, from the point of view of mattress demand, the Great Recession reversed the trend of increasing home ownership.  Since WWII, the percent of U.S. adults owning their own homes had been increasing. After the Great Recession, that percentage has been declining.  This is particularly an acute problem in California where housing pricings are high relative to U.S. median housing prices.

Demand for mattresses in much of the proposed class period (from mid 2007 to at least end of 2011 or 2012) was depressed because of the Great Recession and slow recovery. This means this means that, in order to use the before – after price method advocated by Dr. Langenfeld, we must either adjust the before prices for the recession or adjust the after

---

[3] Deposition of Langenfeld, p.117

prices for the lack of a recession.  Such an adjustment might very well show a large difference in before/after prices.

Dr. Langenfeld makes no attempt to do so and, instead, advocates an even more extreme position – he claims there is little difference in before and after market prices and, therefore, there is no economic loss. This defies any economic logic.

What Dr. Langenfeld appears to be saying is – first, let's look at the raw (unadjusted) before and after market prices. If we see nothing there, then Rossi's proposed analysis must be "unreliable."  I must admit that I fail to understand Dr. Langenfeld's logic here. The before/after difference is confounded by the effects of the recession.  In fact, the finding of no difference could be consistent with a very large impact of the alleged mis-representations.

In order to make any sense out of Dr. Langenfeld's opinions, we must assume that the Great Recession had no affect on the prices of Tempur mattresses.  Dr. Langenfeld presents no evidence that the Great Recession had no affect on the mattress market. It is hard for me to understand how any one, much less a trained economist, could not have taken note of this time of economic devastation, home foreclosure, and widespread unemployment.

In his report, Dr. Langenfeld presents neither economic argument nor factual evidence that the Great Recession had no affect on the prices of mattresses. As an economist, Dr. Langefeld knows that the recession put downward pressure on the prices of mattresses. When pressed in his deposition, Dr. Langenfeld became confused. First, he agreed that when demand falls, prices also fall but then, given an opportunity reflect by his attorney, Dr. Langenfeld reversed himself.

> Q: What happens to the market price of a product when demand falls?
> A: Well, in general, …. What will happened, all else being equal which is obviously not always the case, .. you would anticipate price to fall, basic supply and demand.
> Q: Isn't it true that a price has to fall unless there's a horizontal supply curve?

> A: It depends on the market structure and a variety of other things. If it's an oligopoly, all bets are off, right?[4]

An oligopoly is defined as an industry in which there are a relatively small number of firms with high market share. Some call these industries – "highly concentrated" industries. Dr. Langenfeld is saying that in an oligopoly, equilibrium price does not fall when demand declines. This statement contradicts what we know from economic theory as well as what is assumed in the entire field of anti-trust economics. Any model of oligopoly price-setting will always have the property that, if the aggregate industry demand falls, equilibrium prices will fall. It is true that prices in equilibrium in an oligopolistic industry may be higher than in a perfectly competitive industry but this does not mean that prices won't fall when demand declines. Dr. Langenfeld makes a habit of asserting economic propositions without reference. The reason is that you can't find an authoritative economic reference (e.g. the *Handbook of Industrial Organization* or Tirole's classic book on IO) that would agree with Dr. Langenfeld regarding what happens to oligopoly pricing when demand fails.

## 3. Causation, Experimentation and Counterfactual Reasoning

Dr. Langenfeld raised the issue of causation at several points in his report and deposition. He is using the term "causation" as an economist and not was as lawyer, as he has no formal legal training. To social scientists, in general, and economists, in particular, causal reasoning has always been very important. Entire generations of economists have been trained to be sensitive to the problem of using observational data to infer causality. To take a classic example, we observe that college graduates earn much more, on a lifetime basis, than those with only a high school education. Is this because education "causes" or generates higher

---

[4] Deposition of Langenfeld, p. 117

earnings or because the set of people who are "selected" or go to college are different from those who only graduate from high school?  In other words, we can't simply subtract the average earnings of college graduates from those of high school graduates and call this the "effect of college."[5]

This is precisely what Dr. Langenfeld wants us to do.  To estimate the effect of Tempur's claims, he wants us to subtract the after price from the before market prices. This does not establish causality nor does it provide a valid estimate of the effect of the claims unless we can establish that all other determinants of price are equal or, at least, very similar in the before and after periods.

The fundamental problem of causal reasoning[6] is that we cannot observe what scientists call the "counterfactual."  That is, we can't observe what would happen for events that didn't occur.  We can define the effect of college education on an individual as the difference between what that individual would earn if he/she attended college and what that same individual would earn if he/she did not attend college. For any one person, we only observe one state (college/ no college) of the world, we do not observe the other state. Here we know what market prices prevailed in the class period, we do not know what market prices *would have been* if the Tempur claims were not made. This is the counterfactual. This is never observed.  Dr. Langenfeld proposes to use the "after" market prices to estimate this counterfactual. For the reasons I have outlined above, this is not a valid estimate of the counterfactual. Thus, Dr. Langenfeld fails to address the question of causation.

---

[5] This point is made in Josh Angrist's text, *Mostly Harmless Econometrics*, which has now become a standard text and one I use in my PhD classes.
[6] See, for example, Imbens and Rubin, *Causal Reasoning for Statistics, Social and Biomedical Sciences* (2015).

All scientists face this problem of causal reasoning. Randomized experimentation is one possible solution to the problem of obtaining valid causal estimates. Suppose we were able to take a set of U.S. children aged 10 years and randomly assign ½ of them to the "treatment" of a college education and ½ to the treatment of only high school. The randomized assignment of children insures that there are no systematic differences between those who receive the college education and those who do not. Therefore, we can compare the difference between the average earnings of those in our experiment who receive college educations with the average earnings of those who do not. This is a valid causal estimate. If this is large, we have established a causal connection between a college education and higher earnings.

Obviously, we can't do experiments like this in the U.S. and Josh Angrist and many other famous labor economists have struggled with this problem for many years. However, we can do randomized experiments in a survey context. For example, we can randomly expose some respondents to the claims or randomly add or subtract claims from each product in a conjoint survey. In fact, this is the essence of why conjoint surveys are so useful for causal inference. In my proposed conjoint survey, I will randomly expose respondents to claims. This provides a basis for valid causal reasoning.

Contrary to the opinion of the leading experts on causal reasoning in economics today, Dr. Langenfeld does not believe experimentation is the "gold standard" for establishing causation.

> Q: So you would disagree that random experimentation is the gold standard in any social science including economics for establishing causation?
> …
> A: Yeah, I would disagree with that as far as I understand it. [7]

---

[7] Deposition of Langenfeld, p. 126

Again, I am puzzled as to why Dr. Langenfeld does not embrace the standards for causal reasoning that have been advanced in economics and all of the social sciences in the last 20 years.

## 4. Reibstein's Opinions Regarding the Applicability of Conjoint

Dr. Reibstein is not a damages expert or an economist. Instead, Dr. Reibstein has been brought in specifically to critique my proposal to use conjoint as part of a procedure to estimate the price premium present (if any) from Tempur claims.  This puts Dr. Reibstein is a very awkward position.  He is a professor of marketing at the Wharton school.  He has taught, written about, and been immersed in conjoint analysis for more than 30 years. His colleague, Paul Green, is often considered one of the founders of conjoint analysis. Dr. Reibstein has seen conjoint analysis applied to an endless variety of products in commercial and educational applications.

Rather than simply critique my proposed conjoint on a variety of procedural, scientific, or statistical grounds, Dr. Reibstein stakes out an extreme position -- no form of conjoint analysis can be applied to this problem. For example, he states in his report that "conjoint analysis is an inappropriate tool (heading p.17)." He states that the reasons that conjoint is inappropriate are twofold: 1. Market data are available and 2. Mattress purchase decisions involve an "experiential" element that cannot be simulated.  As I have pointed out, Dr. Reibstein is not an economist and is not qualified to address the use of market price data.  Dr. Reibstein relies entirely on Dr. Langenfeld's contention that such data exists and is relevant.  As I have explained in detail in sections 2 and 3, Dr. Langenfeld does not have any relevant market price data as we do not observe the price of Tempur products during the class period without the claims. I have further explained why prices after the claims were

removed in 2013 cannot be used due to the impact of the Great Recession on demand for mattresses. Thus, we are left with only Dr. Reibstein's view that conjoint cannot be used for products have involve important features that are "experiential."

Dr. Reibstein explains that the decision processes for buying mattresses is complex (p. 20) and involves a number of steps such as visits to on-line web sites, store visits, recommendations of others. "In contrast, the decision to purchase toothpaste can be quite simple." (p. 20). Dr. Reibstein apparently has forgotten the vast array of products with complex decision processes that have been successfully studied with conjoint. The process of buying a car has all of the elements (and more) of the decision process for buying a mattress. Prospective car purchasers visit web sites, read reviews, go to showrooms, talk to salespeople and listen to friends. In fact, one can test drive a car which is more difficult to do with a mattress (to be sure, you can lie down on a mattress in the showroom but this may not simulate sleep). Cars are considerably more complicated objects that mattresses with safety, performance, styling and optional features (no one would seriously contend that style and aesthetics is as important in mattress purchases as car purchases).

Dr. Reibstein would have us believe that conjoint is not applicable to demand for cars. Nothing could be further from the truth. All car manufacturers routinely use conjoint to assess the demand for car features and to help price cars. For example, TNS works closely with both Audi and BMW on the styling and performance characteristics of cars. TNS knows that it is not necessary to test all features of cars or to simulate a showroom experience in order to use conjoint analysis. I would hazard a guess that Dr. Reibstein has mentioned in class at Wharton the classic conjoint study done by Mazda to help them design the sound of the Mazda Miata exhaust. Dr. Reibstein has been involved in smartphone patent litigation in which he has sponsored the use of conjoint. Smartphones have many

hundreds if not thousands of features, many of which involve physical interaction with the phone.

Dr. Reibstein is wrong that conjoint can only be used for products like toothpaste where the decision process is simple. Unless his own conjoint work and that of 10,000s of other studies is fatally flawed, Dr. Reibstein must concede that he is wrong regarding that conjoint cannot be used for high ticket items with complex decision processes.

The real cornerstone of Reibstein's argument is that one cannot design a useful conjoint for mattresses because consumers visit stores to try them out. This is a bit puzzling as consumers also visit car showrooms, electronics showrooms, and appliance showrooms. But Dr. Reibstein says that comfort is an important attribute for mattresses and the only way to assess comfort, according to Dr. Reibstein, is to lie down on the mattress. The only evidence that he presents that consumers actually do this are surveys done by the Blackstone Group, which he accepts uncritically. In fact, we really don't know how important show-room visits are in assessing comfort. It might well be that recommendations of friends and/or reviews are very informative.

But the real question is why does the presence of an attribute which must be "experienced" render any conjoint inapplicable? Dr. Reibstein does not answer this question. Dr. Reibstein does not explain why all of the conjoint research done to price and design cars is fundamentally wrong. Even more extreme than demand for cars are products that have only "experiential" attributes such as movies and amusement parks. Disney is one of the largest employers of UCLA Anderson MBA students and I have advised many student groups on the use of conjoint to price and design Disney parks. Greg Allenby's marketing text, *Seven Summits of Marketing Research*, uses amusement park surveys as the key example. Disney employees routinely use conjoint in their work. According to Dr.

12

Reibstein's logic, we could not use conjoint to measure the demand for amusement parks even though this is common practice.

Just to give Dr. Reibstein the benefit of the doubt, let us assume, for the moment, that comfort cannot be assessed without lying down on a mattress. Does this mean we can't use conjoint to assess the impact of Tempur claims on the demand for mattresses? Comfort is not the attribute or product characteristic we must evaluate in our damages analysis. The attribute we must evaluate is simply a text claim such as "free of formaldehyde and harmful VOCs." The fact that these claims are asserted via simple text phrases makes them ideal for the use of a conjoint survey administered over the internet. We can provide respondents with the exact phrases used by Tempur and, thus, precisely simulate the marketplace.

Dr. Reibstein argues that the comfort attribute cannot be evaluated accurately in a conjoint survey as comfort cannot be simulated without access to the physical products. His argument is incomplete – he must argue why this implies that *other* attributes cannot be evaluated in the proposed conjoint design. I can only guess that Dr. Reibstein's position is that comfort is an important attribute and that it's absence in a conjoint design renders that design inappropriate. Again, this is contrary to conjoint practice. We can use conjoint surveys to configure and price cars even without bringing survey respondents to showrooms. We can't simulate the smell of the upholstery but we can simulate choices among different materials and style of upholstery by simply showing the respondents pictures. In fact, almost all car manufacturer web sites feature a "build your own" or car configurator which is almost exactly like a conjoint environment – customers choose options to "build" their car.

In his deposition, Dr. Reibstein clarified his position on this:

"I think of the major issues is there is a dominant feature that is, and I've used the expression, an experiential feature, and if you omit that from the particular study that you will end up with results that are highly distorted …" p. 133

Thus, Dr. Reibstein takes the position that "comfort" is a dominant feature of a mattress and that any conjoint study of mattresses that does not include this feature would be "distorted."  Dr. Reibstein has done no research with consumers nor can he cite any research as to why he believes comfort is a "dominant" feature. Dr. Reibstein does not provide any academic references or citations or logical argument as to why this might be the case other than what social scientists call "mundane realism" namely that we need to simulate the exact choice process.  Again, either Dr. Reibstein is right and virtually all conjoint studies ever done on complex durable goods are invalid or Dr. Reibstein's claim is overwrought. It is ironic that one of the classic studies that spurred the use and further development of conjoint is the "Courtyard by Marriott" study done by Dr. Reibstein's colleague. Here a survey was done to design a moderate-priced business travelers' hotel.  The study used only written stimuli – no one was taken to a hotel to observe the proposed configurations or view guest rooms. Even more ironically, the comfort of the bed and bed linens is a huge product differentiator in this industry. Dr. Reibstein would be forced to argue that this classic study was invalid and his colleague should be censured (posthumously) for sponsoring shoddy research.

In his deposition, Dr. Reibstein was asked about the Courtyard by Marriott study and he stated and that respondents could easily recall their experiences in a wide variety of hotels (ref). By the same token, I propose to undertake a conjoint survey screened to those who have recently purchased a mattress. We can ask respondents to recall the comfort level of mattresses they considered and introduce this as an attribute even though it is not our focal attribute.  We are using their recollections of comfort levels in the same manner as Dr. Reibstein asserted his colleague was depending on recollections of hotel experiences.

14

Dr. Reibstein holds out toothpaste as an example of a product category in which conjoint can be applied in a reliable and valid manner. His argument is that the choice of toothpaste is a simple process and that toothpastes are characterized by well-defined, non-experiential attributes. Of course, this is not true. After all, just as we sleep on a mattress, we put toothpaste in our mouths several times or more per day. Clearly, the taste and texture of toothpaste is an important attribute that is "experiential." Yet, Dr. Reibstein clearly believes you can do a meaningful conjoint on toothpastes without including the taste attribute.

## 5. Reibstein's Technical Criticisms of My Proposed Damages Methodology

The damages methodology laid out in detail in my report is a two-part procedure. In the first part, I propose to undertake a conjoint study to assess the demand for various mattress product features. In the second part, I propose to use my own methodology published in the top peer-reviewed journal in law and economics to "simulate" or estimate the market price premium accorded the Tempur claims at issue in this matter. Dr. Reibstein is not a qualified economist and, therefore, confines his discussion to only the first part of my proposed damages methodology. Dr. Langenfeld is a professional litigation consultant and, therefore, may not be aware of the developments in the economics and statistics literatures that I develop and extend to apply to this problem. In this section, I will review Dr. Reibstein's more technical critiques of my proposed conjoint study, recognizing that the defendants have chosen not to critique the second half of my proposal.

Dr. Reibstein believes that most, if not all, proposed class members were not exposed to or aware of the Tempur claims. Dr. Reibstein relies exclusively on what has been

told to him regarding the content of the various Blackstone surveys.[8]   As I outline in section 6 below, the Blackstone surveys violate virtually every accepted principle of survey research and must be excluded as wholly unreliable.   Dr. Reibstein must concede that we do not know what proportion of the class members were exposed to the claims.   This means that Dr. Reibstein must retreat to position that conjoint assumes awareness of product features and we just can't assume this is true in this case.

Dr. Reibstein is technically correct that, in theory, conjoint surveys make respondents aware of attributes and their possible levels.   It is important to note that just because a respondent is aware of a feature does not mean that a respondent accords the feature value. All conjoint studies include features with varying degrees of awareness.   For example, Dr. Reibstein has undertaken conjoint studies of smartphone features.   It is well known that many smartphone users, if not most, only use a tiny fraction of the myriad of different features available to them.   The fact that there are books and videos designed to teach usage of smartphones implies that many consumers are not aware of all smartphone features.   This does not stop Dr. Reibstein and others from using conjoint methodology even in cases where a product feature/attribute may not be known.   The whole idea of conjoint is to simulate the choice environment in which these products are purchased. Typically, a relatively large (more than four) number of features is used in the conjoint exercise to avoid highlighting any one feature.

There are also ways to adjust results based on information regarding awareness. For example, if we are introducing a new product, it might be reasonable to assume that only those who saw advertisements for the new product would  purchase the product.   Estimates

---

[8] I must assume that Dr. Reibstein never looked at the Blackstone survey data or questionnaires. Dr. Reibstein claims to be an expert in survey and sampling methodology.  Anyone with even a superficial exposure to survey methodology would reject the Blackstone surveys. Dr. Reibstein, as an expert in survey research, would have immediately spotted these flaws had he had the opportunity to do so.

of exposure to the ad campaign designed to introduce the product can be used to scale estimates of demand stemming from the conjoint design.  Similarly, we can ask respondents about their exposure to the Tempur website and interaction with sales representatives to assess whether the awareness problem is severe enough to merit adjustment.

Dr. Reibstein criticizes my proposed design for by assigning a "large" number of levels for the proposed claims attributed.  This is a misreading of my report. In my report, I merely was trying to delineate the set of possible attribute levels. I did not mean to suggest that any survey I actually undertake would have a very large number of levels. I anticipate that my conjoint survey will have 3 or 4 levels for the claims attribute which will be the same number of levels as other attributes in the survey.

Dr. Reibstein also criticizes my report for lack of detail with respect to my proposed survey.  The goal of my report was to articulate an economic theory of damages and explain how conjoint might be used as part of a market price calculation. I outlined all aspects of the survey but, of course, I did not design a questionnaire or set a specific matrix or grid of possibilities for the conjoint.  As an expert in conjoint, Dr. Reibstein knows that this cannot be done prior to qualitative research using focus groups. As these focus groups had not yet been convened at the time of my report, it was not possible to give more detail than what was included in my report.

I am in the somewhat unusual position as having written two peer-reviewed articles on how to use conjoint for the exact purpose I proposed in my expert report. These articles provide not only the mathematical formulae but also explain exactly how the surveys must be designed an analyzed.  I provided citations and copies of these papers for Dr. Reibstein to review. I believe this provides a somewhat unprecedented (I've never seen an expert who "wrote the book" on a method, yet) level of detail.  In addition, any academic can request

the data and code underlying these articles if he/she would like. I presented a tutorial on this material at the last Sawtooth Software Conference (the leading conference at which conjoint methods are discussed, www.sawtoothsoftware.com/training/conferences) and provided slides as well as code to all participants that is also available.

Finally, Dr. Reibstein accuses me of having "inconsistent" positions on conjoint. This is not correct. It is true that I have criticized the conjoint analyses of other experts, as is my right to do so. I have found much of the conjoint work for litigation lacking in rigor and the requirements for a meaningful damages analysis. I outline the requirements for a conjoint analysis to be useful for a price premium theory of damages in my *Journal of Law and Economics* (2014) article. Many of the studies used in litigation do not meet these standards. For example, in patent litigation, there have been conjoint studies done without the "outside" or "none of the above" option and there also have been studies done with only one brand. By definition, these kinds of conjoint studies cannot be used as an input to market price or equilibrium computations.

I have been most critical of the use of Willingness To Pay as a method for valuing product features. For example, in the smartphone litigation, conjoint experts have made various WTP computations and found absurdly large damage numbers, e.g. a set of rather minor smartphone features could be worth over $100 which is more than 50% of the price of a phone. The reason is that WTP will always exceed the market price. As a result of my involvement in this litigation, I thought that, instead of just critiquing what others have done, I should offer a superior methodology which corrects the upward bias of WTP. This is why I wrote the articles that lay out the procedure for using market price calculations to value product features. Like Dr. Reibstein, I believe conjoint has a place in feature valuation

but it has to be part of a larger exercise that is well grounded in the fundamental principles of economics.

Dr. Reibstein points to my report in a fraud case brought against Phillip Morris in California. I made a number of critiques of a particularly appalling conjoint analysis. I explained that the survey did not actually test the accused mis-representation. Here I propose to directly test the mis-representation. The Plaintiffs' experts proposed a conjoint analysis which was fundamentally flawed, violating many if not all of the requirements I laid out in my article in the *Journal of Law and Economics*. Moreover, the Plaintiffs' expert proposed to use a Willingness To Pay measure of damages which I have already explained is biased. Finally, there was a great deal of highly relevant market place data which directly refuted the claims of the conjoint analysis. Here there is no relevant market place data.

Each situation must be evaluated on its own merits. What I have done throughout both my academic and litigation career is to articulate a set of rigorous scientific standards which can be examined by those who wish to evaluate whatever weight they feel is appropriate to accord my analyses. I hope this will elevate the discussion to a more objective evaluation of damages analyses rather than simply an assessment of the credibility of the damages expert.

## 6. The Blackstone Surveys

Both Dr. Reibstein and Dr. Langenfeld rely heavily on what they represent to be the results of consumer surveys done by the Blackstone Group on behalf of Tempur. For example, Dr. Langenfeld devotes almost 20 pages of his report to what he believes are the results of the Blackstone surveys and Dr. Reibstein devotes around 10 pages of his report to discussing his views on the Blackstone results.

Both Dr. Reibstein and Dr. Langenfeld represent the Blackstone surveys as showing: 1. Few purchasers of Tempur mattresses were exposed to the claims that the plaintiffs dispute. 2. Allergenic or chemical properties of mattress material are of secondary[9] or minimal importance.   It is not clear how these claims are relevant to a critique of my proposed damages methodology. It would seem that these claims might be more relevant to the merits of the case.

However, it appears that neither Dr. Reibstein nor Dr. Langenfeld examined the actual data collected from the Blackstone surveys or the questionnaires. Even a cursory examination of the Blackstone surveys shows that this data is wholly unreliable and collected under conditions that violate virtually every known principle of survey design.  Dr. A. Rossi provides an extensive discussion of the many fatal flaws of the Blackstone surveys so I will not be redundant except to note:

1. ███████████████████████████████████████ ███████████████████████████████████ This is not a representative sample and the defendant's experts have not introduced a single piece of affirmative evidence to the contrary.

2. Severe sample selection biases were introduced by Blackstone survey samplers. For at least one of the four surveys, ██████████████████████ ████████████████████████ were excluded from the sample.

3. ███████████████████████████████████████ introducing the potential for severe missing value problems.

4. ████████████████████████████████████████ ████████████████████████████████████

---

[9] The defendants' experts appear to be arguing here that the only features of a product which can have value are the most important features. This is clearly wrong.

███████████████ Respondents could simply be trying to please the interviewer and not report their true preferences.

5. ████████████████████████████████████████. It is entirely possible that many respondents became frustrated with the length of the survey and terminated. Their responses were not included in the data.

6. ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████

7. The Blackstone group failed to record the actual responses made. Instead they engaged in arbitrary paraphrasing of the answers.


Drs. Langenfeld and Reibstein failed to note that what they are representing as the "results" of the Blackstone surveys was only the results of one question ███████████████ ████████████████████████████ They did not look at the actual data but, instead, accepted a representation that respondents rarely or never listed allergenic or chemical properties as concerns or reasons. Analysis by Dr. A. Rossi shows that ████████████████████████████████████████████████ ████████████████████████████████ Thus, it is not true that respondents never or seldom mentioned ████████████████ in their responses to the flawed Blackstone surveys. On the flip side, ████████████████████ ████████████████████████████████████████████ This is a direct confirmation that many respondents were aware of some of the disputed claims.

The long and short of it is that the Blackstone surveys do not meet any accepted standard for survey research and should not be relied upon. Certainly, these surveys have no bearing on the validity of my proposed conjoint and market price calculation to assess damages.

### 7. Disclaimers

Counsel for the Plaintiffs asked me to consider the impact not only of removing alleged false representations but the possibility that Tempur might be required to place disclaimers on their products that the mattress material may "emit small amounts of formaldehyde and other harmful VOCs." This is a state of world that has never occurred. By definition, there is no market price data for this state of the world. This means that an estimate of the market price in the disclaimer state of the world must be obtained. The only scientifically valid way I know to do so is by adding the disclaimer state of the world to the set of possibilities in a conjoint survey.

It appears then that Dr. Reibstein is saying that there is no possible way to compute damages, at least in the for the situation in which disclaimers might be required. This is not a tenable position.

Respectfully submitted,

July 18, 2016