UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVIN TODD, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>TEMPUR-SEALY INTERNATIONAL, INC., et al.,<br><br>  Defendants. | Case No. 13-cv-04984-JST<br><br>**ORDER DENYING MOTIONS TO STRIKE**<br><br>Re: ECF Nos. 227, 228 |

Before the Court are Defendants' two Motions to Strike expert opinions, ECF Nos. 227, 228, filed in support of Plaintiffs' Motion for Class Certification, ECF No. 145. The Court will deny the Motions to Strike. Class certification will be addressed in a separate order.

## I. BACKGROUND

Plaintiffs[1] bring this action on their own behalf and on behalf of a putative class of purchasers of Tempur products against Tempur-Sealy International, Inc. and Tempur-Pedic North America, LLC (collectively "Defendants") for claims arising out of Defendants' marketing and sale of mattresses, pillows, and other bedding products containing Tempur material. Specifically, Plaintiffs allege that Defendants' representations of their Tempur products as "formaldehyde free," "free of harmful VOCs," "allergen and dustmite resistant," "hypoallergenic," and with a "completely harmless" odor, are false and misleading. ECF No. 156 ("TAC") ¶¶ 3(h), 3(m), 3(n), 4. Plaintiffs allege that Defendants knew their products did not conform to these representations because internal testing revealed that Defendants' products off-gassed many VOCs, including

---

[1] Currently, the Plaintiffs include: Alvin and Melody Todd, Brian and Sara Stone, Robbie Simmons, Thomas Comiskey, Toni Kibbee, Tina White, Johnny Martinez, Keith Hawkins, Patricia and Alan Kaufman, Jerry and Diane Kucharski, Julie Davidoff, Ericka and Kurt Anderson, and Tracey Palmer.

formaldehyde, which can cause allergic reactions. Id. ¶ 4. Further, Plaintiffs claim that Defendants were aware of customer complaints about the odor and correlating physical symptoms such as headache, nausea, asthma, eye and throat irritation, and allergic reactions. Id.

Plaintiffs originally filed their Motion for Class Certification on August 7, 2015, ECF No. 145, but briefing was later stayed in light of additional motions to amend the pleadings and to dismiss. See ECF No. 157. When briefing resumed, Defendants filed two Motions to Strike the opinions of Dr. Michael DiBartolomeis and Dr. Susan Kegley, experts whose opinions Plaintiffs had submitted in support of the Motion for Class Certification. ECF Nos. 227, 228.

## II.   JURISDICTION

Pursuant to the Class Action Fairness Act, the Court has jurisdiction over this case, as a class action in which a member of the class of plaintiffs is a citizen of a state different from any defendant, there are more than 100 class members nationwide, and the matter in controversy exceeds the sum of $5 million, exclusive of interests and costs. 28 U.S.C. § 1332(d).

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In the Ninth Circuit, Rule 702 "contemplates a *broad conception* of expert qualifications." Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004) (emphasis in original) (quoting Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

1  evidence." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993); see also Primiano v.
2  Cook, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by
3  cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). To
4  testify as an expert, an individual "need not be officially credentialed in the specific matter under
5  dispute." Massok v. Keller Indus., Inc., 147 F. App'x 651, 656 (9th Cir. 2005) (citing United
6  States v. Garcia, 7 F.3d 884, 889-90 (9th Cir. 1993)).

7  On the other hand, "[u]nder Daubert, the trial court must act as a 'gatekeeper' to exclude
8  junk science that does not meet Federal Rule of Evidence 702's reliability standards." Ellis v.
9  Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011) (citing Kumho Tire Co. v. Carmichael,
10 526 U.S. 137, 145, 147-49 (1999)). To satisfy Daubert, scientific evidence must be both reliable
11 and relevant. 509 U.S. at 590-91, 597. The proponent of the expert's testimony bears the burden
12 of proving admissibility. Lust By & Through Lust v. Merrell Dow Pharm., Inc., 89 F.3d 594, 598
13 (9th Cir. 1996).

14 The law pertaining to Daubert's reliability prong has been summarized as follows:

> Reliable testimony must be grounded in the methods and procedures of science and signify something beyond "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. The inferences or assertions drawn by the expert must be derived by the scientific method. Id. In essence, the court must determine whether the expert's work product amounts to "'good science.'" Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II") (quoting Daubert, 509 U.S. at 593). In Daubert, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community." Daubert, 509 U.S. at 593-94. The Supreme Court emphasized the "flexible" nature of this inquiry. Id. at 594. As later confirmed in Kumho Tire, "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination." 526 U.S. at 141-42.

Abarca v. Franklin Cnty. Water Dist., 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011). "The relevance prong under Daubert means that the evidence will assist the trier of fact to understand or determine a fact in issue." Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1154 (E.D.

1   Wash. 2009) (citing Daubert, 509 U.S. at 591-92).

## IV.   DR. MICHAEL DIBARTOLOMEIS

Dr. Michael J. DiBartolomeis, an expert in toxicology and public health, runs the California State biomonitoring program and the exposure assessment section of the California Department of Public Health.  ECF No. 236-3 at 3-4.  Dr. DiBartolomeis completed a report, a supplemental report, and a deposition for this case between June and August 2015.  ECF No. 227 at 6.  Defendants argue that the following four opinions should be stricken from Dr. DiBartolomeis's report: "(1) that the defendants' products contain harmful chemicals and 'off-gas' VOCs . . . ; (2) That 'free of', as used in defendants' advertising, should mean absolutely zero presence of the chemical or VOC in question . . . ; (3) That the defendants failed to substantiate the claim that their products are 'free of harmful VOCs' . . . ; [and] (4) That consumer complaints received by the defendants and posted online are 'consistent with' the reactions expected from VOCs."  Id.

### A.   Opinion on the Presence of Harmful Chemicals

Defendants argue that Dr. DiBartolomeis's testimony that Defendants' products contain harmful chemicals and VOCs is unreliable, for three reasons: (1) data regarding dose and exposure are necessary for a reliable opinion on causation; (2) the "no safe dose" theory does not meet the Daubert standard; and (3) government standards do not establish a dose threshold for purposes of Daubert.  See ECF No. 227 at 10-13.  The Court concludes Dr. DiBartolmeis's opinions regarding the presence of harmful chemicals are admissible.

#### 1.   Need for Identification of Dose

Defendants contend that Daubert requires the identification of a particular dose or level of exposure before an expert may provide testimony that harmful chemicals caused an injury.  As Plaintiffs explain, however, Dr. DiBartolomeis "is not opining on whether a particular chemical *caused* a particular injury." ECF No. 236 at 12 (emphasis added).  Rather, Dr. DiBartolomeis "is offering opinions regarding the toxicological properties of various chemicals," and opining that his analysis indicates those chemicals are present in Defendants' products.  Id.  As he states in his report, "it can be concluded from the available toxicity data that there are individual chemicals

4

1 present in Tempur-Pedic products and materials that have a reasonable potential to cause harm or
2 to have caused harm." Id. Although he states that "in general, these chemicals . . . are known to
3 cause, are likely to cause, or are expected to cause one or more adverse health effects," he does not
4 allege that such chemicals caused a particular injury or injuries.

5       For this reason, Defendants' argument that Dr. DiBartolomeis must identify a particular
6 dose is unpersuasive. None of Defendants' out-of-circuit cases apply here, because they all
7 involve experts who sought to opine on causation. See Wright v. Willamette Industries, 91 F.3d
8 1105, 1108 (8th Cir. 1996) ("Dr. Peretti's testimony regarding the probable *cause* of the Wrights'
9 claimed injuries was simply speculation." (emphasis added)); Seaman v. Seacor Marine LLC, 326
10 F. App'x 721-22 (5th Cir. 2009) (excluded expert was offered as plaintiff's "sole causation expert"
11 but failed to "establish general causation"); Bland v. Verizon Wireless, LLC, 538 F.3d 893 (8th
12 Cir. 2008) (expert was excluded from "us[ing] a differential diagnosis to establish the inhalation or
13 ingestion of Freon *caused* Bland's exercise-induced asthma" (emphasis added).

14         **2.    The "No Safe Dose" Theory**

15       Defendants claim that Dr. DiBartolomeis's testimony regarding the presence of harmful
16 chemicals and VOCs is unreliable under the Daubert standard because he offers the opinion that
17 "there is 'no safe' dose for carcinogens." ECF No. 227 at 12. They contend that "courts have
18 soundly rejected the no threshold theory even in the case of carcinogens," and again cite to cases
19 from other circuits. Id. However, as with their first argument, Defendants conflate the idea of
20 *toxicity* with the idea of *causation*. Dr. DiBartolomeis is not testifying that the VOCs in
21 Defendants' products caused Plaintiffs' injuries. Rather, he states that "[c]arcinogens (and some
22 chemicals that cause non-cancer health effects even at the lowest doses such as the heavy metal
23 lead) do not exhibit thresholds for toxicity and therefore any level of exposure *has the potential* to
24 cause harm. Chemical carcinogens that cause genetic damage or mutations in DNA *are thought to
25 have no safe dose of exposure.*" ECF No. 131-11 at 46. This testimony is supported by a
26 reputable treatise in the field of toxicology. Defendants' cases all address situations in which an

expert is opining on causation, and are not relevant here.[2]

### 3. Governmental Standards and Regulations

Defendants argue that DiBartolomeis's opinion that harmful chemicals are present should be excluded because it relies on "government standards and regulations," ECF No. 227 at 13, which they claim "are not a reliable substitute for a dose threshold when determining causation of harm." ECF No. 227 at 14. Once again, Defendants mischaracterize Dr. DiBartolomeis's opinion. His testimony is based on multiple sources, including "toxicological reviews in the peer-reviewed literature" and "reports from cancer bioassays, journal articles from the peer-reviewed literature, and chemical testing data submitted by chemical manufacturers." ECF No. 131-11 at 22.

Moreover, as stated above, Dr. DiBartolomeis has not sought to opine that chemical exposures at levels in excess of governmental regulations caused plaintiffs' injuries.[3] Instead, he merely notes "that all of the 25 representative chemicals [selected from the plaintiffs' tests] have been identified by at least one governmental agency or governmental research institute as being or having the potential to be harmful to humans based on a thorough review and evaluation of the available scientific evidence for each chemical as noted in the profiles for each chemical." ECF No. 131-11 at 26. These opinions are sufficiently reliable under Daubert.

### B. Definition of "Free of"

Dr. DiBartolomeis testified in deposition that "free of, as used in Defendants' advertising, should actually mean the product is free of the chemical or VOC in question." Defendants argue that this testimony should be stricken because it "is based upon personal opinion and is therefore irrelevant." ECF No. 227 at 14.[4]

DiBartolomeis's testimony is based on more than his personal opinion. He also relied on

---

[2] The Court can imagine a personal injury or mass tort case where the testimony might be excluded because of the risk that it might be interpreted as causation testimony even though it was not offered for that purpose. Because Plaintiffs are not suing for personal injury, that danger is not present here.

[3] Plaintiffs are not making personal injury claims. See note 2, supra.

[4] The opinion being challenged here appears only in Dr. DBatolomeis's deposition; Defendants do not cite to his expert report. See id. at 15.

6

his "'public health expertise' as a public health official for the State of California – as research scientist manager running the California State biomonitoring program as well as the exposure assessment section of the California Department of Public Health." See ECF No. 236 at 17. Moreover, Plaintiffs argue that "it is necessary for [Dr. DiBartolomeis] to express his understanding of the definition of a product that is 'free of' toxins in order to offer his opinions that the Tempur products are not 'free of' toxins." Id. at 18.  Defendants do not challenge Dr. DiBartolomeis's professional expertise or experience, or argue that they constitute an insufficient basis for his opinion.

This opinion is sufficiently reliable under Daubert.

### C. Opinion Regarding Substantiation of "Free of Harmful VOCs"

Defendants argue that Dr. DiBartolomeis's testimony that Defendants failed to substantiate their marketing claims "should be excluded because it is irrelevant to the issues in this case." ECF No. 227 at 16.  Though Defendants do not cite any part of Dr. DiBartolomeis's report that they wish to strike, they appear to be referring to Section 4 of the report, which examines whether Tempur-Pedic's claim "that their products are 'free of harmful VOCs' . . . is scientifically substantiated." ECF No. 131-11 at 40.

Once more, Defendants have misrepresented Dr. DiBartolomeis's opinions.  It is clear that Dr. DiBartolomeis is not commenting on Defendants' marketing, but rather is examining the toxicological data that underlie Defendants' claims, a scientific inquiry that is well within the scope of his toxicological expertise. See id.  Section 4 is an integral part of Dr. DiBartolomeis's analysis of the presence of harmful VOCs in Defendants' products.  As such, it is clearly "relevant to the task at hand" and "logically advances a material aspect of the proposing party's case." In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1171 (N.D. Cal. 2007).

### D. Opinion that Consumer Complaints Are Consistent with Reactions to VOCs

Defendants argue that "[Dr.] DiBartolomeis' opinion that consumer complaints are consistent with expected chemical reactions *and* responses fails the Daubert test because it is based on unreliable data." ECF No. 227 at 17.  In particular, Defendants argue that Dr.

7

1  DiBartolomeis's use of "uncontrolled, anecdotal consumer complaints – many of which were
2  gleaned from anonymous posts on the internet" is unreliable because the complaints have not been
3  evaluated for credibility. Id. at 18.

4  Defendants again mischaracterize Dr. DiBartolomeis's opinion. Dr. DiBartolomeis's
5  report makes clear that he is only opining that the stated complaints are *consistent* with exposure
6  to VOCs, not that the complaints themselves are credible and reliable. See, e.g. ECF No. 131-11
7  at 76-78. Indeed, whether the consumer complaints are in fact accurate reports is irrelevant to Dr.
8  DiBartolomeis's conclusions. Notably, Defendants ask that Dr. DiBartolomeis's opinion that
9  consumer complaints are consistent with expected chemical reactions be stricken, but do not ask
10 that the consumer complaints themselves be stricken. ECF No. 227 at 17.

11 In contrast, Defendants' out-of-circuit cases involve expert reports that relied directly on
12 the consumer complaints themselves to reach a substantive opinion. See McClain v. Metabolife
13 Int'l, Inc., 401 F.3d 1233, 1250 (11th Cir. 2005) ("Uncontrolled anecdotal information offers one
14 of the least reliable sources to justify opinions about both general and individual causation . . . yet
15 O'Donnell relies on them in a significant way."); Rhodes v. Bayer Healthcare Pharm., Inc., No.
16 CIV.A. 10-1695, 2013 WL 1289050, at *5 (W.D. La. Mar. 26, 2013) ("Dr. Hamilton's *reliance* on
17 adverse event reports is also unimpressive . . . ." (emphasis added)).

18 For all of these reasons, Defendants' Motion to Strike Dr. DiBartolomeis's expert opinions
19 is denied.

20 **V.    DR. SUSAN KEGLEY**

21 Dr. Susan Kegley is a "Principal and CEO of Pesticide Research Institute, Inc.," which is
22 an "environmental consulting firm." ECF No. 237-1 at 4. Plaintiffs offer her opinions in support
23 of their contentions that Defendants' products contain and emit a variety of harmful chemicals.
24 ECF No. 196 at 5; see also ECF No. 145-10. Defendants seek to strike Dr. Kegley's report and
25 opinions based on general challenges to her expertise as well as specific challenges to particular
26 opinions.

27 **A.    Dr. Kegley's Qualifications**

28 Defendants first argue that Dr. Kegley is not qualified to offer an expert opinion on the

chemicals in their products. ECF No. 228 at 9. They contend that, "[a]lthough Dr. Kegley has a Ph.D in organic chemistry, she has spent her career focusing on pesticides." Id.

To qualify as an expert, a witness must have "knowledge, skill, experience, training, or education" relevant to such evidence or fact in issue. Fed. R. Evid. 702. Here, Defendants do not explain why Dr. Kegley's extensive experience studying toxic chemicals is relevant to the study of pesticides, but not household products. They do cite three cases as support, but none of them were decided on facts comparable those here. In United States v. Chang, 207 F.3d 1169, 1172 (9th Cir. 2000), an expert was excluded because he had experience in "international finance" but sought to opine on whether "a particular security is counterfeit." In Sigler v. Am. Honda Motor Co., 532 F.3d 469, 479 (6th Cir. 2008), an expert with expertise as an automobile mechanic was excluded from offering opinions on "potential defects in the airbag" and "accident reconstruction" such as "estimating the speed at which Sigler's vehicle was traveling when it struck the tree." Finally, in Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., LP, No. CIV-04-191-D, 2008 WL 7489089, at *1 (W.D. Okla. July 22, 2008), the district court did not analyze the excluded expert's background, but rather relied on the fact that the expert "readily admits he is not qualified as an expert by education or experience." None of these cases involved an expert, such as Dr. Kegley, with qualifications in the same or a directly-related field.

Of course, Defendants are permitted to argue that Dr. Kegley's opinion has less persuasive value because her past experience involves pesticides rather than mattresses. But this is a topic for "[v]igorous cross-examination." Daubert, 509 U.S. at 596. Presumably, such cross-examination would offer reasons why the distinctions between pesticides and mattresses render Dr. Kegley's opinions unreliable. Defendants, however, offer no such reasons here. The Court therefore rejects their argument that Dr. Kegley is unqualified.

### B. Opinions Regarding Absorption

Defendants next challenge Dr. Kegley's opinion that a claim by an opposing expert "that the source of VOCs was not Tempur materials or the manufacturing process, but the environment instead" is implausible. ECF No. 145-10 at 15. Defendants contend that Dr. Kegley relies on a formula for calculating absorption from the air, but that she has "never used this formula before,"

and that she applies it imprecisely. ECF No. 228 at 11. Specifically, they contend that she applies it to formaldehyde when it was not designed for that purpose, id. at 12, that she performs a calculation incorrectly, id., and that her data is insufficient because she does not fully account for various factors, such as the number of forklifts used in Defendants' warehouses, id. at 13-15. They repeatedly point to her testimony, in her deposition, that this calculation was "back-of-the-envelope" and not "super precise" as evidence that her calculations were unreliable. See id.

The testimony identified by Defendants does not support their position. In her deposition, Dr. Kegley describes her opinion as follows:

> This is a back-of-the-envelope calculation. That's I would say within an order of magnitude – I'm not trying to be super precise here, but what I'm trying to show is the amount that ends up in foam couldn't possibly be introduced from the environment. There just isn't enough in the environment.

ECF No. 243 at 49. Dr. Kegley's goal is not precisely to identify the degree or rate at which chemicals are absorbed by Defendants' mattresses, but rather to rebut a theory that absorption from the environment is the main source of chemicals within the mattresses. See ECF No. 145-10 at 13 ("To determine if Mikkelsen's hypothesis is correct, we must ask what the value of K is for the VOCs found in the emission studies. To phrase it another way, are the VOCs absorbed to a great extent or a small extent by the foam?"). To that end, Dr. Kegley's report openly acknowledges that her calculations regarding environmental factors are approximate. See, e.g., id. ("I assumed approximately 10,000 square feet of the space was used as storage, a conservative estimate that would result in a high-end estimate of concentration in the warehouse air.").[5]

If Defendants intend to argue that Dr. Kegley's calculations were inadequate to justify even her "estimate" – for example, by assuming Defendants use fewer forklifts than they actually do, ECF No. 228 at 13 – this argument should be raised on cross-examination, not at the Daubert stage. Alternatively, if Defendants intend to argue that Dr. Kegley's conclusions, by virtue of not

---

[5] In regards to Dr. Kegley's mathematical error, Plaintiffs acknowledge this but contend it was a "unit conversion error, not a conceptual one," and that technical errors are not cause for excluding an entire opinion. ECF No. 237 at 18. In regards to the applicability of the formula, they argue that the formula is in fact "a basic application of thermodynamics," and point out that Defendants offer no reason why it would be applicable to other chemicals but not to formaldehyde. Id. Both arguments are persuasive.

being exact, are not relevant to the case, this too is incorrect. Dr. Kegley's opinion that "the amount [of VOCs] that ends up in foam couldn't possibly be introduced from the environment" is obviously relevant to Plaintiffs' claims. ECF No. 243 at 49.

### C. Chamber Emission Testing

Defendants also contend that Dr. Kegley's opinions based on chamber emission testing is irrelevant because testing in a controlled chamber is not "representative of real-world, dynamic environments such as a house or apartment." ECF No. 228 at 16. They argue that because of the "inherent variability between each consumer's home, chamber testing is irrelevant to the issue of whether and to what extent any Tempur mattress or pillow emits VOCs or formaldehyde in a consumer home." Id. at 228.

Once again, Defendants raise an issue in a motion to strike that is better saved for cross-examination. Chamber testing may or may not replicate every feature of a home environment, but it is certainly a stretch to declare chamber testing *irrelevant* given that Defendants also acknowledge the "inherent variability" between different consumers' homes. As Plaintiffs point out, some of the studies on which Dr. Kegley relied were conducted by Defendants themselves. ECF No. 237 at 23.[6]

Defendants also point to a number of alleged flaws in Dr. Kegley's opinion "that the emissions found in chamber testing are the result of impurities in the raw materials used to manufacture [Tempur] foam," and declare that these flaws make her opinion relevant. ECF No. 228 at 17-19. These alleged flaws include that Dr. Kegley did not account for purported differences between Defendants' products and "generic" polyurethane foam, id. at 18, or that Defendants use specially manufactured chemicals, rather than "off-the-shelf" ones to make their foam, id. Again, these are points to be made during cross-examination. They do not render Dr.

---

[6] Defendants cite several out-of-circuit cases in support, but these cases are not applicable. They cite, for example, a case involving an expert who sought to opine on the physical characteristics of a surgical mesh product but never examined the product itself or literature concerning it, In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig., 711 F. Supp. 2d 1348, 1373 (M.D. Ga. 2010), and a case in which an expert opined on defects in the assembly of a handheld torch but never conducted "any independent investigation into the process," Shalaby v. Irwin Indus. Toll Co., No. 07CV2107-MMA BLM, 2009 WL 7452756, at *4 (S.D. Cal. July 28, 2009).

11

Kegley's report inadmissible.

### D. Opinion that Defendants' Statements are "Scientifically Indefensible"

Finally, Defendants argue that Dr. Kegley's opinion that "it is scientifically indefensible to declare Tempur-Pedic's products 'free of formaldehyde or other harmful VOCs" must be stricken. ECF No. 228 at 20; see also ECF No. 145-10 at 21. They contend that Dr. Kegley is offering a legal conclusion, and that her opinion regarding potential harms to consumers is unreliable because she is not "a toxicologist or medical doctor." Id. at 20-21. Finally, they contend that she, like Dr. Bartolomeis, is improperly relying on consumer complaints. Id.

None of these arguments are persuasive. It is not clear to the Court why Defendants believe that Dr. Kegley offers a legal conclusion by stating that something is "scientifically indefensible." Much like Dr. Bartolomeis, Dr. Kegley makes clear that her opinion in this section of her report is a scientific one. See ECF No. 145-10 at 21-28. Similarly, Plaintiffs point out that Dr. Kegley in fact relies on a number of other sources, including Dr. Bartolomeis's report, for her conclusion that Defendants' products contain harmful substances. ECF No. 237 at 28; see also ECF No. 145-10 at 32-33. Lastly, as with Dr. Bartolomeis's opinion, Defendants misconstrue Dr. Kegley's reliance on consumer complaints. Like Dr. Bartolomeis, Dr. Kegley concludes that the consumer complaints are consistent with her findings, not that the complaints themselves are reliable. See ECF No. 145-10 at 33. For the reasons stated above, this opinion is admissible.

For all of these reasons, Defendants' Motion to Strike Dr. Kegley's expert opinions is denied.

### CONCLUSION

Defendants' Motions to Strike are both denied.

IT IS SO ORDERED.

Dated: September 28, 2016

JON S. TIGAR
United States District Judge